

Sept. 12, 2024

**VIA ACMS**
Ms. Molly C. Dwyer
Clerk of the Court
U.S. Court of Appeals for the Ninth Circuit
95 Seventh Street
San Francisco, California 94103

   Re:  No. 24-684, *In re United States*

Dear Ms. Dwyer:

   Real Parties in Interest (Plaintiffs below) respectfully advise the Court that Plaintiffs have this morning filed in the Supreme Court of the United States a petition for a writ of mandamus to the United States Court of Appeals for the Ninth Circuit. A copy of Plaintiffs' mandamus petition is filed herewith as Exhibit 1. Proof of service of that petition is attached as Exhibit 2, and a certificate of word count is attached as Exhibit 3.

        Sincerely,

        *s/ Julia A. Olson*
        JULIA A. OLSON
        (OSB No. 062230, CSB No. 192642)
        Our Children's Trust
        1216 Lincoln Street
        Eugene, OR 97401
        Tel: (415) 786-4825

        PHILIP L. GREGORY
        ANDREA K. RODGERS

        *Attorneys for Real Parties in Interest–*
        *Plaintiffs*

cc: All counsel via ACMS

Attachments

No. 24-___

In the

# Supreme Court of the United States

---

IN RE KELSEY CASCADIA ROSE JULIANA, *et al.*,

*Petitioners.*

---

On Petition for a Writ of Mandamus to the
United States Court of Appeals for the Ninth Circuit

# PETITION FOR A WRIT OF MANDAMUS

Philip L. Gregory
Gregory Law Group
1250 Godetia Drive
Redwood City, CA 94062

Andrea K. Rodgers
Our Children's Trust
3026 NW Esplanade
Seattle, WA 98117

Julia A. Olson
   *Counsel of Record*
Our Children's Trust
1216 Lincoln Street
Eugene, OR 97401
julia@ourchildrenstrust.org
(415) 786-4825

117097



COUNSEL PRESS

(800) 274-3321 • (800) 359-6859

*i*

## QUESTION PRESENTED

When this now nine-year-old case was before the Court in 2018, this Court denied the Government's application for a stay of proceedings in the district court pending disposition of the Government's 2018 petition for a writ of mandamus in this Court. Case No. 18A410. This Court found "the Government's petition for a writ of mandamus does not have a 'fair prospect' of success in this Court . . . . " App. 167a. In denying the requested stay without prejudice, this Court instructed that the conditions set forth in *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 380–81 (2004) ("*Cheney*") dictate whether a petition for a writ of mandamus may be granted. App. 165a–66a, 168a.

In response to the Government's fifth petition for a writ of mandamus in the Ninth Circuit to reverse the district court's interlocutory orders granting Plaintiffs leave to amend and denying in part the Government's motion to dismiss Plaintiffs' second amended complaint, a motions panel of the Ninth Circuit (the "panel") issued a writ of mandamus to the district court to dismiss. The panel did so, however, without applying or finding satisfied the three conditions set forth in *Cheney*, contravening this Court's prior instruction and the final judgment rule.

The question presented is whether a writ of mandamus should issue directing the Ninth Circuit to vacate its writ of mandamus and remand to the district court, where the Ninth Circuit exceeded its prescribed jurisdiction under 28 U.S.C. § 1651 by ignoring the mandatory *Cheney* conditions and reviewing de novo two district court orders

*ii*

that are fully reviewable on direct appeal under 28 U.S.C. § 1292(b) with no cognizable harm to the Government, thereby depriving Plaintiffs of their clear and indisputable right to fair process and an appeal before a merits panel in the court of appeals.

*iii*

## PARTIES TO THE PROCEEDING

Petitioners in this Court (youth "Plaintiffs" in the district court, and real parties in interest in the Ninth Circuit) are Kelsey Cascadia Rose Juliana; Xiuhtezcatl Tonatiuh Martinez; Alexander Loznak; Jacob Lebel; Zealand Bell; Avery McRae; Sahara Valentine; Miriam Oommen; Tia Marie Hatton; Isaac Vergun; Miko Vergun; Hazel Van Ummersen; Sophie Kivlehan; Jaime Butler; Journey Zephier; Vic Barrett; Nathaniel Baring; Aji Piper; Levi D., through his Guardian Leigh-Ann Draheim; Jayden Foytlin; and Nic Venner.

Respondent in this Court, against whom relief is sought, is the United States Court of Appeals for the Ninth Circuit (the "Ninth Circuit").

Real parties in interest in this Court (Defendants in the district court, and Petitioners in the Ninth Circuit— the "Government") are the United States of America; the Office of the President of the United States of America; Brenda Mallory, in her official capacity as Director of Council on Environmental Quality; Shalanda Young, in her official capacity as Director of the Office of Management and Budget; Arati Prabhakar, in her official capacity as Director of the Office of Science and Technology Policy; the United States Department of Energy; Jennifer Granholm, in her official capacity as Secretary of Energy; the United States Department of the Interior; Deb Haaland, in her official capacity as Secretary of Interior; the United States Department of Transportation; Pete Buttigieg, in his official capacity as Secretary of Transportation; the United States Department of Agriculture; Thomas J. Vilsack, in his official capacity as Secretary of

*iv*

Agriculture; the United States Department of Commerce; Gina Raimondo, in her official capacity as Secretary of Commerce; the United States Department of Defense; Lloyd Austin, in his official capacity as Secretary of Defense; the United States Department of State; Antony Blinken, in his official capacity as Secretary of State; the United States Environmental Protection Agency; and Michael Regan, in his official capacity as Administrator of the EPA.

Respondent in the Ninth Circuit was the United States District Court for the District of Oregon ("district court").

*v*

## STATEMENT OF RELATED PROCEEDINGS

United States District Court for the District of Oregon:[1]

*Juliana v. United States*,
   No. 15-cv-01517 (May 1, 2024).

United States Court of Appeals for the Ninth Circuit:

*In re United States*,
   No. 24-684 (July 12, 2024).

*Juliana v. United States*,
   No. 18-36082 (Feb. 10, 2021).

*Juliana v. United States*,
   No. 18-80176 (Dec. 26, 2018).

---

1. Plaintiffs refer to the District Court docket as "D. Ct. Doc."; the Ninth Circuit docket for the Government's first petition for writ of mandamus as "Ct. App. I Doc.," No. 17-71692; the Ninth Circuit docket for the Government's second petition for writ of mandamus as "Ct. App. II Doc.," No. 18-71928; the Ninth Circuit docket for the Government's third petition for writ of mandamus in that court as "Ct. App. III Doc.," No. 18-72776; the Ninth Circuit docket for the Government's fourth petition for writ of mandamus in that court as "Ct. App. IV Doc.," No. 18-73014; the Ninth Circuit docket for the Government's 2018 Petition for Permission to Appeal as "Ct. App. V Doc.," No. 18-80176; the Ninth Circuit docket for the interlocutory proceedings under 28 U.S.C. § 1292(b) as "Ct. App. VI Doc.," No 18-36082; the Ninth Circuit docket for the Government's fifth petition for writ of mandamus in that court as "Ct. App. VII Doc.," No. 24-684; the Supreme Court docket for the Government's first application for stay as "S. Ct. I," No. 18A65; and the Supreme Court docket for the Government's October 2018 petition for mandamus as "S. Ct. II," No. 18-505.

*vi*

*In re United States*,
    No. 18-73014 (Dec. 26, 2018).

*In re United States*,
    No. 18-72776 (Nov. 2, 2018).

*In re United States*,
    No. 18-71928 (July 20, 2018).

*In re United States*,
    No. 17-71692 (Mar. 7, 2018).

Supreme Court of the United States:

*In re United States*,
    No. 18-505 (July 29, 2019).

*In re United States*,
    No. 18A410 (Nov. 2, 2018).

*United States v. U.S. Dist. Ct. for Dist. of Or.*,
    No. 18A65 (July 30, 2018).

*vii*

## TABLE OF CONTENTS

*Page*

QUESTION PRESENTED . . . . . . . . . . . . . . . . . . . . . . . i

PARTIES TO THE PROCEEDING . . . . . . . . . . . . . . . iii

STATEMENT OF RELATED PROCEEDINGS . . . . . v

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . vii

TABLE OF APPENDICES . . . . . . . . . . . . . . . . . . . . . xi

TABLE OF CITED AUTHORITIES . . . . . . . . . . . . . xiii

PETITION FOR A WRIT OF MANDAMUS . . . . . . . .1

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

APPLICABLE OPINIONS . . . . . . . . . . . . . . . . . . . . . .4

JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

RELEVANT CONSTITUTIONAL AND
 STATUTORY PROVISIONS INVOLVED . . . . . . . .5

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . .6

 A. Pretrial proceedings in the district court
  from 2015-2018. . . . . . . . . . . . . . . . . . . . . . . . . . .6

 B. The Government's first six petitions for
  writs of mandamus and fifteen petitions for
  stay . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6

  (1) First petition for writ of mandamus
   in the Ninth Circuit. . . . . . . . . . . . . . . . . . . .7

*viii*

*Table of Contents*

*Page*

(2) Second petition for writ of mandamus in the Ninth Circuit. . . . . . . . . . . . . . . . . . . . . .7

(3) Third petition for writ of mandamus (first in this Court), styled as an application for a stay . . . . . . . . . . . . . . . . . . . .8

(4) Fourth petition for writ of mandamus (third in the Ninth Circuit). . . . . . . . . . . . . .8

(5) Fifth petition for writ of mandamus (second in this Court) . . . . . . . . . . . . . . . . . .8

(6) Sixth petition for writ of mandamus (fourth in the Ninth Circuit) . . . . . . . . . . . . .9

C. On interlocutory appeal, a divided 2020 Ninth Circuit merits panel dismisses Plaintiffs' 2015 complaint without prejudice on standing, and is silent on leave to amend . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

D. On remand, the district court grants leave to amend . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

E. A Ninth Circuit motions panel applies de novo review to grant the seventh petition for a writ of mandamus, ordering immediate dismissal with no Rule 15 analysis on leave to amend . . . . . . . .11

REASONS FOR GRANTING THE PETITION. . . . .13

*ix*

## Table of Contents

*Page*

I. PLAINTIFFS' RIGHT TO THE WRIT IS CLEAR AND INDISPUTABLE BECAUSE THE NINTH CIRCUIT EXCEEDED ITS JURISDICTION BY TERMINATING PROCEEDINGS IN THE DISTRICT COURT PRIOR TO FINAL JUDGMENT.....................15

    A. The panel's order did not conduct, and indeed contravenes, the requisite inquiry under *Cheney*..................16

    B. The panel contravened Plaintiffs' clear and indisputable right to fair process and a right of appeal at final judgment ...........................17

    C. The panel ignored that the Government had other adequate means to obtain full relief and would suffer no cognizable harm .............22

II. THERE ARE NO OTHER ADEQUATE MEANS FOR PLAINTIFFS TO OBTAIN THE RELIEF THEY SEEK..............24

III. MANDAMUS IS APPROPRIATE TO UNDO THE MANIFOLD HARM CREATED BY THE NINTH CIRCUIT'S DECISION.............................26

*x*

## Table of Contents

*Page*

A. Mandamus here would undo the harm to the orderly functioning of the federal court system created by the panel's writ ............................... 26

B. Mandamus would eliminate the dilemma created by the panel for district courts ..................... 29

C. Mandamus would undo the panel's potent disregard of this district court ............................... 29

D. Mandamus would remove unjust prejudice to the Plaintiffs and correct uneven treatment ..................... 31

CONCLUSION ................................ 34

*xi*

## TABLE OF APPENDICES

*Page*

APPENDIX A — Order of the United States Court of Appeals for the Ninth Circuit, filed May 1, 2024 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1a

APPENDIX B — Judgment of the United States District Court for the District of Oregon, Eugene Division, filed May 1, 2024 . . . . . . . . . . . . . . . . . . . . . .6a

APPENDIX C — Supplemental Order of the United States District Court for the District of Oregon, Eugene Division, filed April 19, 2024. . . . . .7a

APPENDIX D — Opinion and Order of the United States District Court for the District of Oregon, Eugene Division, signed December 29, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . .25a

APPENDIX E — Opinion and Order of the United States District Court for the District of Oregon, Eugene Division, signed June 1, 2023 . . . .79a

APPENDIX F — Opinion of the United States Court of Appeals for the Ninth Circuit, filed January 17, 2020. . . . . . . . . . . . . . . . . . . . . . . . . . . . .101a

APPENDIX G — Opinion of the Supreme Court of the United States, filed November 2, 2018. . . . . . .165a

*xii*

*Table of Appendices*

*Page*

APPENDIX H — Opinion of the Supreme Court
of the United States, filed July 30, 2018 . . . . . . . . . 169a

APPENDIX I — Order of the United States
Court of Appeals for the Ninth Circuit,
filed July 12, 2024 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 170a

*xiii*

## TABLE OF CITED AUTHORITIES

*Page*

**Cases**

*Allied Chem. Corp. v. Daiflon, Inc.,*
449 U.S. 33 (1980). . . . . . . . . . . . . . . . . . . . . . . . . 22, 24

*Am. Const. Co. v. Jacksonville, T. & K.W. Ry. Co.,*
148 U.S. 372 (1893). . . . . . . . . . . . . . . . . . . . . . . . . . .16

*Ashland v. Ling-Temco-Vought, Inc.,*
711 F.2d 1431 (9th Cir. 1983). . . . . . . . . . . . . . . . . . .20

*Bacon v. Woodward,*
104 F.4th 744 (9th Cir. 2024). . . . . . . . . . . . . . . . . . .18

*Baker v. Carr,*
369 U.S. 186 (1962). . . . . . . . . . . . . . . . . . . . . . . . . . .34

*Bank of Columbia v. Sweeny,*
26 U.S. 567 (1828). . . . . . . . . . . . . . . . . . . . . . . . .16, 23

*Bankers Life & Cas. Co. v. Holland,*
346 U.S. 379 (1953). . . . . . . . . . . . . . . . . . . . . . .14, 22, 23

*Bauman v. U.S. Dist. Ct.,*
557 F.2d 650 (9th Cir. 1977) . . . . . . . . . . . . . . . . . . . .16

*Cheney v. U.S. Dist. Ct. for D.C.,*
542 U.S. 367 (2004). . . . . . . 1-4, 8, 12-17, 20-24, 26, 29

*Cohen v. Beneficial Indus. Loan Corp.,*
337 U.S. 541 (1949). . . . . . . . . . . . . . . . . . . . . . . . . . .20

*xiv*

*Cited Authorities*

*Page*

*Dupree v. Younger,*
    598 U.S. 729 (2023)............................24

*Eminence Cap., LLC v. Aspeon, Inc.,*
    316 F.3d 1048 (9th Cir. 2003)....................18

*Ex parte Crane,*
    30 U.S. 190 (1831)..............................5

*Ex parte Fahey,*
    332 U.S. 258 (1947)........................16, 30

*Ex parte United States,*
    287 U.S. 241 (1932)............................31

*Fleck & Assocs., Inc. v. Phoenix,*
    471 F.3d 1100 (9th Cir. 2006)....................18

*Foman v. Davis,*
    371 U.S. 178 (1962)..... 3, 11, 12-13, 15, 18-21, 30, 31

*Franks v. Bowman Transp. Co.,*
    424 U.S. 747 (1976)..........................15, 19

*Hollingsworth v. Perry,*
    558 U.S. 183 (2010)......................14, 16, 25

*In re Trade & Com. Bank By & Through Fisher,*
    890 F.3d 301 (D.C. Cir. 2018)....................17

*In re United States,*
    139 S. Ct. 16 (2018)............................8

*xv*

*Cited Authorities*

*Page*

*In re United States,*
    140 S. Ct. 16 (2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9

*In re United States,*
    791 F.3d 945 (9th Cir. 2015). . . . . . . . . . . . . . . . . . . . .16

*In re United States,*
    884 F.3d 830 (9th Cir. 2018) . . . . . . . . .7, 14, 22, 23, 28

*In re United States,*
    895 F.3d 1101 (9th Cir. 2018). . . . . . . . . . . .7, 14, 22, 23

*Juliana v. United States,*
    217 F. Supp. 3d 1224 (D. Or. 2016) . . . . . . . . . . . .6, 32

*Juliana v. United States,*
    339 F. Supp. 3d 1062 (D. Or. 2018) . . . . . . . . . . . . . . .6

*Juliana v. United States,*
    949 F.3d 1125 (9th Cir. 2018). . . . . . . . . . . . . .9, 10, 28

*Juliana v. United States,*
    986 F.3d 1295 (9th Cir. 2021) . . . . . . . . . . . . . . . . . .10

*Juliana v. United States,*
    No. 6:15-cv-01517-AA,
    2018 WL 6303774 (D. Or. Nov. 21, 2018) . . . . . . . . . .9

*Juliana v. United States,*
    No. 6:15-cv-01517-AA,
    2024 WL 1695064 (D. Or. Apr. 19, 2024) . . . . . . . . .12

*Kamal v. Eden Creamery, LLC,*
    88 F.4th 1268 (9th Cir. 2023). . . . . . . . . . . . . . . . . . . .22

*xvi*

*Cited Authorities*

*Page*

*Kerr v. U.S. Dist. Ct. for N. Dist. of Cal.,*
    426 U.S. 394 (1976) . . . . . . . . . . . . . . . . . . . . . . .4, 16, 26

*Kisor v. Wilkie,*
    588 U.S. 558 (2019) . . . . . . . . . . . . . . . . . . . . . . . . . . .4

*Marbury v. Madison,*
    5 U.S. 137 (1803) . . . . . . . . . . . . . . . . . . . . . . . . . . . .24

*MedImmune, Inc. v. Genentech, Inc.,*
    549 U.S. 118 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . .21

*Nat'l Council of La Raza v. Cegavske,*
    800 F.3d 1032 (9th Cir. 2015) . . . . . . . . . . . . . . . . . . . .18

*Panama Canal Co. v. Grace Line, Inc.,*
    356 U.S. 309 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . .19

*Pit River Tribe v. U.S. Forest Serv.,*
    615 F.3d 1069 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . .17

*Plyler v. Doe,*
    457 U.S. 202 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . .33

*Ramos v. Louisiana,*
    590 U.S. 83 (2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

*Rivers v. Roadway Exp., Inc.,*
    511 U.S. 298 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . .4

*Roche v. Evaporated Milk Ass'n,*
    319 U.S. 21 (1943) . . . . . . . . . . .14, 16, 17, 22, 23, 25, 28

*xvii*

*Cited Authorities*

*Page*

*S.F. Herring Ass'n v. Dep't of the Interior,*
946 F.3d 564 (9th Cir. 2019). . . . . . . . . . . . . . . . . .18, 29

*Schlagenhauf v. Holder,*
379 U.S. 104 (1964) . . . . . . . . . . . . . . . . . . . . . 22, 23, 26

*Semtek Int'l Inc. v. Lockheed Martin Corp.,*
531 U.S. 497 (2001) . . . . . . . . . . . . . . . . . . . . . . . . .17, 18

*Steel Co. v. Citizens for a Better Env't,*
523 U.S. 83 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . .17

*United States v. Google,*
No. 20-cv-3010 (APM),
2024 WL 3647498 (D.D.C. Aug. 5, 2024) . . . . . . . . .28

*Uzuegbunam v. Preczewski,*
592 U.S. 279, 141 S. Ct. 792 (2021) . . . . . . . . . . . . . .21

*Vizcaino v. U.S. Dist. Ct. for W. Dist. of Wash.,*
173 F.3d 713 (9th Cir. 1999) . . . . . . . . . . . . . . . . . .2, 17

*W. Va. State Bd. of Educ. v. Barnette,*
319 U.S. 624 (1943) . . . . . . . . . . . . . . . . . . . . . . . . . .33

*Whole Woman's Health v. Jackson,*
595 U.S. 30 (2021) . . . . . . . . . . . . . . . . . . . . . . . . . . .30

*Wilbur v. United States ex rel. Kadrie,*
281 U.S. 206 (1930) . . . . . . . . . . . . . . . . . . . . . . . . . .19

*Will v. Calvert Fire Ins. Co.,*
437 U.S. 655 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . .19

*xviii*

*Cited Authorities*

*Page*

*Will v. United States,*
389 U.S. 90 (1967) . . . . . . . . . . . . . . . . . . . 16, 17, 27, 29

*Work v. United States ex rel. Rives,*
267 U.S. 175 (1925) . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

**Constitutional Provisions**

U.S. Const. amend. V . . . . . . . . . . . . . . . . . . . . . . . . . . .32

U.S. Const. amend. IX . . . . . . . . . . . . . . . . . . . . . . . . . .11

**Statutes, Rules, and Regulations**

28 U.S.C. § 1291 . . . . . . . . . . . . . . .13, 14, 15, 20, 24, 25, 32

28 U.S.C. § 1292(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . .1, 9

28 U.S.C. § 1651 . . . . . . . . . . . . . . . . . . . . . . . . . . .3, 5, 13

28 U.S.C. § 1651(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

Energy Policy Act § 201 . . . . . . . . . . . . . . . . . . . . . . . . . .2

Fed. R. App. P. 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . .14, 20

Fed. R. App. P. 4 . . . . . . . . . . . . . . . . . . . . . . . . . .14, 20, 25

Fed. R. Civ. P. 15(a) . . . . . . . . . . . . . . . . . . . . .19, 20, 21, 29

Fed. R. Civ. P. 15(a)(2) . . . . . . . . . . . . . . . . . .14, 18, 20, 21

Sup. Ct. R. 10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14, 25

*xix*

*Cited Authorities*

*Page*

Sup. Ct. R. 20.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14, 15

9th Cir. Gen. Order 3.6(d) . . . . . . . . . . . . . . . . . . . . . . . .32

**Other Authorities**

3 Blackstone's Commentaries 110 . . . . . . . . . . . . . . . . . .24

Cong. Rsch. Serv., *Lawsuits Against the Federal Government: Basic Federal Court Procedure and Timelines* (Dec. 22, 2020), https://crsreports.congress.gov/product/pdf/IF/IF11349 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .29

U.S. Courts, *About the U.S. Courts of Appeals*, https://www.uscourts.gov/about-federal-courts/court-role-and-structure/about-us-courts-appeals (last visited Sept. 6, 2024). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .25

1

## PETITION FOR A WRIT OF MANDAMUS

Plaintiffs respectfully petition for a writ of mandamus to the Ninth Circuit directing it to vacate its May 1, 2024 order of a writ of mandamus to the district court and to remand the case to the district court to recall its judgment and order of dismissal.

## INTRODUCTION

This Petition seeks to redress an egregious misuse of mandamus jurisdiction by the Ninth Circuit. The Ninth Circuit's assertion of mandamus jurisdiction contravenes this Court's requirements in *Cheney* and this Court's explicit directions in its 2018 Order in this case to comply with *Cheney*. It cannot be the case that the Government may file successive mandamus petitions whenever it strongly disagrees with a district court's interlocutory order, in this instance an order allowing Plaintiffs to amend their complaint after an earlier jurisdictional dismissal for lack of standing. The panel decision makes a mockery of the jurisdictional framework established by Congress under 28 U.S.C. § 1292(b) and carefully preserved by this Court in a long line of cases. This Court should intervene and overturn this abuse of the mandamus remedy before the decision below creates more disruption in the orderly functioning of the federal courts, and to preserve Plaintiffs' rights to fair process and a full appeal in the Ninth Circuit upon final judgment. Plaintiffs have no other adequate remedy but to seek a writ of mandamus from this Court.

For nearly a decade, these 21 youth Plaintiffs have sought to vindicate their claims of mounting injuries

2

to their fundamental constitutional rights to life and liberties resulting from the Government's national energy system and Energy Policy Act § 201. In a sustained effort to evade the Federal Rules of Civil Procedure and the final judgment rule, the Government adopted a litigation strategy of filing repetitious petitions for writs of mandamus that fall far short of the standard set forth in *Cheney*, 542 U.S. at 380–81. The Government's first six petitions for writs of mandamus were denied—and along the way, this Court instructed that the requirements set forth in *Cheney* dictate whether the Ninth Circuit may grant a petition for a writ of mandamus. App. 165–66a.

The Government's seventh mandamus petition challenging two interlocutory orders by the district court—an order granting leave to amend and an order denying in part a motion to dismiss—falls equally short because the Government had "other adequate means to attain the relief [it] desires," *i.e.*, "the regular appeals process." *Cheney*, 542 U.S. at 380–81. Even though the Government's petition did not come close to satisfying the *Cheney* conditions, the panel granted the petition without performing a *Cheney* analysis, or even citing *Cheney*. Ct. App. VII Doc. 1.1; App. 1a–5a. Instead, the panel improperly relied on a pre-*Cheney* Ninth Circuit opinion to apply "de novo" review of "a district court's compliance" with a prior mandate, wholly disregarding *Cheney's* three conditions and creating a new exception to this Court's requirements. App. 2a–3a (citing *Vizcaino v. U.S. Dist. Ct. for W. Dist. of Wash.*, 173 F.3d 713 (9th Cir. 1999)). The panel's writ of mandamus ordered the district court to terminate proceedings before final judgment for lack of jurisdiction. Exceeding its own prescribed jurisdiction, the panel's writ divested the district court of its inherent

3

discretion under *Foman v. Davis* to grant leave to amend and review thereof under an abuse of discretion standard. 371 U.S. 178, 180–82 (1962). The effect of the panel's writ was to deny Plaintiffs any right of appellate review of their amended complaint, in particular whether amendment cured the jurisdictional deficiency identified in the prior certified interlocutory appeal order from 2020.

Mandamus relief is an "extraordinary remedy" appropriate for the "exceptional circumstances" now before this Court, where a lower court's failure to follow this Court's clear instructions has left Plaintiffs with "no other adequate means" to enforce their "clear and indisputable" rights. *Cheney*, 542 U.S. at 380–81 (internal quotation marks omitted). Because the panel's grant of mandamus (1) departed drastically from the law controlling its jurisdiction, (2) is not reviewable on direct appeal from final judgment, and (3) undermines the federal rules and the orderly functioning of the federal court system, the panel's decision should be vacated by a writ of mandamus from this Court. The extraordinary misuse of extraordinary petitions by the Government and an extraordinary writ by the Ninth Circuit have ruptured the fair process litigants are afforded by the federal rules. A bedrock of our legal system is that even the most extraordinary cases are entitled to ordinary procedures.

The merits of Plaintiffs' underlying case and their Article III standing to bring it are not before this Court on this 28 U.S.C. § 1651 petition. Instead, this petition centers on mandamus jurisdiction's extraordinarily circumscribed role in the federal court system. Lower federal courts must obey this Court's decision that "three conditions *must* be satisfied before [a writ of mandamus]

4

may issue." *Cheney*, 542 U.S. at 380–81 (emphasis added); *see also Kerr v. U.S. Dist. Ct. for N. Dist. of Cal.*, 426 U.S. 394, 403 (1976). "[O]nce the Court has spoken, it is the duty of other courts to respect that understanding of the governing rule of law." *Rivers v. Roadway Exp., Inc.*, 511 U.S. 298, 312 (1994); *Ramos v. Louisiana*, 590 U.S. 83, 124 n.5 (2020) (Kavanaugh, J., concurring in part) ("[V]ertical *stare decisis* is absolute."). When lower courts selectively ignore this Court's decisions and assert an autonomous prerogative to deploy "one of the most potent weapons in the judicial arsenal," *Cheney*, 542 U.S. at 380 (internal quotation marks omitted), interfering with the district court's proceedings at will de novo, as the panel did here, such disobedience disrupts "the evenhanded, predictable, and consistent development of legal principles" and undermines "the actual and perceived integrity of the judicial process." *Kisor v. Wilkie*, 588 U.S. 558, 587 (2019). A decision by this Court to grant the present petition would correct the Ninth Circuit's unrestrained issuance of the writ in contravention of both this Court's prior order and *Cheney*, and is the only means for Plaintiffs to obtain the relief to which they are entitled.

## APPLICABLE OPINIONS

The Ninth Circuit's May 1, 2024 order granting the Government's petition for a writ of mandamus is not published in the Federal Reporter and is attached at App. A. The district court's supplemental order addressing the petition is unpublished and is attached at App. C. The district court's order denying in part and granting in part the Government's motion to dismiss Plaintiffs' second amended complaint is not published in the Federal Supplement, but is available at 2023 WL 9023339 and

5

attached at App. D. The district court's order granting Plaintiffs leave to amend is not published in the Federal Supplement, but is available at 2023 WL 3750334 and is attached at App. E. The Ninth Circuit's 2020 Interlocutory Opinion is reported at 947 F.3d 1159 and is attached at App. F. Dispositions of four of the Government's prior petitions for writs of mandamus are reported at 884 F.3d 830, 895 F.3d 1101, 139 S. Ct. 1 (App. H), and 140 S. Ct. 16, respectively. Dispositions of the Government's applications in this Court for a stay are reported at 139 S. Ct. 1 (App. H) and 139 S. Ct. 452 (App. G).

## JURISDICTION

The jurisdiction of this Court is invoked under 28 U.S.C. § 1651. "The supreme court has power to issue a mandamus directed to a circuit court of the United States." *Ex parte Crane*, 30 U.S. 190, 191 (1831) (Marshall, C.J.). The order of the Ninth Circuit was entered on May 1, 2024. App. 1a–5a. The district court entered judgment pursuant to the Ninth Circuit's order the same day. App. 6a. The Ninth Circuit denied Plaintiffs' petition for rehearing en banc on July 12, 2024. App. 170a–71a.

## RELEVANT CONSTITUTIONAL AND STATUTORY PROVISIONS INVOLVED

The All Writs Act, 28 U.S.C. § 1651(a), provides: "The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."

The Final Judgment Rule, 28 U.S.C. § 1291, provides in relevant part: "The courts of appeals . . . shall have

6

jurisdiction of appeals from all final decisions of the district courts of the United States, . . . except where a direct review may be had in the Supreme Court."

## STATEMENT OF THE CASE

### A. Pretrial proceedings in the district court from 2015-2018

Twenty-one children and youth Plaintiffs commenced this action on August 12, 2015, and filed their First Amended Complaint, as a matter of course, on September 10, 2015. D. Ct. Doc. 7.

On November 10, 2016, Judge Ann Aiken, then-Chief Judge for the District of Oregon, adopted the Findings and Recommendations of Magistrate Judge Thomas Coffin and denied the Government's and former intervenors' motions to dismiss. *Juliana v. United States*, 217 F. Supp. 3d 1224 (D. Or. 2016).

On October 15, 2018, in a 62-page opinion, the district court dismissed the President as a defendant, otherwise denied the Government's motion for judgment on the pleadings, and granted the Government's motion for summary judgment in part and denied it in part. *Juliana v. United States*, 339 F. Supp. 3d 1062 (D. Or. 2018). Trial was set for October 29, 2018.

### B. The Government's first six petitions for writs of mandamus and fifteen petitions for stay

Between June 9, 2017 and November 5, 2018, the Government filed six petitions for writs of mandamus, each

7

seeking to avoid the ordinary burdens of discovery and trial by using mandamus as a substitute for the normal appeals process. Each petition was denied. Below is a list of those petitions and their outcomes.

The Government also filed 15 petitions for stays between March 7, 2017 and February 2, 2024. Those petitions are listed in Ct. App. VII Doc. 14.2 Ex. 1.

**(1) First petition for writ of mandamus in the Ninth Circuit**

On June 9, 2017, the Government filed its first petition for a writ of mandamus with the Ninth Circuit seeking to direct the district court to dismiss the case. Ct. App. I Doc. 1-1 at 40. On March 7, 2018, then-Chief Judge Sidney R. Thomas, writing for the Ninth Circuit, denied the petition, ruling the Government had not satisfied any of the conditions for mandamus. *In re United States*, 884 F.3d 830, 837 (9th Cir. 2018).

**(2) Second petition for writ of mandamus in the Ninth Circuit**

The Government filed its second petition for a writ of mandamus in the Ninth Circuit on July 5, 2018, seeking to compel the district court to dismiss the case. Ct. App. II Doc. 1-2 at 54. On July 20, 2018, the Ninth Circuit denied the petition because the Government had not met any of the conditions to qualify for mandamus relief. *In re United States*, 895 F.3d 1101, 1105–06 (9th Cir. 2018).

8

**(3) Third petition for writ of mandamus (first in this Court), styled as an application for a stay**

On July 17, 2018, the Government filed an Application for a Stay with this Court asking the Court "[a]lternatively . . . [to] construe this application as a petition for a writ of mandamus to the district court[.]" S. Ct. I, Appl. for Stay, at 38; *see also id.* at 32. On July 30, 2018, this Court denied the application for a stay and denied the "request for relief." App. 169a.

**(4) Fourth petition for writ of mandamus (third in the Ninth Circuit)**

On October 12, 2018, the Government filed its third petition for a writ of mandamus in the Ninth Circuit, again seeking to stay trial. Ct. App. III Doc. 1-2 at 24. On November 2, 2018, the Ninth Circuit denied the petition as moot. Ct. App. III Doc. 5.

**(5) Fifth petition for writ of mandamus (second in this Court)**

On the eve of trial, on October 18, 2018, the Government filed its second petition for a writ of mandamus in this Court. S. Ct. II, Pet. for Mandamus. The next day, Chief Justice John Roberts temporarily granted an administrative stay pending consideration of the petition. *In re United States*, 139 S. Ct. 16 (2018), *vacated*, App. 165–68a. On November 2, 2018, this Court denied the petition for a stay and lifted the temporary stay. App. 165a–68a. In its denial of the stay, this Court instructed that a writ of mandamus may issue only when the three *Cheney* conditions are satisfied, which must first be addressed in the court of appeals. *Id.* at 165a–67a. On

9

July 29, 2019, this Court dismissed the mandamus petition. *In re United States*, 140 S. Ct. 16 (2019) (mem.).

### (6) Sixth petition for writ of mandamus (fourth in the Ninth Circuit)

On November 5, 2018, the Government filed its fourth petition for a writ of mandamus in the Ninth Circuit (its sixth overall) seeking to avoid "the impending trial." Ct. App. IV Doc. 1-2 at 27.

The same day, the Government moved the district court to reconsider certifying for interlocutory appeal its denial of the Governments' dispositive motions. D. Ct. Doc. 418. On November 21, 2018, the district court stated it "stands by its prior rulings on jurisdictional and merits issues, as well as its belief that this case would be better served by further factual development at trial," but nonetheless certified its orders denying the Government's dispositive motions for interlocutory appeal under 28 U.S.C. § 1292(b). *Juliana v. United States*, No. 6:15-cv-01517-AA, 2018 WL 6303774, at *3 (D. Or. Nov. 21, 2018).

On December 26, 2018, a divided panel of the Ninth Circuit granted the Government's petition for permission to appeal under 28 U.S.C. § 1292(b). Ct. App. V Doc. 1-1; *Juliana v. United States*, 949 F.3d 1125, 1126 (9th Cir. 2018). Judge Michelle Friedland dissented, writing:

> It is . . . concerning that allowing this appeal now effectively rewards the Government for its repeated efforts to bypass normal litigation procedures by seeking mandamus relief in our court and the Supreme Court. If anything has wasted judicial resources in this case, it was those efforts.

10

*Id.* at 1127 n.1 (Friedland, J., dissenting) (citations omitted) (citing six petitions for mandamus and applications for stay by the Government in the Ninth Circuit and this Court).

On December 26, 2018, the Ninth Circuit denied the Government's sixth petition for mandamus. Ct. App. IV Doc. 15.

**C.  On interlocutory appeal, a divided 2020 Ninth Circuit merits panel dismisses Plaintiffs' 2015 complaint without prejudice on standing, and is silent on leave to amend**

On January 17, 2020, after oral argument, a three-judge merits panel of the Ninth Circuit issued its interlocutory opinion. App. 101a–64a (the "2020 Opinion"). Based solely on a narrow redressability holding by a 2-1 majority with a forceful dissent, the 2020 Opinion "remand[ed] this case to the district court with instructions to dismiss for lack of Article III standing." *Id.* at 127a. The 2020 Opinion did not address the issue of leave to amend and did not dismiss the case with prejudice. *See generally id.*

**D.  On remand, the district court grants leave to amend**

After the Ninth Circuit denied Plaintiffs' petition for rehearing en banc, 986 F.3d 1295 (9th Cir. 2021), the Ninth Circuit mandate issued to the district court on March 5, 2021. Ct. App. VI Doc. 204.

On March 9, 2021, Plaintiffs promptly filed their first motion for leave to amend their complaint to cure the jurisdictional deficiencies identified by the Ninth Circuit in its 2020 Opinion. D. Ct. Doc. 462.

11

On June 1, 2023, the district court granted Plaintiffs' motion for leave to amend after conducting a Rule 15(a) futility analysis under *Foman*, 371 U.S. at 180–82. App. 87a–88a, 91a–98a, 100a.

On June 8, 2023, Plaintiffs filed their Second Amended Complaint, D. Ct. Doc. 542, which the Government then moved to dismiss. D. Ct. Doc. 547.

On December 29, 2023, the district court narrowed the claims in the case by granting the Government's motion to dismiss Plaintiffs' claims for injunctive relief and Plaintiffs' claims under the Equal Protection Clause and the Ninth Amendment, and otherwise denied the motion. App. 54a, 62a–63a, 68a, 72a–74a, 76a–77a.

On January 18, 2024, the Government moved the district court for a stay pending resolution of the Government's expected filing of its seventh petition for a writ of mandamus. D. Ct. Doc. 571.

**E. A Ninth Circuit motions panel applies de novo review to grant the seventh petition for a writ of mandamus, ordering immediate dismissal with no Rule 15 analysis on leave to amend**

On February 2, 2024, the Government filed its fifth petition for a writ of mandamus in the Ninth Circuit (its seventh overall) and moved for another stay. Ct. App. VII Doc. 1.1. The Government repeated its singular desire to avoid further discovery and trial, the same argument rejected in its prior mandamus petitions. Ct. App. VII Doc. 1.1 at 48–49. Absent mandamus relief, the sole "damage or prejudice" the Government claimed it would suffer is "the

12

[G]overnment will be required to comply with additional discovery requests and proceed to trial on Plaintiffs' sweeping claims." *Id*. at 48.

The Government answered the Second Amended Complaint on February 27, 2024, admitting many factual allegations. D. Ct. Doc. 590.

On February 29, 2024, a motions panel of the Ninth Circuit directed Plaintiffs to answer the petition for a writ of mandamus and denied the Government's stay request without prejudice, referring the petition to the next available motions panel. Ct. App. VII Doc. 12.1.

Plaintiffs answered the mandamus petition, Ct. App. VII Doc. 14.1, and the district court filed a supplemental order addressing the petition. App. 7a–24a. The same day, the district court denied the Government's motion for stay, finding the petition for mandamus unlikely to succeed on the merits because it met none of the requirements for mandamus. *Juliana v. United States*, No. 6:15-cv-01517-AA, 2024 WL 1695064, at *2–4 (D. Or. Apr. 19, 2024).

On May 1, 2024, in an unpublished 3-page order on the papers without oral argument, a different motions panel of the Ninth Circuit granted the Government's petition for a writ of mandamus and ordered the district court to dismiss the case without leave to amend. App. 1a–5a. The panel took de novo review of the district court's compliance with the prior mandate. App. 3a. The panel neither cited *Cheney* nor inquired into whether the mandatory conditions for mandamus were satisfied. *Id.* at 2a–5a; 542 U.S. at 380–81. The panel conducted no review of the district court's Rule 15(a) futility analysis under *Foman*,

13

371 U.S. at 180–82, and assigned no error to the district court's finding that amendment would not be futile. The panel conducted no review of Plaintiffs' second amended complaint, instead concluding that the prior mandate as to the *first* amended complaint precluded normal appellate review of the *second* amended complaint. App. 2a–5a. The district court promptly dismissed and issued final judgment the same day. D. Ct. Doc. 600; App. 6a.

Plaintiffs timely petitioned for rehearing en banc on June 17, 2024. Ct. App. VII Doc. 27.1. Five *amicus curiae* briefs supported the petition for rehearing. Ct. App. VII Docs. 31.1; 32.1; 33.2; 35.1; 36.1. Plaintiffs also moved to recall the mandate for violations of the Federal Rules of Appellate Procedure, Ninth Circuit Rules, and related Guidelines. Ct. App. VII Doc. 26.1. The panel denied rehearing and recall on July 12, 2024. App. 170a–71a.

## REASONS FOR GRANTING THE PETITION

This Court should grant Plaintiffs' Petition because the panel clearly and indisputably exceeded the lawful exercise of its prescribed jurisdiction under 28 U.S.C. § 1651 by issuing a writ of mandamus to the district court without attempting to satisfy the requisite conditions set forth in *Cheney*, under circumstances that indisputably fell short of the *Cheney* conditions. Instead, by applying de novo review, the panel used the writ as an end run around the final judgment rule, 28 U.S.C. § 1291, and impermissibly "used [the writ] as a substitute for the regular appeals process." *Cheney*, 542 U.S. at 380–81.

Here, by contrast, the three *Cheney* conditions are met. Plaintiffs' right to issuance of the writ is clear

14

and indisputable because, in exceeding its prescribed jurisdiction, the panel deprived Plaintiffs of (1) their right to fair process under the federal rules, Fed. R. Civ. P. 15(a)(2); (2) their right to a direct appeal of final judgment, 28 U.S.C. § 1291, Fed. R. App. P. 3, 4; and (3) specifically the right to be heard in the court of appeals on whether their second amended complaint was futile or whether it sufficiently alleged redressability in light of the 2020 Opinion. *Cheney*, 542 U.S. at 381 (condition two). The panel lacked jurisdiction to make the latter determination.

Unlike the Government below, Plaintiffs have no other right of appeal. A petition for the rare writ of certiorari, which "is not a matter of right, but of judicial discretion," does not provide Plaintiffs "adequate means to attain the relief [they] desire" and to which the law entitles Plaintiffs: a fair process in the district court to seek "freely give[n] leave" to amend and a final judgment, followed by a full appeal in the court of appeals as a matter of right. Sup. Ct. R. 10; *cf.* 28 U.S.C. § 1291; *Cheney*, 542 U.S. at 380 (condition one); *see also Hollingsworth v. Perry*, 558 U.S. 183, 190–91, 199 (2010). Inversely, the Government can appeal "as a matter of course" every aspect of the district court's orders on final judgment and, meanwhile, no cognizable harm will befall it. *In re United States*, 884 F.3d at 836; *In re United States*, 895 F.3d at 1106; *Bankers Life & Cas. Co. v. Holland*, 346 U.S. 379, 383–84 (1953); *Roche v. Evaporated Milk Ass'n*, 319 U.S. 21, 30 (1943).

"[T]he writ is appropriate" to correct the "exceptional circumstances" of the panel's "judicial 'usurpation of power.'" *Cheney*, 542 U.S. at 380–81 (citation omitted; condition three); Sup. Ct. R. 20.1. The panel disrupted the judicial hierarchy by commandeering the district court's discretionary power to grant or deny leave to amend, *see*

15

*Foman*, 371 U.S. at 182; usurping the district court's role as the decisionmaker of first instance, *see Franks v. Bowman Transp. Co.*, 424 U.S. 747, 779 (1976); and improperly depriving Plaintiffs of an appeal as of right related to any deficiencies in their second amended complaint for declaratory relief. *See* 28 U.S.C. § 1291. Mandamus is also "appropriate under the circumstances" where the Government's alleged harm of expending attorneys' fees and costs in the ordinary course of litigation is not cognizable for mandamus, compared to the irreversible harm of denying due process to these young Plaintiffs who lack political power and whose lives and health are being increasingly injured by their Government. *Cheney*, 542 U.S. at 381; App. 21a, 103a, 107a–09a, 112a–14a. The panel's abuse of an extraordinary writ is so exceptional as to warrant a writ of mandamus from this Court.

Because Plaintiffs meet the three conditions of *Cheney* and this Court's Rule 20.1, a writ of mandamus should issue directing the Ninth Circuit to vacate its own writ of mandamus and remand the case to the district court without delay.

## I. PLAINTIFFS' RIGHT TO THE WRIT IS CLEAR AND INDISPUTABLE BECAUSE THE NINTH CIRCUIT EXCEEDED ITS JURISDICTION BY TERMINATING PROCEEDINGS IN THE DISTRICT COURT PRIOR TO FINAL JUDGMENT

Plaintiffs' "right to issuance of the writ is clear and indisputable" because the panel committed egregious legal errors. *Cheney*, 542 U.S. at 381 (internal quotations omitted).

16

### A. The panel's order did not conduct, and indeed contravenes, the requisite inquiry under *Cheney*

The panel clearly and indisputably exceeded the lawful exercise of its prescribed jurisdiction by ignoring the legal standard for granting a petition for a writ of mandamus. This Court's prior order in this very case made clear that mandamus may issue only when the *Cheney* conditions are met. App. 165a–66a (citing *Hollingsworth*, 558 U.S. at 190; *Cheney*, 542 U.S. at 380–81 (2004)); *see also Cheney*, 542 U.S. at 380 ("[T]hree conditions *must* be satisfied before it may issue.") (emphasis added). The requirements in *Cheney* are the culmination of two centuries of this Court's precedents. *See, e.g.*, *Kerr*, 426 U.S. at 403; *Will v. United States*, 389 U.S. 90, 96 (1967); *Ex parte Fahey*, 332 U.S. 258, 260 (1947); *Roche*, 319 U.S. at 30; *Am. Const. Co. v. Jacksonville, T. & K.W. Ry. Co.*, 148 U.S. 372, 379 (1893); *Bank of Columbia v. Sweeny*, 26 U.S. 567, 569 (1828). Nearly 50 years ago this Court wrote that it is a "rule that the writ will issue only in extraordinary circumstances" after the "various conditions for its issuance" have been satisfied, identifying the same three requirements specified in *Cheney*. *Kerr*, 426 U.S. at 403.

In contravention of this standard, which allows no exceptions for wielding the most potent judicial tool, the panel granted the Government's seventh petition for a writ of mandamus without conducting any analysis under, *or even citing*, *Cheney*, its predecessors, or its successors. App. 2a–5a. The panel also evaded its own circuit's seminal mandamus standard set forth in *Bauman v. U.S. Dist. Ct.*, 557 F.2d 650 (9th Cir. 1977), which the Ninth Circuit applies in a manner "consistent with" *Cheney*. *In re United States*, 791 F.3d 945, 955 n.7 (9th Cir. 2015).

17

Instead, the panel created its own standard for mandamus, disassociated from *Cheney*'s conditions and relying on an isolated pre-*Cheney* case involving attempted "relitigation of final judgments" *on the merits* in an otherwise unappealable class certification decision, as justifying de novo review here. App. 2a–3a (citing *Vizcaino*, 173 F.3d at 719 and misapplying the Court's treatment of *Vizcaino* in *Pit River Tribe v. U.S. Forest Serv.*, 615 F.3d 1069, 1078–80 (9th Cir. 2010)). In creating a new mandamus test to enforce the prior mandate before final judgment, the panel disregarded the Ninth Circuit's holding that "[n]othing in *Bauman* allows for this [*Vizcaino*] exception." *Pit River Tribe*, 615 F.3d at 1079 n.1; *see also In re Trade & Com. Bank By & Through Fisher*, 890 F.3d 301, 303 (D.C. Cir. 2018) (rejecting a *Vizcaino*-styled exception because "[n]either *Cheney* nor any later case created an exception for mandamus actions seeking to enforce a mandate"). By issuing the writ without analyzing each pre-requisite for mandamus, the panel "abdicat[ed] . . . the very expository and supervisory functions" that an appellate court serves, *Will*, 389 U.S. at 107, and committed "an abuse of judicial power." *Roche*, 319 U.S. at 31.

**B.  The panel contravened Plaintiffs' clear and indisputable right to fair process and a right of appeal at final judgment**

In the district courts, the Federal Rules of Civil Procedure and this Court's precedent preserve litigants' right to cure jurisdictional deficiencies, like standing, and, accordingly, jurisdictional dismissals are without prejudice. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998); *Semtek Int'l Inc. v. Lockheed Martin Corp.*,

18

531 U. S. 497, 505 (2001); Fed. R. Civ. P. 15(a)(2). "If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief," leave to amend should be freely given. *Foman*, 371 U.S. at 182. In recognition of this foundational procedural rule, Ninth Circuit precedent is clear that when a dismissal for lack of jurisdiction is silent on leave to amend, the district court retains discretion to grant or deny amendment. *S.F. Herring Ass'n v. Dep't of the Interior*, 946 F.3d 564 (9th Cir. 2019); *see also Fleck & Assocs., Inc. v. Phoenix*, 471 F.3d 1100, 1106–07 (9th Cir. 2006) (jurisdictional dismissals are without prejudice). "It is black-letter law that a district court must give plaintiffs at least one chance to amend a deficient complaint, absent a clear showing that amendment would be futile." *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1041 (9th Cir. 2015) (citing *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003)).

The panel flouted these rules here. When Plaintiffs' 2015 complaint was dismissed without prejudice solely on the redressability prong of standing on interlocutory appeal by the Ninth Circuit in 2020, after finding Plaintiffs' burden to show injury in fact and causation satisfied, the court was silent on leave to amend. App. 112a–13a, 127a. Plaintiffs had never previously sought leave to amend because they had prevailed in the district court on Defendants' standing challenges. App. 105a. Accordingly, on remand, Plaintiffs retained the right per Rule 15(a)(2) to seek leave to amend for the first time to address the Ninth Circuit's jurisdictional concern. *See also Bacon v. Woodward*, 104 F.4th 744, 753 (9th Cir. 2024) (A "district court should grant leave to amend *even if no request to amend the pleading was made*, unless it determines that the pleading could not be cured by the

19

allegation of other facts."). Indeed, "Rule 15(a) declares that leave to amend 'shall be freely given when justice so requires'; this mandate is to be heeded." *Foman*, 371 U.S. at 182.

Plaintiffs' right to seek leave to amend is clear and indisputable under Rule 15. *Foman*, 371 U.S. at 182. "[O]utright refusal to grant the leave without any justifying reason appearing for the denial is . . . abuse of [ ] discretion and inconsistent with the spirit of the Federal Rules." *Id.* Justified reasons for denying leave to amend include "undue delay," "bad faith," "repeated failure to cure deficiencies by amendments previously allowed," "undue prejudice to the opposing party by virtue of allowance of the amendment," or "futility of amendment." *Id.* Absent such circumstances, leave to amend "should, as the rules require, be 'freely given.'" *Id.*

Because "the grant or denial of an opportunity to amend is within the discretion of the District Court," *Foman*, 371 U.S. at 182, mandamus jurisdiction could not lie below to "direct the exercise of judgment or discretion in a particular way." *Wilbur v. United States ex rel. Kadrie*, 281 U.S. 206, 218 (1930); *see also, e.g., Work v. United States ex rel. Rives*, 267 U.S. 175, 177 (1925); *Panama Canal Co. v. Grace Line, Inc.*, 356 U.S. 309, 318 (1958). "Where a matter is committed to a district court's discretion, it cannot be said that a litigant's right to a particular result is 'clear and indisputable.'" *Will v. Calvert Fire Ins. Co.*, 437 U.S. 655, 665–66 (1978) (plurality); *Franks*, 424 U.S. at 779 ("[O]wing to the structure of the federal judiciary these choices are, of course, left in the first instance to the district courts."). As a highly discretionary district court function, orders granting leave to amend are not

20

amenable to the extraordinary conditions of mandamus, but are otherwise fully reviewable on an appeal of final judgment. *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949) ("Appeal gives the upper court a power of review, not one of intervention.").

Nonetheless, while the district court performed this required and discretionary Rule 15(a)(2) function, carefully addressing the *Foman* circumstances, the Ninth Circuit has never done so, instead presumptively denying leave to amend via the writ without applying the appropriate legal standard. App. 2a–5a; *Ashland v. Ling-Temco-Vought, Inc.*, 711 F.2d 1431, 1436 (9th Cir. 1983) ("The trial court's grant of leave to amend the pleadings under Fed.R.Civ.P. 15(a) is reviewed for abuse of discretion."). On improper de novo review, the panel invoked the "spirit" of the prior mandate as leaving no room for amendment. App. 3a–4a. However, writs of mandamus cannot issue on a panel's invocation of "spirit" but on mandatory *Cheney* conditions. Moreover, the Ninth Circuit's 2020 Opinion never questioned nor addressed *Foman*, futility, or Rule 15, not even in spirit. *See generally* App. 101a–64a. The panel's writ ignored *Foman* and Plaintiffs' second amended complaint entirely. App. 1a–5a. The effect of the panel's writ was to deprive Plaintiffs of their right to appellate review of their second amended complaint, which they would have been afforded on final judgment. 28 U.S.C. § 1291; Fed. R. App. P. 3, 4; *see* App. 23a.

The only court that conducted a futility analysis—the district court—concluded that amendment would *not* be futile. App. 98a. The panel did not review that decision for an abuse of discretion, nor did it rule that Plaintiffs did not cure the standing deficiency through amendment.

21

App. 1a–5a. Further, even if a writ of mandamus could be used to review a discretionary interlocutory order, any error by the district court on granting leave to amend was not clear and indisputable where the Ninth Circuit's 2020 jurisdictional dismissal was silent on amendment, where district courts have broad discretion to grant leave to amend under Rule 15(a), and where this Court issued an intervening Article III redressability opinion in *Uzuegbunam v. Preczewski*, 592 U.S. 279, 141 S. Ct. 792, 798, 801 (2021) (construing nominal damages as a form of declaratory relief, sufficient for Article III standing); Fed. R. Civ. P. 15(a); *Foman*, 371 U.S. at 182.

In the same vein, any error in the district court's redressability analysis regarding Plaintiffs' claims for *declaratory* relief in their second amended complaint where the Government did not contest injury and causation, was not clear and indisputable and is subject to review on direct appeal of final judgment. *See MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (A claim for declaratory judgment is justiciable if it entails "a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality[.]"). District courts are vested "with discretion in the first instance" to determine whether declaratory judgment is proper, "because facts bearing on the usefulness of the declaratory judgment remedy, and the fitness of the case for resolution, are peculiarly within their grasp." *Id.* at 136.

Thus, the panel, in issuing the writ of mandamus before final judgment, denied Plaintiffs their rights to both a Rule 15(a)(2) process and thereafter to appellate review under *Foman*'s standard in the court of appeals.

22

### C. The panel ignored that the Government had other adequate means to obtain full relief and would suffer no cognizable harm

The panel did not address the most important condition precedent to mandamus. If it had, it would have clearly and indisputably concluded that the Government had "other adequate means to attain the relief [it] desires," i.e., "the regular appeals process." *Cheney*, 542 U.S. at 380–81. Moreover, the Government's reliance on only non-cognizable reasons for seeking a writ of mandamus as a substitute for appeal—the loss of attorneys' fees and time in the ordinary course of litigation—could not support mandamus. *In re United States*, 884 F.3d at 836; *In re United States*, 895 F.3d at 1106; *Schlagenhauf v. Holder*, 379 U.S. 104, 110 (1964); *Bankers Life*, 346 U.S. at 383–84; *Roche*, 319 U.S. at 30.

If "[a] litigant is free to seek review of the propriety of [the order in question] on direct appeal after a final judgment has been entered[, . . . ] it cannot be said that the litigant 'has no other adequate means to seek the relief he desires.'" *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980). This Court has long held "that the extraordinary writs cannot be used as substitutes for appeals . . . even though hardship may result from delay and perhaps unnecessary trial." *Bankers Life*, 346 U.S. at 383. Here, the district court's interlocutory orders subject to mandamus—grant of leave to amend and order on motion to dismiss—were reviewable on appeal after final judgment. App. 20a–21a, 23a; *Kamal v. Eden Creamery, LLC*, 88 F.4th 1268, 1275 (9th Cir. 2023).

23

The panel clearly and indisputably erred because the Government made no cognizable showing that the regular appeals process was "[in]adequate." *See Cheney*, 542 U.S. at 380. The panel "failed to ask this question." *Id.* at 391. The Government's argument to that effect consisted only of its desire to avoid trial and the cost of litigating in the district court. Ct. App. VII Doc. 1.1 at 47–49. The Government's position, however, was foreclosed by this Court's repeated emphasis that the cost and inconvenience of litigation is not a permissible justification for seeking mandamus as a substitute for appeal. "It is . . . well settled, that the writ is not to be used as a substitute for appeal, even though hardship may result from delay and perhaps unnecessary trial[.]" *Schlagenhauf*, 379 U.S. at 110 (citations omitted); *see also Bankers Life*, 346 U.S. at 383–84. "[W]e must take it Congress contemplated [even significant inconvenience] in providing that only final judgments should be reviewable." *Roche,* 319 U.S. at 30. "As was pointed out by Chief Justice Marshall, to grant the writ in such a case would be a 'plain evasion' of the Congressional enactment that only final judgments be brought up for appellate review." *Id.* (quoting *Bank of Columbia*, 26 U.S. at 569).

The Government's argument of harm also was foreclosed twice before by the Ninth Circuit in this very case. The Ninth Circuit previously rejected the Government's earlier petitions for mandamus because "litigation burdens are part of our legal system[.]" *In re United States*, 884 F.3d at 836; *see also In re United States*, 895 F.3d at 1106 ("The government made this argument in its first mandamus petition, and we rejected it."). The panel ignored this prior precedent.

24

The panel clearly and indisputably exceeded its jurisdiction by rewarding the Government's persistence in raising the same non-colorable argument for mandamus. Because precedent is clear that the Government's desire to avoid further litigation did not justify mandamus under *Cheney*, Plaintiffs have a clear and indisputable right to a writ of mandamus to the Ninth Circuit to remand to the district court to resume ordinary litigation practice.

## II. THERE ARE NO OTHER ADEQUATE MEANS FOR PLAINTIFFS TO OBTAIN THE RELIEF THEY SEEK

Plaintiffs meet the conditions for mandamus relief in this Court because, unlike the Government, they have "no other adequate means to attain the relief [they] desire[ ]." *Cheney*, 542 U.S. at 380. Plaintiffs' second amended complaint has not been reviewed on appeal by the circuit court, nor can it now in light of the panel's writ. Only a writ of mandamus to the Ninth Circuit will preserve Plaintiffs' right to appellate review of their second amended complaint in the court of appeals first, before the merits issues are presented to this Court. Such mandamus can only issue to a lower court from a higher court. *Marbury v. Madison*, 5 U.S. 137, 147 (1803) (citing 3 Blackstone's Commentaries 110).

In the Ninth Circuit, Plaintiffs have no other adequate means to attain their relief because the panel's writ is not reviewable by a merits panel "on direct appeal after a final judgment." *Allied Chem. Corp.*, 449 U.S. at 36. Review after final judgment under 28 U.S.C. § 1291 is reserved for "claims of district court error." *Dupree v. Younger*, 598 U.S. 729, 734 (2023) (internal quotations omitted). In addition, the panel's writ of mandamus was

25

not an order for which "a statutory method of appeal has been prescribed," *Roche*, 319 at 27–28.

A petition for a writ of certiorari, which "is not a matter of right, but of judicial discretion," Sup. Ct. R. 10, does not provide Plaintiffs adequate means to attain relief for the cognizable harms argued above. *See Hollingsworth*, 558 U.S. at 190–91, 199; *cf.* 28 U.S.C. § 1291. Losing parties in civil litigation in federal court are entitled to a direct appeal in the court of appeals without petitioning the court for review. Fed. R. App. P. 4. Litigants have no appeal as of right in this Court where fewer than two percent of petitions are granted.[2] The rare possibility of a writ of certiorari is not a bar for satisfying the requirements for a writ of mandamus in this Court. *See Hollingsworth*, 558 U.S. at 190–91, 199 (granting a stay pending the filing of a petition for a writ of mandamus or for certiorari, and holding there was "a fair prospect" that a majority of this Court would grant applicants' petition for a writ of mandamus and would find that applicants had no other adequate means to attain relief, even though certiorari was also available). Thus, under *Hollingsworth*, the potential availability of certiorari is not an adequate substitute for the mandamus relief Plaintiffs are seeking here.

Because the full record below encompasses nine years of litigation spanning eleven dockets in three courts, including seven decisions by the circuit court, certiorari is also a much broader writ than necessary to vacate the panel's improperly granted writ of mandamus. Thus, a

---

2. U.S. Courts, *About the U.S. Courts of Appeals*, https://www.uscourts.gov/about-federal-courts/court-role-and-structure/about-us-courts-appeals (last visited Sept. 6, 2024).

26

writ of certiorari does not provide an "avenue far short of mandamus to achieve precisely the relief [Plaintiffs] seek." *Kerr*, 426 U.S. at 405. Plaintiffs' petition for a writ of certiorari, if it becomes necessary because this petition is denied, would present a different set of legal questions encompassing a wider set of rights than those at issue here, including review of the Ninth Circuit's 2020 Opinion on redressability, and review for the first time of the district court's decisions to grant leave to amend and deny in part the Government's motion to dismiss Plaintiffs' second amended complaint. Certiorari thus cannot provide substitute relief for the panel's improperly granted writ of mandamus.

## III. MANDAMUS IS APPROPRIATE TO UNDO THE MANIFOLD HARM CREATED BY THE NINTH CIRCUIT'S DECISION

Here, "the writ is appropriate under the circumstances" because it would remedy the harm done by the panel's writ to the orderly functioning of the federal court system; eliminate the dilemma created by the panel for district courts; undo the panel's potent disregard of the district court here; and remove the unjust prejudice to the Plaintiffs. *Cheney*, 542 U.S. at 381; *see Schlagenhauf*, 379 U.S. at 111, 120 (finding third *Cheney* condition satisfied when district court ordered mental and physical examinations without a showing of good cause).

### A. Mandamus here would undo the harm to the orderly functioning of the federal court system created by the panel's writ

A writ of mandamus by this Court is appropriate to correct the panel's harm to the orderly functioning of the

27

federal court system. "[T]he writ serves a vital corrective and didactic function." *Will*, 389 U.S. at 107. If this Court allows the panel's issuance of the writ to stand, it raises unsettling questions for the lower courts and expands the jurisdictional role of circuit courts prior to final judgment. May other motions panels use the writ of mandamus to cut off proceedings in the district court they disagree with, leapfrogging the normal rules of certification for interlocutory appeal or awaiting final judgment? Will district courts lose the discretion to interpret and apply the circuit court's mandates regarding jurisdictional dismissals and consider whether leave to amend should be granted on remand? When the Government is defending against a suit it believes will have significant consequences if plaintiffs prevail on the merits, can it repeatedly pursue mandamus before final judgment as a "get out of the case free" card merely to avoid the costs of litigation—until it draws the right three-judge panel?[3]

A writ of mandamus by this Court to the Ninth Circuit would correct the Department of Justice's repeated efforts to avoid the final judgment rule through multiple petitions for writs of mandamus. By granting the Government's seventh petition for a writ of mandamus—which contained the same defects as its previous six failed attempts—the panel rewarded the Government's sheer perseverance in continuing to file successive non-colorable petitions for writs of mandamus as the case proceeded in the district court. Because "[t]he United States is a defendant in close to one-fifth of the civil cases filed in federal court[,]" any escalation of this strategy by the Department of Justice

---

3. To date, 12 different Ninth Circuit judges and four different panels have issued orders or opinions in this case.

28

could easily glut the appellate courts with meritless mandamus petitions. *See In re United States*, 884 F.3d at 836; *Juliana*, 949 F.3d at 1127 n.1 (Friedland, J., dissenting). A writ of mandamus by this Court reversing the Ninth Circuit's improper writ would instruct litigants in federal court—especially the Government—that the tactic of persistently filing meritless petitions will not bear fruit.

Such instruction by this Court would prevent, in future cases, the waste of time and resources that the Government's mandamus strategy created in this case. The weeks-long trial the government sought mandamus relief from is not exceptional in important federal cases. *See United States v. Google*, No. 20-cv-3010 (APM), 2024 WL 3647498, at *5 (D.D.C. Aug. 5, 2024) (DOJ tried a nine-week-long case). This Court's jurisprudence is clear that even the inconvenience and cost of a trial "of several months' duration" is insufficiently extraordinary for mandamus. *Roche*, 319 U.S. at 30. Moreover, the Government's resort to mandamus proved far more inefficient and more expensive than the ordinary litigation process would have been. The Government has spent more time and expense prematurely running to the Ninth Circuit and this Court for relief than it would have had the October 2018 trial been allowed to proceed. *Compare* Case No. 18A410, Appl. for Stay at 5a (Government counsel Montero's declaration that trial would have entailed 7,300 attorney and paralegal hours) *with* D. Ct. Doc. 571-1 ¶¶ 2–3 (Government counsel Montero's declaration that post-October 2018 litigation entailed over 8,000 attorney and paralegal hours). Those efforts turned this case into a decade-long procedural, rather than merits, contest,

29

grossly exceeding the median length of civil cases in the U.S. district courts of 27 months from filing to trial.[4]

## B. Mandamus would eliminate the dilemma created by the panel for district courts

The panel's forceful rebuke of the district court under these circumstances creates an untenable dilemma for all district courts. On the one hand, if a district court denies leave to amend after a jurisdictional dismissal, it risks reversal for abuse of discretion, because Rule 15(a) mandates that leave shall be "freely" given. On the other hand, if the district court grants leave to amend after a jurisdictional dismissal, it now risks mandamus, as demonstrated by the panel's issuance of mandamus here. District courts cannot exercise their discretion and avoid this predicament simply by relying on binding precedent on point, because the district court below did exactly that. *See* App. 89a–90a (relying on *S.F. Herring*, 946 F.3d at 574). A writ of mandamus from this Court would eliminate the dilemma.

## C. Mandamus would undo the panel's potent disregard of this district court

Because a writ of mandamus is "one of 'the most potent weapons in the judicial arsenal,'" *Cheney*, 542 U.S. at 380 (quoting *Will*, 389 U.S. at 107), "[d]ue regard" must be given "for the extremely awkward position in which it places the District Judge[.]" *Will*, 389 U.S. at 106–07.

---

4. Cong. Rsch. Serv., *Lawsuits Against the Federal Government: Basic Federal Court Procedure and Timelines* (Dec. 22, 2020), https://crsreports.congress.gov/product/pdf/IF/IF11349.

30

Mandamus constitutes a harsh rebuke of a district judge because it "ha[s] the unfortunate consequence of making the judge a litigant." *Ex parte Fahey*, 332 U.S. at 260; *see Whole Woman's Health v. Jackson*, 595 U.S. 30, 40 (2021) ("Judges exist to resolve controversies about a law's meaning or its conformance to the Federal and State Constitutions, not to wage battle as contestants in the parties' litigation."). Here, the panel unfairly issued its May 1, 2024 writ of mandamus to the district court without any inquiry into whether the district court had clearly and indisputably erred in resolving controversies before it, in conformance with the Constitution and this Court's precedent. The panel never analyzed Plaintiffs' 2023 second amended complaint, and therefore, could not know if the district court erred in concluding the amendment cured the jurisdictional deficiencies the Ninth Circuit found in 2020.

Had the district court proceeded on Plaintiffs' 2015 complaint, which was dismissed by the Ninth Circuit on standing grounds, such action would have been a clear and indisputable violation of the Ninth Circuit's 2020 mandate. However, the district court did not proceed on the 2015 complaint. It heeded the mandate and considered Plaintiffs' motion for leave to amend in light of the 2020 Opinion, as it was required to do, granted leave under a *Foman* analysis, in concert with circuit precedent, and later denied in part and granted in part the Government's subsequent motion to dismiss, further narrowing Plaintiffs' second amended complaint. App. 54a, 73a–74a, 87a–94a, 100a. The question of whether *that operative complaint* now meets the requirements of Article III and the Declaratory Judgment Act is a question that can be addressed on direct appeal of final judgment in the ordinary course of litigation.

31

A writ of mandamus from this Court would reverse the panel's unfair rebuke of a former chief judge and senior member of the judiciary, who has never before received such a writ, and was simply following this Court's precedent to fulfill her role in the federal court system. For nine years, the district court has received the Charlie Brown football treatment because the "breadth of Plaintiffs' claims is striking" and justiciability "presents substantial grounds for difference of opinion." App. 169a. While that may be true, it does not excuse, and provides even more reason to ensure, that the case proceeds strictly according to the rules and arrives at each level of the judiciary fully developed. After all, in finding injury and causation satisfied in 2020, the Ninth Circuit wrote: "A substantial evidentiary record documents that the federal government has long promoted fossil fuel use despite knowing that it can cause catastrophic climate change, and that failure to change existing policy may hasten an environmental apocalypse." App. 103a.

### D. Mandamus would remove unjust prejudice to the Plaintiffs and correct uneven treatment

A writ of mandamus from this Court is also appropriate because it would "aid . . . the appellate jurisdiction which might otherwise be defeated by the unauthorized action of the court below." *Ex parte United States*, 287 U.S. 241, 246 (1932). Because this case was resolved by a motions panel in the form of mandamus, rather than by a merits panel on direct appeal, Plaintiffs' case has now been dismissed on jurisdictional grounds without leave to amend and without appeal as of right to a merits panel—despite the district court's finding that leave to amend was warranted in this case, and without any court having concluded that amendment would be futile. *See Foman*, 371 U.S. at 182.

32

The requested writ is appropriate to return the parties to the status quo that existed before the panel improperly issued its writ.

Justice requires even-handed treatment of Plaintiffs and the Government. Having repeatedly invoked the non-merits jurisdiction of this Court and the Ninth Circuit, the Government should not be heard to protest when it is invoked by the other side. A return to the status quo would restore Plaintiffs' rights to rely on the integrity of the rules of civil and appellate procedure and this Court's precedent, and compel the Government to also abide by them. Had the panel denied mandamus, the parties would equally have rights after final judgment in the district court to direct appeal to a merits panel under 28 U.S.C. § 1291 of any adverse decision. *See* 9th Cir. Gen. Order 3.6(d).

The disregard of fair process here involves the matter of irreversible threats to Plaintiffs' lives and safety. The young Plaintiffs' ongoing physical and mental health injuries, alongside harms to their homes, sacred tribal lands, and ways of life, implicate the most fundamental of rights safeguarded by our Constitution. *See, e.g.*, App. 26a, 47a, 68a, 84a, 112a. Each federal judge to review Plaintiffs' Fifth Amendment claims thus far, regarding the serious infringement of their rights to life and personal security,[5] has deemed their injuries cognizable, even if Plaintiffs' initial request for relief was deemed too

---

5. The district court, the magistrate judge, and the three judges impaneled by the Ninth Circuit in 2020 all found Plaintiffs' harms to be existential. D. Ct. Doc. 68 at *5 (magistrate findings); *Juliana*, 217 F. Supp. 3d at 1250; App. 103a; *id.* at 130a–31a (Staton, J., dissenting).

33

ambitious in the Ninth Circuit's 2020 Opinion. App. 77a, 84a, 104a, 112a, 131a–40a. Claims brought by children claiming a lifetime of hardship and disabling injuries imposed by their Government deserve at least fair process and due consideration in the courts. *See Plyler v. Doe*, 457 U.S. 202, 222–23, 227–30 (1982) (reviewing under heightened scrutiny and declaring unconstitutional a state law and systemic conduct that discriminated against undocumented children where there was no fundamental right or suspect class at issue); *see also W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) (reexamining and reversing precedent to protect children's liberty interests).

> The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts. One's right to life, liberty, and . . . other fundamental rights may not be submitted to vote; they depend on the outcome of no elections.

*Id.* at 638. These rights, when infringed, are for the courts to declare through fair process.

34

## CONCLUSION

As the district court concluded in addressing the Government's seventh petition for a writ of mandamus against her:

> This Court has great regard for the judicial process. It has deliberately considered all motions the parties brought, and its decisions are accessible for appellate scrutiny in the due course of litigation. Trial courts across the country address complex cases involving similar jurisdictional, evidentiary, and legal questions as those presented here without resorting to interlocutory appeal or petitioning for a writ of mandamus. As Justice Stewart noted, "the proper place for the trial is in the trial court, not here." *Baker v. Carr*, 369 U.S. 186, 266 (1962) (Stewart, J., concurring.) Defendants therefore have other means, such as a direct appeal, to obtain the desired relief. This Court recommends denying defendants' petition for writ of mandamus.

App. 24a.

For the foregoing reasons, Plaintiffs respectfully ask the Court to issue a writ of mandamus to the United States Court of Appeals for the Ninth Circuit to vacate its issuance of a writ of mandamus to the U.S. District Court for the District of Oregon and to remand this case to the district court for further proceedings.

35

Respectfully submitted,

Philip L. Gregory
Gregory Law Group
1250 Godetia Drive
Redwood City, CA 94062

Andrea K. Rodgers
Our Children's Trust
3026 NW Esplanade
Seattle, WA 98117

September 12, 2024

Julia A. Olson
   *Counsel of Record*
Our Children's Trust
1216 Lincoln Street
Eugene, OR 97401
julia@ourchildrenstrust.org
(415) 786-4825

**APPENDIX**

*i*

## TABLE OF APPENDICES

*Page*

APPENDIX A — Order of the United States Court of Appeals for the Ninth Circuit, filed May 1, 2024 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1a

APPENDIX B — Judgment of the United States District Court for the District of Oregon, Eugene Division, filed May 1, 2024 . . . . . . . . . . . . . . . . . . . . . . .6a

APPENDIX C — Supplemental Order of the United States District Court for the District of Oregon, Eugene Division, filed April 19, 2024 . . . . . .7a

APPENDIX D — Opinion and Order of the United States District Court for the District of Oregon, Eugene Division, signed December 29, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . .25a

APPENDIX E — Opinion and Order of the United States District Court for the District of Oregon, Eugene Division, signed June 1, 2023 . . . .79a

APPENDIX F — Opinion of the United States Court of Appeals for the Ninth Circuit, filed January 17, 2020 . . . . . . . . . . . . . . . . . . . . . . . . . . . . .101a

APPENDIX G — Opinion of the Supreme Court of the United States, filed November 2, 2018 . . . . . . .165a

*ii*

## TABLE OF APPENDICES

*Page*

APPENDIX H — Opinion of the Supreme Court
of the United States, filed July 30, 2018 . . . . . . . . .169a

APPENDIX I — Order of the United States
Court of Appeals for the Ninth Circuit,
filed July 12, 2024 . . . . . . . . . . . . . . . . . . . . . . . . . . . .170a

1a

**APPENDIX A**

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

————————

No. 24-684
D.C. No. 6:15-cv-1517
District of Oregon, Portland

In re: UNITED STATES OF AMERICA.

UNITED STATES OF AMERICA, *et al.*,

*Petitioners,*

v.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON, EUGENE,

*Respondent,*

STATE OF ALABAMA,

*Defendant,*

XIUHTEZCATL TONATIUH M., through his
Guardian Tamara Roske-Martinez, *et al.*,

*Real Parties in Interest,*

THE NATIONAL ASSOCIATION OF
MANUFACTURERS, *et al.*,

*Intervenors,*

ENVIRONMENTAL JUSTICE CLINIC –
UNIVERSITY OF MIAMI SCHOOL OF LAW, *et al.*,

*Amici Curiae.*

————————

2a

*Appendix A*

Filed:   May 1, 2024

─────────

**ORDER**

─────────

Before: BENNETT, R. NELSON, and MILLER, Circuit Judges.

In the underlying case, twenty-one plaintiffs (the Juliana plaintiffs) claim that—by failing to adequately respond to the threat of climate change—the government has violated a putative "right to a stable climate system that can sustain human life." *Juliana v. United States*, No. 6:15-CV-01517-AA, 2023 WL 9023339, at *1 (D. Or. Dec. 29, 2023). In a prior appeal, we held that the Juliana plaintiffs lack Article III standing to bring such a claim. *Juliana v. United States*, 947 F.3d 1159, 1175 (9th Cir. 2020). We remanded with instructions to dismiss on that basis. *Id.* The district court nevertheless allowed amendment, and the government again moved to dismiss. The district court denied that motion, and the government petitioned for mandamus seeking to enforce our earlier mandate. We have jurisdiction to consider the petition. *See* 28 U.S.C. § 1651. We grant it.

1. "[M]andamus is an extraordinary remedy . . . reserved for extraordinary situations." *Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 289 (1988). "[M]andamus is the appropriate remedy" when

3a

*Appendix A*

"sought on the ground that the district court failed to follow the appellate court's mandate." *Vizcaino v. U.S. Dist. Ct. for W. Dist. of Wash.*, 173 F.3d 713, 719 (9th Cir. 1999); *see also United States v. U.S. Dist. Ct. for S. Dist. of N.Y.*, 334 U.S. 258, 263 (1948). We review a district court's compliance with the mandate de novo. *Pit River Tribe v. U.S. Forest Serv.*, 615 F.3d 1069, 1080 (9th Cir. 2010).

2. The petition accuses the district court of failing to execute our mandate on remand. District courts must "act on the mandate of an appellate court, without variance or examination, only execution." *United States v. Garcia-Beltran*, 443 F.3d 1126, 1130 (9th Cir. 2006). "[T]he only step" that a district court can take is "to obey the mandate." *Rogers v. Consol. Rock Prods. Co.*, 114 F.2d 108, 111 (9th Cir. 1940). A district court must "implement both the letter *and the spirit* of the mandate, taking into account the [prior] opinion and the circumstances it embraces." *Pit River Tribe*, 615 F.3d at 1079 (emphasis added) (cleaned up).

3. In the prior appeal, we held that declaratory relief was "not substantially likely to mitigate the plaintiffs' asserted concrete injuries." *Juliana*, 947 F.3d at 1170. To the contrary, it would do nothing "absent further court action," which we held was unavailable. *Id.* We then clearly explained that Article III courts could not "step into the[] shoes" of the political branches to provide the relief the Juliana plaintiffs sought. *Id.* at 1175. Because neither the request for declaratory relief nor the request for injunctive relief was justiciable, we "remand[ed] th[e] case

4a

*Appendix A*

to the district court with instructions to dismiss for lack of Article III standing." *Id.* Our mandate was to dismiss.

4. The district court gave two reasons for allowing amendment. First, it concluded that amendment was not expressly precluded. Second, it held that intervening authority compelled a different result. We reject each.

The first reason fails because we "remand[ed] . . . with instructions to dismiss for lack of Article III standing." *Id.* Neither the mandate's letter nor its spirit left room for amendment. *See Pit River Tribe*, 615 F.3d at 1079.

The second reason the district court identified was that, in its view, there was an intervening change in the law. District courts are not bound by a mandate when a subsequently decided case changes the law. *In re Molasky*, 843 F.3d 1179, 1184 n.5 (9th Cir. 2016). The case the court identified was *Uzuegbunam v. Preczewski*, which "ask[ed] whether an award of nominal damages by itself can redress a past injury." 141 S. Ct. 792, 796 (2021). Thus, *Uzuegbunam* was a damages case which says nothing about the redressability of declaratory judgments. Damages are a form of retrospective relief. *Buckhannon Bd. & Care Home v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 608–09 (2001). Declaratory relief is prospective. The Juliana plaintiffs do not seek damages but seek only prospective relief. Nothing in *Uzuegbunam* changed the law with respect to prospective relief.

5a

*Appendix A*

We held that the Juliana plaintiffs lack standing to bring their claims and told the district court to dismiss. *Uzuegbunam* did not change that. The district court is instructed to dismiss the case forthwith for lack of Article III standing, without leave to amend.

**PETITION GRANTED.**

6a

**APPENDIX B**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
EUGENE DIVISION

_____

Civ. No. 6:15-cv-01517-AA

KELSEY CASCADIA ROSE JULIANA, *et al.,*

*Plaintiffs,*

v.

UNITED STATES OF AMERICA, *et al.,*

*Defendants.*

_____

Filed:   May 1, 2024

_____

**JUDGMENT**

_____

AIKEN, District Judge:

For the reasons set forth in the Court's accompanying Order, this case is DISMISSED.

It is so ORDERED and DATED this 1st day of May 2024.

/s/ Ann Aiken
Ann Aiken
United States District Judge

7a

## APPENDIX C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
EUGENE DIVISION

———————

Civ. No. 6:15-cv-01517-AA

KELSEY CASCADIA ROSE JULIANA, *et al.,*

*Plaintiffs,*

v.

UNITED STATES OF AMERICA, *et al.,*

*Defendants.*

———————

Filed:   April 19, 2024

———————

**SUPPLEMENTAL ORDER
ADDRESSING PETITION FOR WRIT
OF MANDAMUS**

———————

AIKEN, District Judge:

    This supplemental order is issued in response to the invitation of the United States Court of Appeals for the Ninth Circuit to address defendants' Petition for Writ of Mandamus ("Pet."), ECF No. 581-1, which is pending before the appellate court, Case No. 24-684.

8a

*Appendix C*

## INTRODUCTION

The young plaintiffs here have compiled an abundance of factual evidence to support their claim that the government has known about the dangers posed by fossil fuel production, and, despite that knowledge, chose to promote production and consumption of coal, oil, and gas at increasing levels over decades. The evidence, as the Ninth Circuit stated, "leaves little basis for denying that climate change is occurring at an increasingly rapid pace . . . and stems from fossil fuel combustion." *Juliana v. United States*, 947 F.3d 1159, 1166 (9th Cir. 2020).

A case about climate change, to be sure, raises legal issues of first impression, but the matters the district court has addressed time and again throughout the pendency of this case are the bread-and-butter of daily trial court work: injury, causation, and redressability under Article III; justiciability; viability of claims under Federal Rules of Procedure 12(b); standards for injunctive and declaratory relief—foundational inquiries necessary to proceed to any factfinding phase reaching the heart of plaintiffs' novel claims. Plaintiffs note in their response that this is defendants' seventh petition for writ of mandamus. Defendants' petition challenges the district court's order granting leave to amend and denying a motion to dismiss on the pleadings, assigning error to this Court's rulings as one would through the usual appellate process.

As the Ninth Circuit has stated, "[t]here is enduring value in the orderly administration of litigation by the trial courts, free of needless appellate interference. In turn,

9a

*Appendix C*

appellate review is aided by a developed record and full consideration of issues by the trial courts. If appellate review could be invoked whenever a district court denied a motion to dismiss, we would be quickly overwhelmed with such requests, and the resolution of cases would be unnecessarily delayed." *In re United States*, 884 F.3d 830, 837 (9th Cir. 2018). This Court appreciates its responsibility in the constitutional scheme to develop a record, consider the facts, and faithfully interpret the law. Fulfilling this role will aid the appellate court in its review in the normal course of appeal, the proper vehicle for its analysis of defendants' assignments of error.

## BACKGROUND

A factual background relevant to the parties' arguments on defendants' now-pending petition for writ of mandamus is set forth in the district court's Order on defendants' motion to dismiss, ECF No. 565 (December 29, 2023). Otherwise, it has briefed extensively by the parties. In their petition, defendants assert that this Court violated the Ninth Circuit's mandate in its 2020 decision. This Court highlights portions of the procedural history it finds helpful to recall.

## I. 2020 Appellate Court Decision

The Ninth Circuit did not reach the merits of plaintiffs' claims because it found that plaintiffs lacked standing. In the appellate court's 2020 decision, writing for the majority, Judge Hurwitz, joined by Judge Murguia, began with the basics: "To have standing under Article

10a

*Appendix C*

III, a plaintiff must have (1) a concrete and particularized injury that (2) is caused by . . . challenged conduct and (3) is likely redressable by a favorable judicial decision." *Juliana*, 947 F.3d at 1168. (9th Cir. 2020).

Agreeing with the district court, Judge Hurwitz found that "[a]t least some plaintiffs" had claimed "particularized injuries," since climate change threatened to harm certain plaintiffs in "concrete and personal" ways if left unchecked. *Id*. And, that some plaintiffs had also established causation because there was "at least a genuine factual dispute as to whether" U.S. climate policy was a "substantial factor" in exacerbating plaintiffs' climate change-related injuries. *Id*. at 1169. Thus, plaintiffs' standing turned on redressability: "whether the plaintiffs' claimed injuries [were] redressable by an Article III court." *Id*.

Plaintiffs claimed defendants had violated their constitutional right to a climate system capable of sustaining life, and to redress that violation, sought injunctive relief, including an order directing defendants to "prepare and implement an enforceable national remedial plan to phase out fossil fuel emissions and draw down excess atmospheric CO2 to stabilize the climate system." First. Am. Compl. at 94 ¶¶ 2, 6, 7.

"Reluctantly," the panel found such relief "beyond [the district court's] constitutional power." *Juliana*, 947 F.3d at 1165. For injunctive relief, the Ninth Circuit was "skeptical," but assumed without deciding that plaintiffs might show that their injuries could be redressed by an order in their favor. *Id*. at 1171. That said, the appellate

11a

*Appendix C*

court based its ruling on the second redressability prong, stating that an injunction was "beyond the power of an Article III court to order, design, supervise, or implement." *Id.* The appellate court explained that Article III courts cannot order injunctive relief unless constrained by more "limited and precise" legal standards, discernable in the Constitution, and that plaintiffs must make their case to the political branches. *Id.* at 1175.

As for plaintiffs' request for declaratory relief, the Ninth Circuit determined that a declaration would be "unlikely by itself to remediate [plaintiffs'] alleged injuries." *Juliana* 947 F.3d at 1170. Accordingly, the Ninth Circuit "reverse[d] the certified orders of the district court and remand[ed]" the case "with instructions to dismiss for lack of Article III standing." *Id.* at 1175.

## II. 2023 District Court Orders

After the Ninth Circuit ordered the district court to dismiss the case, plaintiffs moved to file a second amended complaint. ECF No. 462. On June 1, 2023, this Court granted plaintiffs' motion to amend their complaint. Order on Second Am. Compl., ECF No. 540 (June 1, 2023). Plaintiffs had notified the Court of an intervening case from the United States Supreme Court, *Uzuegbunam v. Preczewski*, ___U.S.___, 141 S. Ct. 792 (2021) which held that, for purposes of Article III standing, nominal damages—a form of declaratory relief—provide the necessary redress for a completed violation of a legal right. *Id.* at 798, 802. That, with this Court's understanding that the Ninth Circuit had not expressly foreclosed the

12a

*Appendix C*

possibility of amendment, led the Court to grant plaintiffs' motion to amend. This Court explained:

> "Absent a mandate which explicitly directs to the contrary, a district court upon remand can permit the plaintiff to file additional pleadings . . . ." *San Francisco Herring Ass'n v. Dep't of the Interior*, 946 F.3d 564, 574 (9th Cir. 2019) (quoting Nguyen, 792 F.2d at 1502; *see also Sierra Club v. Penfold*, 857 F.2d 1307, 1312 (9th Cir. 1988). When mandate in the prior appeal did not expressly address the possibility of amendment and did not indicate a clear intent to deny amendment seeking to raise new issues not decided by the prior appeal, that prior opinion did not purport "to shut the courthouse doors." *San Francisco Herring Ass'n*, 946 F.3d at 574 (citing *Nguyen*, 792 F.2d at 1503).

> . . .

> "Here, this Court does not take lightly its responsibility under the rule of mandate. Rather, it considers plaintiffs' new factual allegations under the Declaratory Judgment Act, and amended request for relief in light of intervening recent precedent, to be a new issue that, while discussed, was not decided by the Ninth Circuit in the interlocutory appeal. Nor did the mandate expressly state that plaintiffs could not amend to replead their case—particularly where the opinion found a

13a

*Appendix C*

narrow deficiency with plaintiffs' pleadings on redressability. This Court therefore does not interpret the Ninth Circuit's instructions as mandating it "to shut the courthouse doors" on plaintiffs' case where they present newly amended allegations. *San Francisco Herring Ass'n*, 946 F.3d at 574.

ECF No. 540 at 10-11.

Defendants quickly moved to dismiss plaintiffs' second amended complaint, ECF No. 547, and this Court denied defendants' motion. Order on Mot. to Dismiss, ECF No. 565 (December 29, 2023). Defendant had again asserted that the district court had violated the rule of mandate and this Court again explained its due regard for the rule:

Because it is jurisdictional error to contravene a rule of mandate, the Court duly reconsiders the mandate of the Ninth Circuit and does not take the matter lightly. "A district court that has received the mandate of an appellate court cannot vary or examine that mandate for any purpose other than executing it." *Hall v. City of Los Angeles*, 697 F.3d 1059, 1067 (9th Cir. 2012). "Violation of the rule of mandate is a jurisdictional error." *Id*. at 1067.

"But while the mandate of an appellate court forecloses the lower court from reconsidering matters determined in the appellate court, it leaves to the district court any issue not

14a

*Appendix C*

expressly or impliedly disposed of on appeal." *S.F. Herring Ass'n v. Dep't of the Interior*, 946 F.3d 564, 574 (9th Cir. 2019) (quoting *Nguyen v. United States*, 792 F.2d 1500, 1502 (9th Cir. 1986)). In determining which matters fall within the compass of a mandate, "[d]istrict courts must implement both the letter and the spirit of the mandate, taking into account the appellate court's opinion and the circumstances it embraces." *Vizcaino v. U.S. Dist. Ct. for W. Dist. of Wash.*, 173 F.3d 713, 719 (9th Cir. 1999) (as amended) (quoting *Delgrosso v. Spang & Co.*, 903 F.2d 234, 240 (3d Cir. 1990)).

"Absent a mandate which explicitly directs to the contrary, a district court upon remand can permit the plaintiff to file additional pleadings . . . " *S.F. Herring*, 946 F.3d at 574 (quoting *Nguyen*, 792 F.2d at 1502); *see also Sierra Club v. Penfold*, 857 F.2d 1307, 1312 (9th Cir. 1988). When the mandate in the prior appeal does not expressly address the possibility of amendment and does not indicate a clear intent to deny amendment seeking to raise new issues not decided, that mandate does not purport "to shut the courthouse doors." *S.F. Herring*, 946 F.3d at 574.

In *S.F. Herring*, the Ninth Circuit discussed its mandate in a prior appeal, which vacated the district court's order entering summary judgment in the defendants' favor and directed

15a

*Appendix C*

the district court to dismiss the complaint. *See S.F. Herring Ass'n v. U.S. Dep't of Interior*, 683 F. App'x 579, 581 (9th Cir. 2017) (vacating judgment and remanding case with instructions to dismiss for lack of subject matter jurisdiction). On remand, the district court allowed the plaintiff to file a second amended complaint.

In the later appeal, the Ninth Circuit determined that the district court correctly found that the earlier mandate to dismiss did not prevent the plaintiff from seeking leave to re-plead. *S.F. Herring*, 946 F.3d at 574. The appellate court reasoned that in instructing the district court to dismiss, the mandate was silent on whether dismissal should be with or without leave to amend, and the mandate therefore did not preclude the district court from allowing plaintiff to file amended pleadings. *Id.* at 572-574.

When this Court granted plaintiffs' motion for leave to amend, it "consider[ed] plaintiffs' new factual allegations under the Declaratory Judgment Act and plaintiffs' amended request for relief, in light of intervening recent precedent, to be a new issue that, while discussed, was not decided by the Ninth Circuit in the interlocutory appeal." *Juliana v. United States*, No. 6:15-CV-01517-AA, 2023 WL 3750334, at *5 (D. Or. June 1, 2023).

16a

*Appendix C*

The Court once again finds that the Ninth Circuit's mandate did not address whether amendment, if permitted, would cure the deficiency it identified in plaintiffs' complaint. The Ninth Circuit also did not instruct the Court to dismiss without leave to amend. Accordingly, its mandate to dismiss did not foreclose that opportunity, and the Court, on reconsideration, finds that in permitting plaintiffs to proceed with their second amended complaint, the rule of mandate is not contravened. *S.F. Herring*, 946 F.3d at 574; *see also Creech v. Tewalt*, 84 F.4th 777, 783 (9th Cir. 2023) (where appellate court remanded and stated that plaintiff should have leave to amend, district court did not violate rule of mandate by dismissing without leave to amend, because appellate court did not expressly foreclose that option).

ECF No. 565 at 19-20.

On February 2, 2023, defendants filed notice with the district court of their petition for writ of mandamus in the Ninth Circuit. Pet., ECF No. 585, 585-1. Defendants contend that the Ninth Circuit should issue a writ of mandamus to this Court, directing it to dismiss this case for lack of jurisdiction and without leave to amend. The Ninth Circuit invited the district court to address the petition.

17a

*Appendix C*

## LEGAL STANDARD

"The writ of mandamus is a drastic and extraordinary remedy reserved for really extraordinary causes." *In re Van Dusen*, 654 F.3d 838, 840 (9th Cir. 2011) (quoting *Ex parte Fahey*, 332 U.S. 258, 259–60 (1947)) (internal quotation marks omitted). "[O]nly exceptional circumstances amounting to a judicial usurpation of power or a clear abuse of discretion will justify the invocation of this extraordinary remedy." *Cheney v. U.S. Dist. Ct.*, 542 U.S. 367 (2004) (internal quotation marks and citations omitted).

In considering whether to grant a writ of mandamus, appellate courts are guided by the five factors identified in *Bauman v. U.S. Dist. Ct.*, 557 F.2d 650 (9th Cir. 1977): (1) whether the petitioner has no other means, such as a direct appeal, to obtain the desired relief; (2) whether the petitioner will be damaged or prejudiced in any way not correctable on appeal; (3) whether the district court's order is clearly erroneous as a matter of law; (4) whether the district court's order is an oft repeated error or manifests a persistent disregard of the federal rules; and (5) whether the district court's order raises new and important problems or issues of first impression. *Perry v. Schwarzenegger*, 591 F.3d 1147, 1156 (9th Cir. 2010) (citing *Bauman*, 557 F.2d at 654-55). "All factors are not relevant in every case and the factors may point in different directions in any one case." *Christensen v. U.S. Dist. Ct.*, 844 F.2d 694, 697 (9th Cir. 1988).

18a

*Appendix C*

**DISCUSSION**

Defendants maintain that mandamus is warranted because (1) the district court violated the Ninth Circuit's mandate which required dismissal and foreclosed amendment; (2) the district court erred in finding that plaintiffs have Article III standing; and (3) the district court erred in finding that plaintiffs had stated plausible claims for relief under due process clause and public trust doctrine.

**I. Standing & Merits**

This Court has addressed the merits of the parties' arguments on Article III standing and the viability of plaintiffs' due process and public trust claims, and as before, "stands by its prior rulings on jurisdictional and merits issues, as well as its belief that this case would be best served by further factual development at trial." *Juliana v. United States*, No. 6:15-CV-01517-AA, 2018 WL 6303774, at *3 (D. Or. Nov. 21, 2018); *see also* ECF No. 565 at 21-34 (discussing redressability for purposes of Article III standing), *id.* at 35-36 (discussing the political question doctrine and justiciability), *id.* at 36-44 (discussing plaintiffs' due process claim), *id.* at 46-48 (discussing plaintiffs' public trust claim and incorporating analysis from prior orders).

As in their motion to dismiss, defendants maintain that the relief plaintiffs seek is "sweeping" and "unprecedented" and that plaintiffs must make their demands to the political branches. *See* Pet. For Writ of Mandamus ("Pet.")

19a

*Appendix C*

at 1, Doc. 585-1. In any case over which trial courts have jurisdiction, where the plaintiffs have stated a legal claim, it is the proper and peculiar province of the courts to impartially find facts, faithfully interpret and apply the law, and render reasoned judgment. *See* The Federalist No. 78 (Alexander Hamilton).

As this Court stated in its 2023 Order denying defendants' motion to dismiss, "[t]he judiciary is capable and duty-bound to provide redress for the irreparable harm government fossil fuel promotion has caused." ECF No. 565 at 6. This Court draws from that 49-page Order to answer why the remedies plaintiffs seek are not "sweeping" or "unprecedented." In its Order, this Court explained why plaintiffs' proposed remedy is one typical for a district court to fashion and over which it can provide jurisdictional oversight while the parties implement the plans, practices, and policies they together devise. *Id.* at 31-34. As to the merits of plaintiffs constitutional and public trust doctrine claims, the assignments of errors defendants raise in their petition are better suited to an appeal in the regular course.

## II. Propriety of Writ of Mandamus

This Court maintains, as do plaintiffs and amici, that the issues defendants raise on mandamus are better addressed through the ordinary course of litigation.

The first *Bauman* factor is whether the petitioner will "ha[ve] no other means . . . to obtain the desired relief." *Perry*, 591 F.3d at 1156. This factor ensures that a writ

20a

*Appendix C*

of mandamus will not "be used as a substitute for appeal even though hardship may result from delay and perhaps unnecessary trial." *Schlagenhauf v. Holder*, 379 U.S. 104, 110 (1964) (internal citation omitted).

Defendants argue that a writ of mandamus is the only means to ensure that the district court complies with the Ninth Circuit's 2020 decision holding that plaintiffs' claims are beyond the judicial power to redress. Pet. at 29. That said, the Court has explained that its Orders duly regarded and complied with the Ninth Circuit's decision and found plaintiffs' amended complaint demonstrated redress was within the district court's constitutional authority. ECF No. 540 at 14-18; ECF No. 565 at 28-34. Further, challenges to standing "may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment." *Wood v. City of San Diego*, 678 F.3d 1075, 1082 (9th Cir. 2012) (citing *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 506 (2006)). Therefore, defendants' argument that it has no other means to raise a challenge based on redressability—an element of standing—does not succeed.

The second *Bauman* factor is whether the petitioner "will be damaged or prejudiced in any way not correctable on appeal." *Perry*, 591 F.3d at 1156. To satisfy this factor, the defendants "must demonstrate some burden . . . other than the mere cost and delay that are the regrettable, yet normal, features of our imperfect legal system." *DeGeorge v. U.S. Dist. Ct.*, 219 F.3d 930, 935 (9th Cir. 2000) (alteration in original) (quoting *Calderon v. U.S. Dist. Ct.*, 163 F.3d 530, 535 (9th Cir. 1998) (en banc)). Prejudice

21a

*Appendix C*

serious enough to warrant mandamus relief "includes situations in which one's 'claim will obviously be moot by the time an appeal is possible,' or in which one 'will not have the ability to appeal.'" *Id.* (quoting *Calderon*, 163 F.3d at 535).

Defendants argue that holding a trial on the plaintiffs' claims threatens the separation of powers and flouts the Ninth Circuit's mandate. To the extent that defendants are asserting that executive branch officials and agencies in general should not be burdened by an unmeritorious lawsuit, "Congress has not exempted the government from the normal rules of appellate procedure, which anticipate that sometimes defendants will incur burdens of litigating cases that lack merit but still must wait for the normal appeals process to contest rulings against them." *In re United States*, 884 F.3d 830, 836 (9th Cir. 2018).

"The first two criteria articulated in *Bauman* are designed to [ensure] that mandamus, rather than some other form of relief, is the appropriate remedy." *In re Cement Antitrust Litig. (MDL No. 296)*, 688 F.2d 1297, 1301 (9th Cir. 1982), *aff'd sub nom. Arizona v. U.S. Dist. Ct.*, 459 U.S. 1191 (1983) (mem.). This Court's determination that the mandate did not foreclose dismissal is a legal conclusion, along with the district court's determinations on the plausibility of plaintiffs' claims under Federal Rules of Civil Procedure 12(b)(1) and (6), and those determinations, if in error, are correctable through the ordinary course of litigation. In this Court's view, defendants have not satisfied the second *Bauman* factor.

22a

*Appendix C*

The third *Bauman* factor is whether the district court's order "is clearly erroneous as a matter of law." *Perry*, 591 F.3d at 1156. Appellate review of that factor "is significantly deferential and . . . is not met unless the reviewing court is left with a definite and firm conviction that a mistake has been committed." *In re Bundy*, 840 F.3d 1034, 1041 (9th Cir. 2016) (quoting *In re United States*, 791 F.3d 945, 955 (9th Cir. 2015)). "The absence of controlling precedent weighs strongly against a finding of clear error [for mandamus purposes]." *In re Van Dusen*, 654 F.3d 838, 845 (9th Cir. 2011).

Here, this Court provided authority from the Ninth Circuit in support of its determination that it had not violated the rule of mandate. See ECF No. 540 at 10-11, ECF No. 565 19-20. The Court also thoroughly analyzed plaintiffs' claims on the merits, as described above (p. 9). Defendants do not put forth any other controlling Ninth Circuit authority on any of the theories asserted by plaintiffs. Defendants argue that the theories are unprecedented. Thus, the lack of controlling precedent here weighs strongly against a finding of clear error. *Id.*

The fourth *Bauman* factor is whether the district court's order is "an oft repeated error or manifests a persistent disregard of the federal rules." *Perry*, 591 F.3d at 1156. This Court finds no oft-repeated error here, and defendants do not contend that the district court violated any federal rule. The defendants do not satisfy the fourth factor.

The final factor is whether the district court's order "raises new and important problems or issues of first

23a

*Appendix C*

impression." *Perry*, 591 F.3d at 1156. The Ninth Circuit has relied on this factor when there is a "novel and important question" that "may repeatedly evade review." *Id.* at 1159; *see also In re Cement Antitrust Litig.*, 688 F.2d at 1304–05 ("[A]n important question of first impression will evade review unless it is considered under our supervisory mandamus authority. Moreover, that question may continue to evade review in other cases as well.").

As this Court has found, the legal theories asserted raise issues of first impression—i.e., existence of federal public trust doctrine and whether the right to a climate that can sustain human life is fundamental under the Constitution. The merits of those claims are suitable for appeal after final judgment. Whether a district court may grant leave to amend a complaint after a reviewing court orders dismissal is not a matter of first impression, as discussed in this Court's prior orders. *See* ECF No. 540 at 9-11; ECF No. 565 at 18-21. Accordingly, this Court's order granting amendment and denying a motion to dismiss on the pleadings does not present the possibility that those issues will evade appellate review. In this Court's view, defendants have not satisfied the fifth *Bauman* factor. Under the test, a writ of mandamus is not necessary.

## III. Staying Litigation

Defendants also ask the Ninth Circuit to stay litigation while deciding their petition for writ of mandamus. Defendants have moved to stay litigation several times and have filed multiple petitions for writ of mandamus. ECF Nos. 177, 308, 365, 390, 420, 585. In this iteration,

24a

*Appendix C*

defendants maintain that the case must be stayed because there is a substantial likelihood that the Ninth Circuit will grant their petition. Pet. at 5-6. Defendants have not met their burden to show the petition for writ of mandamus is warranted or likely to be granted. The Court has analyzed the appropriate factors and finds that a stay should not be granted.

**CONCLUSION**

This Court has great regard for the judicial process. It has deliberately considered all motions the parties brought, and its decisions are accessible for appellate scrutiny in the due course of litigation. Trial courts across the country address complex cases involving similar jurisdictional, evidentiary, and legal questions as those presented here without resorting to interlocutory appeal or petitioning for a writ of mandamus. As Justice Stewart noted, "the proper place for the trial is in the trial court, not here." *Baker v. Carr*, 369 U.S. 186, 266 (1962) (Stewart, J., concurring.) Defendants therefore have other means, such as a direct appeal, to obtain the desired relief. This Court recommends denying defendants' petition for writ of mandamus.

SUPPLEMENTAL ORDER DATED this 19th day of April 2024.

/s/ Ann Aiken
Ann Aiken
United States District Judge

25a

**APPENDIX D**

2023 WL 9023339

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF OREGON, EUGENE DIVISION

_____

Civ. No. 6:15-cv-01517-AA

KELSEY CASCADIA ROSE JULIANA, *et al.*,

*Plaintiffs,*

v.

THE UNITED STATES OF AMERICA, *et al.*,

*Defendants.*

_____

Signed:   December 29, 2023

_____

**OPINION AND ORDER**

_____

AIKEN, District Judge:

In 2015, twenty-one plaintiffs—a group of young people, including "future generations"—brought this civil rights action against the federal government, alleging injury from the devastation of climate change

26a

*Appendix D*

and contending that the Constitution guarantees the right to a stable climate system that can sustain human life. Through the years of litigating this case, plaintiffs maintain that their government, by subsidizing fossil fuel extraction and consumption, is responsible for destroying the climate system on which all life, liberty, and property depends, violating plaintiffs' fundamental rights under the Due Process Clause of the Constitution and the historical public trust doctrine. On June 1, 2023, the Court granted plaintiffs' motion to file a second amended complaint.

Now before the Court is defendants' motion to dismiss the second amended complaint. ECF No. 547. For the reasons explained, the Court DENIES defendants' motion to dismiss, ECF No. 547; DENIES defendants' motion for an order certifying its prior order, ECF No. 540, for interlocutory appeal, ECF No. 551; and DENIES defendants' motion to stay litigation, ECF No. 552. The Court GRANTS plaintiffs' motion to set a pretrial conference, ECF No. 543.

## INTRODUCTION

The parties do not disagree that the climate crisis threatens our ability to survive on planet Earth. This catastrophe is *the* great emergency of our time and compels urgent action.[1] As this lawsuit demonstrates,

---

1. *See* David Wallace-Wells, The Uninhabitable Earth: Life After Warming (2019); Andrew Freedman & Jason Samenow, *Humidity and Heat Extremes Are on the Verge of Exceeding Limits of Human Survivability, Study Finds*, Washington Post (May 8, 2020) (reporting study warning that highly populated

27a

*Appendix D*

young people—too young to vote and effect change through the political process—are exercising the institutional procedure available to plead with their government to change course. While facts remain to be proved, lawsuits like this highlight young people's despair with the drawn-out pace of the unhurried, inchmeal, bureaucratic response to our most dire emergency. Top elected officials have declared that the climate emergency spells out "code red for humanity."[2] Burning fossil fuels changes the climate more than any other human activity.[3] The government does not deny that it has promoted fossil fuel combustion through subsidies; tax exemptions; permits for fossil fuel development projects; leases on federal lands and offshore areas; permits for imports and exports; and permits for energy facilities.[4] Despite many

---

regions of the world will be rendered uninhabitable sooner than previously thought for parts of the year); Nafeez Ahmed, *New Report Suggests 'High Likelihood of Human Civilization Coming to an End' Starting in 2050*, VICE (June 3, 2019).

2.  President Joseph Biden, Remarks on "Actions to Tackle the Climate Crisis" at Brayton Point Power Station, Somerset, Massachusetts (July 20, 2022), https://www.whitehouse.gov/briefing-room/speeches-remarks/2022/07/20/remarks-by-president-biden-on-actions-to-tackle-the-climate-crisis/ [https://perma.cc/LU2U-CTFM].

3.  Environmental Protection Agency, Sec. Environmental Topics, Climate Change, *Causes of Climate Change*, (last updated April 25, 2023), https://www.epa.gov/climatechange-science/causes-climate-change [https://perma.cc/UGU4-B6EF].

4.  *Juliana v. United States*, 947 F.3d 1159, 1167 (9th Cir. 2020) ("The government affirmatively promotes fossil fuel use in a host of ways, including beneficial tax provisions, permits for imports and exports, subsidies for domestic and overseas projects,

28a

*Appendix D*

climate change suits around the country, in 2023, the United States witnessed record-breaking levels of oil and gas production.[5] And recent calculations conservatively estimate that the United States provides the oil and gas industry $20,000,000,000.00 annually in an array of subsidies.[6]

Defendants maintain that, because tackling the climate crisis is complex, and no single remedy may *entirely* redress plaintiffs' harms caused by climate change, the judiciary is constrained by the Constitution from offering any redress at all. *See* defs.' mot. to dismiss ("Mot.") at 11-13. Defendants contend that the issue of climate change is political in its nature, and that redress of plaintiffs' alleged injuries must be sought from Congress. *Id.* at 28. That unnecessarily narrow view overlooks one clear and constitutional path to shielding future generations from

and leases for fuel extraction on federal land.").

5. *Energy Poverty Prevention and Accountability Act of 2023: Hearing on H.R.6474 and H.R.6481 before the H. Nat. Resources Subcomm. on Energy and Min. Resources, 118th Cong.* (statement of J. Mijin Cha, Assistant Professor, Univ. of Cal.) (citing Oliver Milman, "*US Oil and Gas Production Set to Break Record in 2023 despite UN Climate Goals*," The Guardian, November 27, 2023, sec. Environment, https://www.theguardian.com/environment/2023/nov/27/us-oil-gas-record-fossil-fuels-cop28-united-nations [https://perma.cc/VJ4C-KZGH]).

6. *Id.* (Statement of J. Mijin Cha) (citing Environmental and Energy Study Institute, Fact Sheet, "*Proposals to Reduce Fossil Fuel Subsidies (2021),*" (July 23, 2021)) https://www.eesi.org/papers/view/fact-sheet-proposals-to-reduce-fossil-fuel-subsidies-2021 [https://perma.cc/SD8B-7P6B].

29a

*Appendix D*

impacts of the onslaught of environmental disaster: that it is the responsibility of the judiciary to declare the law that the government may not deprive the People of their Constitutional guarantee of the God-given right to life. U.S. Const. art III; U.S. Const. amend. V; *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 170 (1803).

Plaintiffs' allegations are that collective resolve at every level and in every branch of government is critical to reducing fossil fuel emissions and vital to combating climate change. That curbing climate change requires an all-hands-on-deck approach does not oust the Court from its province or discharge it of its duty under the Constitution to say what the law is. *Marbury* 5 U.S. at 170.[7] Combatting climate change may require all to act in accord, but that does not mean that the courts must "throw up [our] hands" in defeat. *See Juliana v. United States*, 947 F.3d 1159, 1175 (9th Cir. 2020) (Staton, J., dissenting).

The legislative and executive branches of government wield constitutional powers entrusted to those branches by the People through the democratic process. *See* U.S. Const. art. I and art. II. So too, as part of a coequal branch of government, the Court cannot shrink from its role to decide on the rights of the individuals duly presenting their case and controversy. *Marbury*, 5 U.S. at 170. Indeed,

---

7. *See also* Edith M. Lederer, *UN Chief: World Must Prevent Runaway Climate Change by 2020*, Associated Press News (Sept. 10, 2018) (describing massive decarbonization effort necessary to avoid climate "tipping points."), https://apnews.com/article/floods-united-nations-antonio-guterres-us-news-climate-71ab1abf44c14605bf2dda29d6b5ebcc [https://perma.cc/84E6-D24C].

30a

*Appendix D*

courts at home and abroad are capably grappling with climate change lawsuits seeking redress against both government and private actors on a range of legal theories, many novel.[8] In Montana, Judge Kathy Seeley presided over the first climate change trial in the United States, piercing through expert testimony and scientific evidence to provide factual findings and conclusions of law, ruling that the state's failure to consider climate change when approving fossil fuel projects was unconstitutional. *See Held v. Montana*, Findings of Fact, Conclusions of Law, and Order, Civil Action CDV-2020-307 (Mont. First Jud. D. Ct. Lewis and Clark County, Aug. 14, 2023).

The judiciary is capable and duty-bound to provide redress for the irreparable harm government fossil fuel promotion has caused. Legal scholar and professor Mary Christina Wood contends that the all-encompassing breadth of ongoing "irreparable harm" sets the climate emergency apart from any other crisis, in terms of the human interests at stake.[9] As Professor Wood eloquently states: "Because no crisis is as ominous, imminent, and far reaching, the climate emergency must be considered

---

8. The Sabin Center for Climate Change Law of Columbia University has assembled for public access the "Climate Change Litigation Database" containing summaries and court dockets for climate change lawsuits brought in the United States and abroad. *Climate Change Litigation Databases,* Colum. L. Sch.: Sabin Ctr. For Climate Change L., https://climatecasechart.com/ [https://perma.cc/B89Z-YN4M].

9. Mary C. Wood, *"On the Eve of Destruction"*: *Courts Confronting the Climate Emergency*, 97 Ind. L.J. 239, 249 (2022) (hereinafter "Wood, *Eve of Destruction*").

31a

*Appendix D*

*sui generis*," that is, "in a class of its own."[10] The legal approach must "rise to the emergency rather than repeat a failed past paradigm."[11] In the context of Australian youth's challenge to government approval of a coal mine, Justice Bromberg wrote that failure to curb climate change is "what might fairly be described as the greatest inter-generational injustice ever inflicted by one generation of humans upon the next."[12]

---

10. *Id.*

11. *Id.*

12. *Sharma v. Minister for the Env't* [2021] FCA 560 1, 90 (27 May 2021) (Austl.). The court stated:

> "It is difficult to characterise in a single phrase the devastation that the plausible evidence presented in this proceeding forecasts for the Children. As Australian adults know their country, Australia will be lost and the World as we know it gone as well. The physical environment will be harsher, far more extreme and devastatingly brutal when angry. As for the human experience—quality of life, opportunities to partake in nature's treasures, the capacity to grow and prosper—all will be greatly diminished. Lives will be cut short. Trauma will be far more common and good health harder to hold and maintain. None of this will be the fault of nature itself. It will largely be inflicted by the inaction of this generation of adults, in what might fairly be described as the greatest inter-generational injustice ever inflicted by one generation of humans upon the next."

Id.

32a

*Appendix D*

Some may balk at the Court's approach as errant or unmeasured,[13] but more likely than not, future generations may look back to this hour and say that the judiciary failed to measure up at all. In any case over which trial courts have jurisdiction, where the plaintiffs have stated a legal claim, it is the proper and peculiar province of the courts to impartially find facts, faithfully interpret and apply the law, and render reasoned judgment.[14] Such is the case here.

## BACKGROUND

## I. Plaintiffs' Lawsuit

In 2015, plaintiffs filed this civil rights lawsuit that journalists later coined "The Biggest Case on the Planet."[15] At the start of this case, the twenty-one

---

13. *Juliana v. United States*, 947 F.3d 1159, 1174 (9th Cir. 2020) ("Not every problem posing a threat—even a clear and present danger—to the American Experiment can be solved by federal judges. As Judge Cardozo once aptly warned, a judicial commission does not confer the power of 'a knight errant, roaming at will in pursuit of his own ideal of beauty or of goodness'; rather, we are bound 'to exercise a discretion informed by tradition, methodized by analogy, disciplined by system.' ") (quoting Benjamin N. Cardozo, The Nature of the Judicial Process 141 (1921)).

14. *See* The Federalist No. 78 (Alexander Hamilton).

15. Laura Parker, *"Biggest Case on the Planet" Pits Kids v. Climate Change*, Nat'l Geographic (Nov. 9, 2018), https://www.nationalgeographic.com/science/article/kids-sue-us-government-climate-change [https://perma.cc/2J7J-74C2].

33a

*Appendix D*

plaintiffs were between the ages of eight and nineteen. They brought suit along with "future generations" through their guardian, Dr. James Hansen. Plaintiffs named as defendants all federal agencies that plaintiffs alleged were responsible for the U.S. energy policy, including the Department of Agriculture, Department of Transportation, Environmental Protection Agency, Department of Interior, the State Department, Council on Environmental Quality, Department of Defense, and Department of Commerce. Compl., ECF No. 1; First Am. Compl. ("FAC"), ECF No. 7.

Plaintiffs compiled an abundance of factual evidence to support their claim that the government has known about the dangers posed by fossil fuel production, and, despite that knowledge, chose to promote production and consumption of coal, oil, and gas at increasing levels over decades. The record is extensive. The evidence, as the Ninth Circuit stated, "leaves little basis for denying that climate change is occurring at an increasingly rapid pace ... and stems from fossil fuel combustion." *Juliana*, 947 F.3d at 1166.

From the beginning, plaintiffs alleged that, as early as the year 1899, scientists understood that $CO_2$ concentration in the atmosphere caused heat retention, global heating, and climate change. FAC ¶ 131. Plaintiffs stated that for over fifty years, the United States of America has known that $CO_2$ pollution from burning fossil fuels was causing global warming and dangerous climate change, and that continuing to burn fossil fuels would destabilize the climate system on which present and

34a

*Appendix D*

future generations of our nation depend for survival. *Id.* ¶¶ 132-35. Recounting over a dozen signpost junctures, plaintiffs provide letters, memoranda, and reports to the political branches from scientific experts and government agencies cautioning about the danger of carbon pollution and warning that a lack of action would be felt for decades. *Id.* ¶¶ 136-50.

Defendants moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6) for lack of standing; failure to state a cognizable constitutional claim; and failure to state a claim on a public trust theory. ECF No. 27. The Court denied that motion in November 2016. *See* Nov. 10, 2016 Op. & Order, ECF No. 83. Defendants also moved for judgment on the pleadings and summary judgment. ECF Nos. 195, 207. For the most part, the Court denied those motions.

When the Court denied defendants' motions to certify its dispositive orders for interlocutory appeal, defendants petitioned the Supreme Court for a writ of mandamus, ECF No. 390-1, and to stay proceedings, ECF No. 391-1, both which were denied. Defendants asked the district court to reconsider certifying its orders for interlocutory appeal, and, that time, the Ninth Circuit invited the district court to do so. *See* Nov. 21, 2018 Order, ECF Nos. 444, 445. Defendants then sought permission to appeal, which the Ninth Circuit granted. Filed Ord., *Juliana v. United States*, No. 18-36082 (9th Cir. Dec. 26, 2018).

On January 17, 2020, a divided panel of the Ninth Circuit issued a decision reversing the district court's

35a

*Appendix D*

certified orders and remanding the case with instructions to dismiss for lack of Article III standing. *Juliana*, 947 F.3d at 1175. Writing for the majority, Judge Hurwitz, joined by Judge Murguia, began with the basics: "To have standing under Article III, a plaintiff must have (1) a concrete and particularized injury that (2) is caused by ... challenged conduct and (3) is likely redressable by a favorable judicial decision." *Id.* at 1168.

Agreeing with the district court, Judge Hurwitz found that "[a]t least some plaintiffs" had claimed "particularized injuries," since climate change threatened to harm certain plaintiffs in "concrete and personal" ways if left unchecked. *Id.* The appellate court described the dire circumstances faced by one plaintiff who had had to evacuate his coastal home because of climate change. *Id.* And some plaintiffs had also established causation because there was "at least a genuine factual dispute as to whether" U.S. climate policy was a "substantial factor" in exacerbating plaintiffs' climate change-related injuries. *Id.* at 1169. Thus, plaintiffs' standing turned on redressability: "whether the plaintiffs' claimed injuries [were] redressable by an Article III court." *Id.*

Plaintiffs claimed defendants had violated their constitutional right to a climate system capable of sustaining life, and to redress that violation, sought injunctive relief, including an order directing defendants to "prepare and implement an enforceable national remedial plan to phase out fossil fuel emissions and draw down excess atmospheric $CO_2$ to stabilize the climate system." FAC at 94 ¶¶ 2, 6, 7.

36a

*Appendix D*

"Reluctantly," the panel found such relief "beyond [the district court's] constitutional power." *Juliana*, 947 F.3d at 1165. To establish redressability, the appellate court explained, plaintiffs must have identified relief that was both "(1) substantially likely to redress their injuries" and "(2) within the district court's power to award." *Id.* at 1170. On the first prong, the panel found that plaintiffs' own experts had stated that only a comprehensive, government-led plan to reduce U.S. greenhouse gas emissions could mitigate "the global consequences of climate change" and thereby bring plaintiffs' total redress. *Id.* Turning to the second prong, the panel found that supervising such a plan "would necessarily require" judges to make "a host of complex policy decisions." *Id.* at 1171.

Plaintiffs told the appellate court that even partial relief would suffice to redress their injuries, and that the district court "need not itself make policy decisions," because if plaintiffs' request for a remedial plan were granted, the political branches "could decide what policies" would be best to "draw down excess atmospheric $CO_2$." *Id.* at 1172. But the panel determined that, "even under such a scenario," the district court would need to pass judgment on the sufficiency of the government's response to the order. In the Ninth Circuit's view, a district court could not engage in passing judgment on the sufficiency of the government's response to a court order, because it "necessarily would entail a broad range of policymaking." *Id.*

The panel continued: "[A] constitutional directive or legal standard[ ] must guide the court's exercise of

37a

*Appendix D*

equitable power," and, on the other hand, "limited and precise" legal rules simply could not resolve the range of policy-related questions plaintiffs' claims raised. *Id.* at 1173. The appellate court determined that no remedy subject to limited and precise definition could redress plaintiffs' injuries and therefore issuing such relief was not within the district court's power. *Id.*

Judge Josephine L. Staton dissented. "Plaintiffs bring suit," she lamented, "to enforce the most basic structural principle embedded in our system of ordered liberty: that the Constitution does not condone the Nation's willful destruction." *Id.* at 1175. In Judge Staton's view, the district court had the power to award plaintiffs' relief unless plaintiffs' claims ran afoul of the political question doctrine. *See id.* at 1184-85. Since plaintiffs' claims did not pose political questions, she continued, they should have proceeded. *Id.* at 1185-86. "[O]ur history is no stranger to widespread, programmatic changes ... ushered in by the judiciary[ ]," Judge Staton concluded, and the "slow churn" of institutional-reform litigation "should not dissuade us here." *Id.* at 1188-89. At end of the day, the narrower understanding prevailed: that Article III courts cannot order injunctive relief unless constrained by more "limited and precise" legal standards, discernable in the Constitution, and that plaintiffs must make their case to the political branches. *Id.* at 1175. The Ninth Circuit "reverse[d] the certified orders of the district court and remand[ed]" the case "with instructions to dismiss for lack of Article III standing." *Id.*

Plaintiffs moved to file an amended complaint, removing from their prayer for relief the injunction that

38a

*Appendix D*

the Ninth Circuit had found objectionable. ECF No. 462. The Court granted it because (1) the Ninth Circuit did not foreclose the possibility of amendment when it mandated dismissal; (2) plaintiffs had notified the Court of a Supreme Court case providing a new and more expansive interpretation of declaratory judgments; and (3) plaintiffs' proposed complaint narrowed the scope of the injunctive relief it had initially requested. *See Juliana v. United States*, No. 6:15-CV-01517-AA, 2023 WL 3750334 (D. Or. June 1, 2023).

## II. Plaintiffs File a Second Amended Complaint

In plaintiffs' second amended complaint, they maintain earlier factual allegations, contending that defendants implemented no recommendation provided to them via scientific reports warning of catastrophic climate change. Second Am. Compl. ("SAC") ¶ 153. Plaintiffs contend that, if defendants had not disregarded the evidence, "$CO_2$ emissions today would be reduced by 35% from 1987 levels." *Id.* Instead, since 1991, plaintiffs state that defendants have allowed $CO_2$ emissions from fossil fuel combustion to increase. *Id.* Plaintiffs provide tables setting forth data from government sources showing that fossil fuel production, fossil fuel energy consumption, and fossil fuel emissions have climbed substantially since 1965, and that by 2011, fossil fuel combustion in the U.S. accounted for 94% of $CO_2$ emissions. *Id.* ¶¶ 155-58. By 2012, data plaintiffs provide shows that the U.S. was the largest producer of natural gas, and the second largest producer of coal and energy production. *Id.* ¶ 160. By 2014, according to the United States Energy Information

39a

*Appendix D*

Administration, the U.S. had become the largest producer of total petroleum in the world. *Id.* ¶ 161.

Plaintiffs assert that defendants knew the harmful effect of their actions would significantly endanger many, like plaintiffs, with damage persisting for millennia. *Id.* ¶¶ 1, 161. Despite that knowledge, plaintiffs allege defendants continued their policies and practices of promoting the exploitation of fossil fuels and that defendants acted with deliberate indifference to the peril they knowingly created. *Id.*

Plaintiffs' inventory cataloguing the regulatory permits, export permits, and approvals for leasing, drilling, and mining on public lands is substantial. The accounting of exploitation for fossil fuel extraction, coal tracts, and oil and gas leases is staggering. *Id.* ¶¶ 164-70. Plaintiffs comprehensively inventory the affirmative governmental promotion of fossil fuel combustion over decades. *Id.* ¶¶ 171-78.

Plaintiffs also include allegations drawing from scientific evidence documenting the tangible impacts of climate change. Evidence describes rising sea levels, severe droughts, hurricanes, wildfires, extreme heat, flash flooding, unprecedented ocean acidification, and rapid depletion of sea ice. *Id.* ¶¶ 213-41. Such events alter our air quality, water availability, water quality, crop yields, animal agriculture, and housing security. *Id.* Plaintiffs' allegations about what the future holds if climate change is unabated are harrowing. *Id.* ¶¶ 242-55.

40a

*Appendix D*

As the legal basis for their claims, plaintiffs maintain that defendants have violated the Due Process Clause and Equal Protection Clause of the Fifth Amendment; the "unenumerated rights preserved for the people by the Ninth Amendment"; and the public trust doctrine. FAC at 84, 88, 91, 92; SAC at 133, 137, 140, 141 (bringing same claims for relief).

Plaintiffs seek declaratory relief under the Declaratory Judgment Act, 28 U.S.C. § 2201. SAC ¶ 14. Requested relief includes a declaration that the United States national energy system that creates the harmful conditions described above has violated and continues to violate the Fifth Amendment of the U.S. Constitution and plaintiffs' constitutional rights to substantive due process and equal protection of the law. *Id.* at 143 ¶ 1. Further, plaintiffs seek a declaration that defendants violated public trust rights and a declaration that the Energy Policy Act, Section 201 is unconstitutional. *Id.* at 143 ¶¶ 2-3.[16] Plaintiffs request injunctive relief only if necessary and "as appropriate." *Id.* at 143 ¶ 4.

## III. The Government Files a Motion to Dismiss

Defendants move to dismiss under Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6), asserting that plaintiffs lack standing; that plaintiffs cannot bring claims

---

16. As noted earlier, plaintiffs had initially sought injunctive relief, including an order directing defendants to "prepare and implement an enforceable national remedial plan to phase out fossil fuel emissions and draw down excess atmospheric $CO_2$ to stabilize the climate system." FAC at 94 ¶¶ 2, 6, 7.

41a

*Appendix D*

in the absence of a statutory right of action; that plaintiffs ask the Court to exercise authority that exceeds the scope of its power under Article III of the Constitution; and that all of plaintiffs' claims fail on the merits. Defendants also assert that, if the Court denies their motion, it should again certify its decision for interlocutory appeal.

## LEGAL STANDARDS

### I.  Motion to Dismiss – Federal Rule of Civil Procedure 12(b)(1)

A court reviews a motion to dismiss a complaint for lack of Article III standing under Rule 12(b)(1). *Naruto v. Slater*, 888 F.3d 418, 425 n.7 (9th Cir. 2018) (quoting *Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011)). If the jurisdictional attack is facial, courts determine whether the allegations contained in the complaint are sufficient on their face to invoke federal jurisdiction, accepting all material allegations in the complaint as true and construing them in favor of the party asserting jurisdiction. *See Warth v. Seldin*, 422 U.S. 490, 501 (1975). Once a party has moved to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), the party invoking federal jurisdiction bears the burden of establishing the elements of standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). "[A] party must establish an Article III case or controversy before [a court can] exert subject matter jurisdiction." *Matter of E. Coast Foods, Inc.*, 66 F.4th 1214, 1218 (9th Cir. 2023). To satisfy the "irreducible constitutional minimum" of Article III standing, a plaintiff must establish (1) an injury in fact (2) that is fairly

42a

*Appendix D*

traceable to the challenged conduct and show that a court can provide (3) a remedy likely to redress that injury. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

## II. Motion to Dismiss – Federal Rule of Civil Procedure 12(b)(6)

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a "claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* at 556. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Id.* The tenet that a court must accept as true all allegations contained in a complaint is inapplicable to legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id.* (citing *Twombly*, 550 U.S. at 555). "Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not show[n]—that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

## DISCUSSION

Over the eight years litigating this case, plaintiffs have presented evidence spanning over 50 years describing

43a

*Appendix D*

defendants' contribution to climate change through both inaction and affirmative promotion of fossil fuel use. The Court recalls plaintiffs' evidence included a letter by a top aide to President Nixon's domestic policy adviser emphasizing the effect of rising sea levels in 1969: "Goodbye New York. Goodbye Washington, for that matter."[17] In 1986, a Senate subcommittee observed that "there is a very real possibility that man—through ignorance or indifference, or both—is irreversibly altering the ability of our atmosphere to perform basic life support functions for the planet."[18] Those are but two documents out of hundreds highlighting the lengthy nature of government knowledge of the dangers of fossil fuel combustion. By and large, defendants have not disputed the factual premises of plaintiffs' claims. *Juliana,* 947 F.3d at 1167 (so stating). However, plaintiffs have not legally established that evidence. In reviewing defendants' motion to dismiss, the Court notes that, though it has held evidentiary hearings and painstakingly reviewed thousands of pages of declarations and exhibits, today, its task is solely to decide whether plaintiffs have standing to bring suit and state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(1), (6).

---

17. Memorandum from Daniel P. Moynihan, Assistant to the President for Domestic Pol'y, to John Ehrlichman, Assistant to the President for Domestic Affs. (Sept. 17, 1969), [https://perma.cc/G92P-AKLJ].

18. *Ozone Depletion, the Greenhouse Effect, and Climate Change: Hearing Before the Subcomm. on Env't Pollution of the Comm. on Env't & Pub. Works,* 99th Cong. 2 (1986) (opening statement of Sen. John H. Chafee, Chairman, Subcomm. on Env't Pollution).

44a

*Appendix D*

As an initial matter, defendants assert that the Court must consider whether the rule of mandate, as a jurisdictional rule, requires the Court to dismiss the second amended complaint. Mot. at 10. Next, defendants maintain that plaintiffs have failed to bring a justiciable case and that the Court must dismiss plaintiffs' claims under Rule 12(b)(1) for lack of subject matter jurisdiction. *Id.* at 10-16. Finally, defendants urge the Court to find that plaintiffs' claims fail on the merits and that plaintiffs should have brought this action under the Administrative Procedure Act ("APA") but failed to do so. *Id.* at 32.

## I.   Mandate of the Court of Appeals for the Ninth Circuit

Defendants state that the Ninth Circuit was clear when it remanded the case to the Court with instructions to dismiss. *Id.* at 11. Defendants argue that, when the scope of the remand is clear, a district court cannot vary or examine the mandate of an appellate court "for any other purpose than execution." *Id.* at 10 (citing *In re Sanford Fork & Tool Co.*, 160 U.S. 247, 255 (1895)). Defendants contend that, rather than examine whether plaintiffs' amended pleadings establish redressability to satisfy the requirement of standing, the Court should reconsider the Ninth Circuit's mandate and dismiss the second amended complaint. *Id.* at 11. Because it is jurisdictional error to contravene a rule of mandate, the Court duly reconsiders the mandate of the Ninth Circuit and does not take the matter lightly.

"A district court that has received the mandate of an appellate court cannot vary or examine that mandate for

45a

*Appendix D*

any purpose other than executing it." *Hall v. City of Los Angeles*, 697 F.3d 1059, 1067 (9th Cir. 2012). "Violation of the rule of mandate is a jurisdictional error." *Id.* at 1067. "But while the mandate of an appellate court forecloses the lower court from reconsidering matters determined in the appellate court, it leaves to the district court any issue not expressly or impliedly disposed of on appeal." *S.F. Herring Ass'n v. Dep't of the Interior*, 946 F.3d 564, 574 (9th Cir. 2019) (quoting *Nguyen v. United States*, 792 F.2d 1500, 1502 (9th Cir. 1986)). In determining which matters fall within the compass of a mandate, "[d]istrict courts must implement both the letter and the spirit of the mandate, taking into account the appellate court's opinion and the circumstances it embraces." *Vizcaino v. U.S. Dist. Ct. for W. Dist. of Wash.*, 173 F.3d 713, 719 (9th Cir. 1999) (as amended) (quoting *Delgrosso v. Spang & Co.*, 903 F.2d 234, 240 (3d Cir. 1990)).

"Absent a mandate which explicitly directs to the contrary, a district court upon remand can permit the plaintiff to file additional pleadings ..." *S.F. Herring*, 946 F.3d at 574 (quoting *Nguyen*, 792 F.2d at 1502); *see also Sierra Club v. Penfold*, 857 F.2d 1307, 1312 (9th Cir. 1988). When the mandate in the prior appeal does not expressly address the possibility of amendment and does not indicate a clear intent to deny amendment seeking to raise new issues not decided, that mandate does not purport "to shut the courthouse doors." *S.F. Herring*, 946 F.3d at 574.

In *S.F. Herring*, the Ninth Circuit discussed its mandate in a prior appeal, which vacated the district court's order entering summary judgment in the defendants' favor

46a

*Appendix D*

and directed the district court to dismiss the complaint. *See S.F. Herring Ass'n v. U.S. Dep't of Interior*, 683 F. App'x 579, 581 (9th Cir. 2017) (vacating judgment and remanding case with instructions to dismiss for lack of subject matter jurisdiction). On remand, the district court allowed the plaintiff to file a second amended complaint. In the later appeal, the Ninth Circuit determined that the district court correctly found that the earlier mandate to dismiss did not prevent the plaintiff from seeking leave to re-plead. *S.F. Herring*, 946 F.3d at 574. The appellate court reasoned that in instructing the district court to dismiss, the mandate was silent on whether dismissal should be with or without leave to amend, and the mandate therefore did not preclude the district court from allowing plaintiff to file amended pleadings. *Id.* at 572-574.

When this Court granted plaintiffs' motion for leave to amend, it "consider[ed] plaintiffs' new factual allegations under the Declaratory Judgment Act and plaintiffs' amended request for relief, in light of intervening recent precedent, to be a new issue that, while discussed, was not decided by the Ninth Circuit in the interlocutory appeal." *Juliana v. United States*, No. 6:15-CV-01517-AA, 2023 WL 3750334, at   (D. Or. June 1, 2023). The Court once again finds that the Ninth Circuit's mandate did not address whether amendment, if permitted, would cure the deficiency it identified in plaintiffs' complaint.

The Ninth Circuit also did not instruct the Court to dismiss without leave to amend. Accordingly, its mandate to dismiss did not foreclose that opportunity, and the Court, on reconsideration, finds that in permitting

47a

*Appendix D*

plaintiffs to proceed with their second amended complaint, the rule of mandate is not contravened. *S.F. Herring*, 946 F.3d at 574; *see also Creech v. Tewalt*, 84 F.4th 777, 783 (9th Cir. 2023) (where appellate court remanded and stated that plaintiff should have leave to amend, district court did not violate rule of mandate by dismissing *without* leave to amend, because appellate court did not expressly foreclose that option).

## II. Standing

The Ninth Circuit determined that plaintiffs had established an injury in fact, traceable to defendants—the first two elements of constitutional standing. *Juliana* 947 F.3d at 1168-70. For completeness in its standing analysis, this Court adopts the Ninth Circuit's determination. Defendants reserve the right to "oppose" the Ninth Circuit's ruling. Mot. at 12.

Defendants contend that plaintiffs have not satisfied the third element of standing, because they failed to demonstrate that their injuries are "redressable" and that they are entitled to injunctive or declaratory relief. Defendants maintain that plaintiffs' requested relief fails, because plaintiffs cannot show that the relief they seek is (1) substantially likely to redress their injuries or (2) within the Court's power to award. *Id.* at 4-5, 12; *see also Spokeo*, 578 U.S. at 338.

A plaintiff must support each element of the standing test "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at

48a

*Appendix D*

561 (1992). Accordingly, at the motion-to-dismiss stage, "general allegations" suffice to establish standing because those allegations are presumed to "embrace those specific facts that are necessary to support the claim." *Id.* A plaintiff need not show a favorable decision is "certain" to redress his injury but must show a substantial likelihood it will do so. *Washington Env't Council v. Bellon*, 732 F.3d 1131, 1146 (9th Cir. 2013). The injury need not be completely redressable; it is sufficient that the injury be partially redressed. *Meese v. Keene*, 481 U.S. 465, 476 (1987) ("enjoining the application of the words political propaganda to the films would at least partially redress the reputational injury of which appellee complains.").

As for plaintiffs' request for declaratory relief, the Ninth Circuit determined that a declaration would be "unlikely by itself to remediate [plaintiffs'] alleged injuries." *Juliana* 947 F.3d at 1170. For injunctive relief, the Ninth Circuit was "skeptical," but assumed without deciding that plaintiffs might be able to show that their injuries could be redressed by an order in their favor. *Id.* at 1171. That said, the appellate court based its ruling on the second redressability prong, stating that an injunction was "beyond the power of an Article III court to order, design, supervise, or implement." *Id.* Plaintiffs' second amended complaint scales down the requested injunctive relief, seeking "an injunction restraining [d]efendants from carrying out policies, practices, and affirmative actions that render the national energy system unconstitutional in a manner that harms [p]laintiffs," and only "if deemed necessary, just and proper." SAC at 143 ¶ 4.

49a

*Appendix D*

Accordingly, for plaintiffs' claim for both injunctive relief and declaratory relief, the Court will evaluate whether each form of relief is (1) substantially likely to redress their injuries and (2) within the Court's power to award. *Spokeo,* 578 U.S. at 338.

## A. Injunctive Relief

### 1. Substantial Likelihood of Redress

Defendants assert that an order enjoining defendants' fossil fuel activities will not stop catastrophic climate change or even partially ameliorate plaintiffs' injuries, and therefore, any such injunction is not substantially likely to redress plaintiffs' injuries and satisfy standing. Mot. at 12.

Whether a court order will halt *all* climate change by restraining defendants from carrying out fossil fuel activities is the wrong inquiry for at least two reasons. First, redressability does not require certainty, it requires only a substantial likelihood that the Court could provide meaningful relief. *Spokeo,* 578 U.S. at 338. Second, the possibility that some other individual or entity might cause the same injury does not defeat standing—the question is whether the injury *caused by the defendant* can be redressed.

Defendants have not disputed plaintiffs' factual allegations that they produce a quarter of all emissions on Earth. *Juliana*, 947 F.3d at 169. Based on plaintiffs' alleged facts, an order to defendants to refrain from

50a

*Appendix D*

certain fossil fuel activities which are causing plaintiffs'
injuries would redress those injuries. On the spectrum of
likely to unlikely, a favorable court order is much closer to
likely, *i.e.,* substantially likely, to redress plaintiffs' harm.

"Substantially likely" is a *legal* characterization,
not an evidence based, scientific number. Quantifying a
threshold datapoint at which plaintiffs' harm would be
remedied would involve rigorous, disciplined fact-finding,
and inevitably would raise a host of questions: What part
of plaintiffs' injuries stem from causes beyond defendants'
control? Even if emissions increase elsewhere, will the
extent of plaintiffs' injuries be less if they obtain the relief
they seek in this lawsuit? When would we reach this "point
of no return" that plaintiffs' evidence describes, and do
defendants have it within their power to avert reaching
it, even without cooperation from third parties? All these
questions are inextricably bound up in an evidentiary
inquiry, and none of them can be answered at the motion-
to-dismiss stage. At this junction, the Court finds that
plaintiffs have shown that a favorable decision from this
Court would be substantially likely to redress plaintiffs'
injuries. Defendants' motion to dismiss is denied as to
this issue.

## 2.    The Court's Power to Provide Redress

Defendants assert that the Ninth Circuit determined
that the injunction plaintiffs sought in their first amended
complaint would "necessarily require a host of complex
policy decisions entrusted ... to the wisdom and discretion
of the executive and legislative branches," *Juliana*, 947

51a

*Appendix D*

F.3d at 1171, decisions "which must be made by the People's elected representatives." *Id.* at 1172. Defendants maintain that, even with amendment, plaintiffs' requested injunctive relief is unavailable, because it would "enjoin the executive branch from exercising discretionary authority" granted to it by statute, and would enjoin Congress from exercising power expressly granted to it by the Constitution. Mot. at 13 (citing the Property Clause, U.S. Const. art. IV, § 3, cl. 2). In defendants' view, the requested injunction remains beyond a district court's power to award. *Id.*

While crafting and implementing injunctions in cases involving longstanding agency shortcomings may require rigorous, adversarial fact-finding to penetrate questions of science, there is nothing exceptional about a federal court issuing injunctions against federal agencies. *See e.g.*, *Nw. Env't Def. Ctr. v. United States Army Corps of Engineers*, No. 3:18-CV-00437-HZ, 2021 WL 3924046 (D. Or. Sept. 1, 2021) (injunction requiring U.S. Army Corps of Engineers to implement drawdown, spill, and specific fish management actions at its facilities; establishing an expert panel to craft implementation plans; and requiring status reports from agency).

Other federal district courts have similarly ordered agency action, and appellate courts have affirmed that granting this type of injunctive relief falls within the "broad equitable powers" of district courts. *Cobell VI*, 240 F.3d 1081, 1108 (D.C. Cir. 2001); *Gautreaux v. Romney*, 457 F.2d 124, 132 (7th Cir. 1972). Courts may also issue injunctions even when "ordering what is in effect

52a

*Appendix D*

nationwide relief." *Bresgal v. Brock*, 843 F.2d 1163, 1171 (9th Cir. 1987).

Without any explicit statutory command to the contrary, no court has held that these powers *categorically* fail on separation-of-powers grounds. *See* Samuel Buckberry Joyce, *Climate Injunctions: The Power of Courts to Award Structural Relief Against Federal Agencies*, 42 Stan. Env'tl. L.J. 241, 268-281, May 2023 (compiling cases featuring structural injunctions against the federal government).

Familiar instances of large-scale institutional litigation in modern American history include cases that ordered busing to desegregate schools;[19] the treaty rights cases that assured a fair share of fish for American Indian treaty fishers;[20] cases instituting prison condition reform;[21] and cases relating to land use and low-income housing.[22] Legal scholars have cited those cases and explained that injunctions in those cases "aimed to break down, scrutinize, and reform institutional dynamics and

---

19.  *See, e.g., Brown v. Bd. of Educ. of Topeka*, 347 U.S. 483 (1954); *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1 (1971); *Milliken v. Bradley*, 418 U.S. 717 (1974); *Green v. Cnty. Sch. Bd. of New Kent Cnty.*, 391 U.S. 430 (1968).

20.  *See, e.g., United States v. Washington*, 520 F.2d 676 (9th Cir. 1975); *Washington v. Washington State Com. Passenger Fishing Vessel Ass'n*, 443 U.S. 658 (1979).

21.  *See, e.g., Brown v. Plata*, 563 U.S. 493 (2011); *Hudson v. McMillian*, 503 U.S. 1 (1992); *Hutto v. Finney*, 437 U.S. 678 (1978).

22.  *See Hills v. Gautreaux*, 425 U.S. 284, 298 (1976).

53a

*Appendix D*

practices that caused the government to repeatedly violate fundamental rights of citizens to bring about enduring constitutional and civil rights compliance."[23]

In their first amended complaint, plaintiffs' requested remedy was an injunction requiring the government not only to "cease permitting, authorizing, and subsidizing" fossil fuel use, but also to "prepare a remedial plan subject to judicial approval to draw down harmful emissions." *Juliana*, 947 F.3d at 1170.

When it determined that plaintiffs' requested relief was beyond the power of an Article III court to order, the Ninth Circuit did not offer any explicit guidance on how to distinguish other structural injunction cases, where the district court has power to order specific, injunctive relief, from this case, where the relief necessary to redress plaintiffs' injuries is held to be too broad.

Plaintiffs have scaled back the specific directives they at first sought in the injunction in their first amended complaint. At this point in the litigation, where the facts alleged are accepted as true, the Court can only identify one distinction between the injunction plaintiffs' request and the injunctions issued in the structural reform cases described above. In other reform cases, those plaintiffs' obtained injunctions against a single agency for a discreet violation of law. In this case, plaintiffs seek relief on constitutional grounds and historical trust principles against a host of governmental defendants.

---

23.  Wood, *Eve of Destruction*, at 262.

54a

*Appendix D*

The Court appreciates that, under existing precedent, an injunction of the scope plaintiffs first requested, and the "scaled down" request plaintiffs make now, against every named defendant in this suit, would be more expansive than any case of which the Court is aware.

On the other hand, requiring plaintiffs to bring piecemeal statutory actions against individual agencies perpetuates a status quo unlikely to bring about the all-out course correction necessary to avoid the impending crisis. Requiring plaintiffs to file individual suits premised on discreet agency shortcomings may be a viable path to achieving protections for the environment. However, a court order directing the agencies to work together, outside their silos to oversee resolution of a complex, multiagency problem may prove especially constructive where a practical solution has eluded the entire government for decades.

Such an order has not proven to be necessary—and is perhaps premature—at this point in the case. Plaintiffs' amended request for injunction, though narrower, still treads on ground over which Ninth Circuit cautioned the Court not to step. If the reform plaintiffs seek is to prod a negotiated change of behavior, it is unnecessary to seek injunctive relief at this point to do so. Defendants' motion to dismiss plaintiffs' claim for injunctive relief is granted.

**B.   Declaratory Relief**

Plaintiffs' second amended complaint seeks a declaration that "the national energy system" violates

55a

*Appendix D*

the Constitution and the public trust doctrine. SAC at 143, ¶¶ 1-3. Defendants contend that plaintiffs' claim for declaratory relief must be dismissed, asserting that the declaration is not materially distinct from the declaration plaintiffs sought in their first amended complaint. And defendants argue that plaintiffs cannot satisfy the two prongs for redressability, because an "unbounded declaration" alone will not redress plaintiffs' injuries, and declaring an "energy system" unconstitutional would "functionally declare unconstitutional unspecified laws, regulations, and policies," and such a declaration is therefore not within the power of a federal court. Mot. at 14.

### 1.  Substantial Likelihood of Redress

Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, courts can grant declaratory relief in the first instance and later consider if further relief is warranted. "In a case of actual controversy within its jurisdiction, [ ] any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." 28 U.S.C. § 2201. "Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment." 28 U.S.C. § 2202.

56a

*Appendix D*

The Supreme Court has long recognized that declaratory judgment actions can provide redressability, even where relief obtained is a declaratory judgment alone. *See generally Franklin v. Massachusetts*, 505 U.S. 788, 803 (1992) *and Utah v. Evans*, 536 U.S. 452 (2002). In *Franklin* and *Evans*, states objected to the technique used by the Census Bureau to count people and those states sued government officials.

In *Franklin v. Massachusetts*, the Supreme Court stated that "[f]or purposes of establishing standing," it did not need to decide whether injunctive relief was appropriate where "the injury alleged is likely to be redressed by declaratory relief," and the court could "assume it is substantially likely that the President and other executive and congressional officials would abide by an authoritative interpretation of the census statute and constitutional provision by the District Court." 505 U.S. at 803. In *Utah v. Evans*, the Supreme Court referenced *Franklin*, explaining that, in terms of its "standing" precedent, declaratory relief affects a change in legal status, and the practical consequence of that change would "amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered." 536 U.S. 452 (2002).

Other cases recognize the role of declaratory relief in resolving Constitutional cases. *See, e.g.*, *Evers v. Dwyer*, 358 U.S. 202, 202-04 (1958) (ongoing governmental enforcement of segregation laws created actual controversy for declaratory judgment); *Powell v. McCormack*, 395 U.S. 486, 499 (1969) ("A court may grant

57a

*Appendix D*

declaratory relief even though it chooses not to issue an injunction or mandamus.").

Finally, the Supreme Court held that, for the purpose of Article III standing, nominal damages—a form of declaratory relief—provide the necessary redress for a completed violation of a legal right, even where the underlying unlawful conduct had ceased. *Uzuegbunam*, 592 U.S. 279, ––––, 141 S. Ct. 792, 802. *Uzuegbunam* illustrates that when a plaintiff shows a completed violation of a legal right, as plaintiffs have shown here, standing survives, even when relief is nominal, trivial, or partial. As Justice Thomas stated, in the context of nominal damages, "True, a single dollar often cannot provide full redress, but the ability to effectuate a partial remedy satisfies the redressability requirement. 592 U.S. at ––––, 141 S. Ct. at 801 (quoting *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 13 (1992)).

To satisfy redressability under Article III, plaintiffs need not allege that a declaration alone would solve their every ill. To plead a justiciable case, a court need only evaluate "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (quoting *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)).

There is nothing in § 2201 preventing a court from granting declaratory relief even if it is the only relief

58a

*Appendix D*

awarded. Section 2201 provides that declaratory relief may be granted "whether or not further relief is or could be sought." *Id.* Under the statute, the relief plaintiffs seek fits like a glove where plaintiffs' request declaratory relief independently of other forms of relief, such as an injunction. *See Steffel v. Thompson*, 415 U.S. 452, 475, (1974) (stating in a different context that "regardless of whether injunctive relief may be appropriate, federal declaratory relief is not precluded."). A declaration that defendants are violating plaintiffs' constitutional rights may be enough to bring about relief by changed conduct.

## 2.   The Court's Power to Provide Redress

As expressed in *Marbury v. Madison*: "It is emphatically the province and duty of the judicial department to say what the law is." 5 U.S. at 177. Over the course of American history, courts have corrected longstanding, systemic wrongs of political branches that encroach on the fundamental rights of citizens.

The judiciary has the unique and singular duty to both declare constitutional rights and prevent political acts that would curb or violate those rights. *Id.* at 167. It is a foundational doctrine that when government conduct harms American citizens, the judiciary is constitutionally required to perform its independent role and determine whether the challenged conduct, not exclusively committed to any branch by the Constitution, is unconstitutional. *Id.* at 176-78.

The Act gives "federal courts competence to make a declaration of rights." *Pub. Affairs Associates v. Rickover*,

59a

*Appendix D*

369 U.S. 111, 112 (1962). The Supreme Court has found it "consistent with the statute ... to vest district courts with discretion in the first instance, because facts bearing on the usefulness of the declaratory judgment remedy, and the fitness of the case for resolution, are peculiarly within their grasp." *MedImmune*, 549 U.S. at 136.

A declaratory judgment need not be "unbound" as defendants assert but may precisely describe and quantify the government's obligations. For example, in the landmark treaty fishing cases, courts declared the tribes right to take up to 50 percent of the harvestable quantities of fish. *United States v. Washington*, 520 F.2d 676, 687 (9th Cir. 1975).

Declaratory judgments are thus firmly sited within the core competences of the courts in a way that structural injunctions are not. Declaratory judgments ask courts to declare actions lawful or unlawful, applying legal standards to a set of facts. Unlike structural injunctions, which envision an on-going dialogue between the court and the parties, the declaratory relief model facilitates a dialogue between the parties. Following a court's declaration of rights, which serves as the baseline below which a defendant may not fall, the various stakeholders are left to handle the details.[24]

---

24. *See generally* Emily Chiang, *Reviving the Declaratory Judgment: A New Path to Structural Reform*, 63 Buff. L. Rev. 549 (May 2015) (discussing models of structural reform and encouraging public interest lawyers to consider declaratory relief as an effective and uniquely suited tool for structural reform in the modern age).

60a

*Appendix D*

From the beginning, the Court has envisioned that the government defendants would be interested in collectively developing a remedial plan of their own making—not of the Court's making—containing measures that they decide are appropriate to bring the agencies into constitutional compliance.

Following a declaratory judgment outlining the constitutional benchmark, a fact-finding stage often requires scientific analysis (a proficiency in which defendants are well-equipped) along with production of data defendants most likely already possess. To avoid complex remedial issues from clouding the foundational task of defining plaintiffs' basic rights and defendants' consequent obligations, the Court would bifurcate the case into a "liability" stage and a "remedy" stage.

The liability stage may allow the Court to specify legal obligations in a declaratory judgment, while the remedy stage demands a more innovative judicial role to supervise the parties in crafting a plan. During the remedy stage, the Court could invoke the usual standards of deference to the agency, while the case remains open under its ongoing jurisdiction so that parties can challenge aspects of the remedy implementation without bringing a new lawsuit.

One model of supervision involves the appointment of a special master to handle complex factual issues, make determinations on recurring issues, and make recommendations to the court. Consent decrees are used in many contexts of long-lasting government violations. Professor Wood points out one notable example in the

61a

*Appendix D*

environmental context that arose from a treaty fishing case, *United States v. Oregon*, handled by Judge Belloni, U.S. District Court of Oregon.[25] The litigation "culminated in a consent decree" and the Columbia River Fish Management Plan ("CRFMP") became "a model of judicial administration that gained nationwide acclaim."[26]

The CRFMP established a system of co-management between nine sovereigns (states, tribes, and the federal government) managing treaty fisheries in the Columbia River Basin. *See United States v. Oregon*, 699 F. Supp. at 1469 (describing and approving Columbia River Fish Management Plan). The CRFMP set forth detailed management criteria for each fishery, established technical and policy committees, and created a dispute resolution process that involved the court only as a last resort. Professor Wood argues that by "allowing the sovereign parties to identify points of agreement and work out the details of a remedy using their own administrative and scientific expertise, the consent decree process can create an enduring remedy structure to fit complex institutional and biological circumstances."[27]

Defendants have not shown that plaintiffs' claim for declaratory relief falls outside the scope of the Court's authority, where "facts bearing on the usefulness of

---

25. Wood, *Eve of Destruction*, at 264 (citing *United States v. Oregon*, 699 F. Supp. 1456, 1469 (D. Or. 1988) (describing and approving the CRFMP)).

26. *Id.*

27. *Id.*

62a

*Appendix D*

the declaratory judgment remedy, and the fitness of the case for resolution, are peculiarly within [its] grasp." *MedImmune*, 549 U.S. at 136. Accordingly, defendants' motion to dismiss is denied as to this issue.

## III. Political Question Doctrine

Defendants maintain that plaintiffs' claims present political questions over which the Court lacks jurisdiction. Mot. at 12-19. In defendants' view, plaintiffs ask the Court to "review and assess the entirety of Congress's and the Executive Branch's programs and regulatory decisions relating to climate change and then to pass on the comprehensive constitutionality of all of those policies, programs, and inaction in the aggregate." *Id.* at 17. Defendants assert that no federal court "has ever purported to use the judicial [p]ower to perform such a sweeping policy review." *Id.*

Defendants appear to misunderstand the function of the Court acting within its prescribed authority to declare what the law is—it is not the Court which will perform "a sweeping policy review," it is *defendants.*

There is no need for the Court to step outside its prescribed role to decide this case. At its heart, this lawsuit asks the Court to determine whether defendants have violated plaintiffs' constitutional rights. That question is squarely within the purview of the judiciary. *See INS v. Chadha*, 462 U.S. 919, 941 (1983) (the judiciary is bound to determine whether the political branches have "chosen a constitutionally permissible means of implementing

63a

*Appendix D*

[their] power"); *Jewel v. Nat'l Sec. Agency*, 673 F.3d 902, 912 (9th Cir. 2011) (although lawsuit challenging federal agencies' surveillance practices "strikes at the heart of a major public policy controversy," claims were justiciable because they were "straightforward claims of statutory and constitutional rights, not political questions.").

The Court previously analyzed whether plaintiffs' claims presented a political question under *Baker v. Carr*, 369 U.S. 186 (1962) and adopts that analysis here. *See Juliana v. United States*, 217 F. Supp. 3d 1224, 1235-42 (D. Or. 2016) *rev'd and remanded on other grounds*, 947 F.3d 1159 (9th Cir. 2020). The Ninth Circuit explicitly stated that it did not find that plaintiffs had presented a political question. *Juliana*, 947 F.3d at 1174 n.9 ("Contrary to the dissent, we do not find this to be a political question, although that doctrine's factors often overlap with redressability concerns").

Here the Constitution entrusts defendants with the power to oversee departments and agencies in the executive branch in their administration of the broad range of laws committed to their implementation. Mot. at 18. Speculation about the remedial stage does not support dismissal. *Baker*, 369 U.S. at 198 ("Beyond noting that we have no cause at this stage to doubt the District Court will be able to fashion relief if violations of constitutional rights are found, it is improper now to consider what remedy would be most appropriate if appellants prevail at trial."). Because the Court finds that under *Baker*, the political question doctrine does not impede plaintiffs' claims, defendants' motion to dismiss is denied on this issue.

64a

*Appendix D*

## IV. First Claim for Relief – Due Process Clause of the Fifth Amendment

Plaintiffs allege that the Due Process Clause of the Fifth Amendment recognizes and preserves the fundamental right of citizens to be free from government actions that harm "life, liberty, and property." SAC ¶ 278. Plaintiffs maintain that these "inherent and inalienable rights" reflect the basic societal contract of the Constitution to protect citizens and "posterity"— future generations—from government infringement upon basic freedoms and basic rights. *Id.* Plaintiffs state that defendants' affirmative aggregate acts have been and are infringing on plaintiffs' liberties, by knowingly creating a destabilized climate system that is causing irreversible harm.

Defendants challenge plaintiffs' due process claims on two grounds. First, they assert any challenge to defendants' affirmative actions (*i.e.*, leasing land, issuing permits) cannot proceed because plaintiffs have failed to identify infringement of a fundamental right or discrimination against a suspect class of persons.

Second, they argue plaintiffs cannot challenge defendants' inaction (*i.e.*, failure to prevent third parties from emitting $CO_2$ at dangerous levels). Defendants maintain that the Constitution "does not impose an affirmative duty to protect individuals, and plaintiffs have failed to allege a cognizable claim under the "state-created danger" exception to that rule. Mot. at 21.

65a

*Appendix D*

Defendants state that the Supreme Court has repeatedly instructed courts considering novel due process claims to "exercise the utmost care whenever ... asked to break new ground in this field, ... lest the liberty protected by the Due Process Clause be subtly transformed" into judicial policy preferences. *Id.* at 19-20 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997)). Defendants maintain that plaintiffs' request to recognize an implied fundamental right to a stable climate system, SAC ¶ 304, "contradicts that directive, because such a purported right is without basis in the Nation's history or tradition." Mot. at 20.

### A. Affirmative Government Action and Due Process

The Due Process Clause of the Fifth Amendment to the United States Constitution bars the federal government from depriving a person of "life, liberty, or property" without due process of law. U.S. Const. amend. V.

When a plaintiff challenges affirmative government action under the Due Process Clause, the threshold inquiry is the applicable level of judicial scrutiny. *Witt v. Dep't of the Air Force*, 527 F.3d 806, 813 (9th Cir. 2008). The default level of scrutiny is rational basis, which requires a reviewing court to uphold the challenged governmental action so long as it "implements a rational means of achieving a legitimate governmental end[.]" *Kim v. United States*, 121 F.3d 1269, 1273 (9th Cir. 1997) (quotation marks omitted). When the government

66a

*Appendix D*

infringes on a "fundamental right," however, a reviewing court applies strict scrutiny. *Witt*, 527 F.3d at 817. Substantive due process "forbids the government to infringe certain fundamental liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." *Reno v. Flores*, 507 U.S. 292, 302, (1993).

It appears undisputed by plaintiffs, and in any event is clear to this Court, that defendants' affirmative actions would survive rational basis review. Resolution of this part of the motion to dismiss therefore hinges on whether plaintiffs have alleged infringement of a fundamental right.

Fundamental liberty rights include both rights enumerated elsewhere in the Constitution and rights and liberties which are either (1) "deeply rooted in this Nation's history and tradition" or (2) "fundamental to our scheme of ordered liberty[.]" *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010) (internal citations, quotations, and emphasis omitted). Seemingly "new" fundamental rights are not out of bounds. When the Supreme Court broke new legal ground by recognizing a constitutional right to same-sex marriage, Justice Kennedy wrote that

> The nature of injustice is that we may not always see it in our own times. The generations that wrote and ratified the Bill of Rights ... did not presume to know the extent of freedom in all its dimensions, and so they entrusted to future generations a charter protecting the

67a

*Appendix D*

right of all persons to enjoy liberty as we learn its meaning. When new insight reveals discord between the Constitutions central protections and a received legal stricture, a claim to liberty must be addressed.

*Obergefell v. Hodges,* 576 U.S. 644, 664 (2015). Thus, "[t]he identification and protection of fundamental rights is an enduring part of the judicial duty to interpret the Constitution ... [that] has not been reduced to any formula." *Id.* at 663-64 (citation and quotation marks omitted). In determining whether a right is fundamental, courts must exercise "reasoned judgment," keeping in mind that "[h]istory and tradition guide and discipline this inquiry but do not set its outer boundaries." *Id.* at 664. The genius of the Constitution is that its text allows "future generations [to] protect ... the right of all persons to enjoy liberty as we learn its meaning." *Id.*

Exercising "reasoned judgment," *id.*, the Court finds that the right to a climate system that can sustain human life is fundamental to a free and ordered society.

Defendants contend plaintiffs are asserting a right to be free from pollution or climate change, and that courts have consistently rejected attempts to define such rights as fundamental. Mot. at 20. Defendants mischaracterize the right plaintiffs assert. Plaintiffs do not object to the government's role in producing any pollution or in causing any climate change; they assert the government has caused pollution and climate change on a catastrophic level, and that if the government's actions continue unchecked, they

68a

*Appendix D*

will permanently and irreversibly damage plaintiffs' property, their economic livelihood, their recreational opportunities, their health, and ultimately their (and their children's) ability to live.

In this opinion, this Court simply holds that where a complaint alleges governmental action is affirmatively and substantially damaging the climate system in a way that will cause human deaths, shorten human lifespans, damage property, threaten human food sources, and dramatically alter the planets ecosystem, it states a claim for a due process violation. To hold otherwise would be to say that the Constitution affords no protection against a government's knowing decision to poison the air its citizens breathe or the water its citizens drink.

How can the judiciary uphold the Constitution's guarantee that the government shall not deprive its citizens of life without due process, while also upholding government "actions that could leave [future generations] a world with an environment on the brink of ruin and no mechanism to assert their rights." *Aji P. v. State*, 198 Wash. 2d 1025, 497 P.3d 350, 351 (2021) (Gonzalez, C.J.) (dissenting). We cannot vow to uphold the Constitution's protection of a God-given right to life, and at the same time, exercise "judicial restraint" by telling plaintiffs that "life" cannot possibly include the right to be free from knowing government destruction of their ability to breathe, to drink, or to live. "It cannot be presumed that any clause in the [C]onstitution is intended to be without effect." *Marbury*, 5 U.S. at 174. Plaintiffs have adequately alleged infringement of a fundamental right and defendants' motion to dismiss is denied on this issue.

69a

*Appendix D*

## B.  Government Inaction Under the Due Process Clause

Plaintiffs allege that "[a]cting with full appreciation of the consequences of their acts, defendants knowingly caused, and continue to cause, dangerous interference with our atmosphere and climate system." SAC ¶ 280. They allege this danger stems, "in substantial part, [from] [d]efendants' historic and continuing permitting, authorizing, and subsidizing of fossil fuel extraction, production, transportation, and utilization." *Id.* ¶ 279. Plaintiffs allege defendants acted "with full appreciation" of the consequences of their acts. *Id.* ¶¶ 278–79. Plaintiffs challenge defendants' failure to limit third-party $CO_2$ emissions under the danger creation exception stated in *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189 (1989).

The Due Process Clause imposes no duty on the government to protect persons from harm inflicted by third parties that would violate due process if inflicted by the government. *Id.* at 196; *accord Patel v. Kent Sch. Dist.*, 648 F.3d 965, 971 (9th Cir. 2011). As a general matter:

> [The Due Process Clause] is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. It forbids the State itself to deprive individuals of life, liberty, or property without "due process of law," but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means.

70a

*Appendix D*

*DeShaney*, 489 U.S. at 194-95. The Ninth Circuit recognizes two narrow exceptions to the no-duty-to-protect rule from *DeShaney*: (1) the "special-relationship" exception, which applies to individuals involuntarily placed in state custody; and (2) the state-created danger exception. *Murguia v. Langdon*, 61 F.4th 1096, 1106 (9th Cir. 2023).

In the Ninth Circuit, a plaintiff challenging government inaction on a danger creation theory must first show the "state actor create[d] or expose[d] an individual to a danger which he or she would not have otherwise faced." *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061 (9th Cir. 2006). The state action must place the plaintiff "in a worse position than that in which he would have been had the state not acted at all." *Pauluk v. Savage*, 836 F.3d 1117, 1125 (9th Cir. 2016) (quotation marks omitted and alterations normalized).

Second, the plaintiff must show the "state actor ... recognize[d]" the unreasonable risks to the plaintiff and "actually intend[ed] to expose the plaintiff to such risks without regard to the consequences to the plaintiff." *Campbell v. Wash. Dep't of Soc. & Health Servs.*, 671 F.3d 837, 846 (9th Cir. 2011) (brackets and quotation marks omitted). The defendant must have acted with "[d]eliberate indifference," which "requires a culpable mental state more than gross negligence." *Pauluk*, 836 F.3d at 1125 (quotation marks omitted).

Defendants assert that applying the *DeShaney* exception to the circumstances of this case would cause

71a

*Appendix D*

the exception to swallow the rule, arguing that "[e]very instance" in which the Ninth Circuit has "permitted a state-created danger theory to proceed has [also] involved an act by a government official that created an obvious, immediate, and particularized danger to a specific person known to that official." Mot. at 22; *Pauluk*, 836 F.3d at 1129-30 (Murguia, J., concurring in part and dissenting in part) (internal quotation marks omitted). Defendants assert that plaintiffs fail to identify immediate harm to their personal security or bodily integrity and identify no government actions or actors that put them in danger— only general degradation of the climate, without the immediate, direct, physical, and personal harms at issue in the above referenced cases. Mot. at 20.

Plaintiffs' allegations include "[harm to] plaintiffs' dignity, including their capacity to provide for their basic human needs, safely raise families, practice their religious and spiritual beliefs, maintain their bodily integrity, and lead lives with access to clean air, water, shelter, and food." SAC ¶ 283. In the face of these risks, plaintiffs allege defendants "have had longstanding, actual knowledge of the serious risks of harm and have failed to take necessary steps to address and ameliorate the known, serious risk to which they have exposed [p]laintiffs." *Id.* ¶ 285.

Accepting the allegations of the complaint as true, plaintiffs have adequately alleged a danger creation claim. Defendants' arguments do not reflect that *DeShaney* imposes rigorous proof requirements. A plaintiff asserting a danger-creation due process claim must show (1) the government's acts created the danger to the plaintiff; (2)

72a

*Appendix D*

the government knew its acts caused that danger; and (3) the government with deliberate indifference failed to act to prevent the alleged harm. These stringent standards are sufficient safeguards against the flood of litigation concerns raised by defendants.

At the motion-to-dismiss stage, the Court accepts the factual allegations in the complaint as true. Plaintiffs have alleged that defendants helped create the current climate crisis, that defendants acted with full knowledge of the consequences of their actions, and that defendants have failed to correct or mitigate the harms they helped create in deliberate indifference to the injuries caused by climate change. Plaintiffs may therefore proceed with their substantive due process challenge to defendants' failure to adequately regulate $CO_2$ emissions and defendants' motion to dismiss is denied as to this issue.

## V. Second Claim for Relief: Equal Protection Under the Fifth Amendment

Plaintiffs allege that both unborn members of "future generations" and minor children who cannot vote are a suspect classification. SAC ¶¶ 290-301. Plaintiffs state that, for purposes of this action, they should be treated as protected classes because many harmful effects caused by the acts of defendants will occur again. *Id.* ¶ 297. Plaintiffs maintain that the Court should determine they must be treated as protected classes, and federal laws and actions that disproportionately discriminate against and endanger them must be invalidated. *Id.*

73a

*Appendix D*

Defendants assert that "[n]one of the government actions that [p]laintiffs complain of classify or affect youth or posterity any differently than they affect other persons." Mot. at 29. While plaintiffs' allegations are to the contrary, asserting that future generations will be decidedly more effected by climate change, defendants assert that their actions furthering fossil fuel combustion survive rational basis review, because plaintiffs cannot allege that there is no conceivable set of facts that could provide a rational basis for defendants' actions. *Id.*

Both the Supreme Court and the Ninth Circuit have held that age is not a suspect class. *City of Dallas v. Stanglin*, 490 U.S. 19, 25 (1989); *United States v. Flores-Villar*, 536 F.3d 990, 998 (9th Cir. 2008). *Stanglin* and *Flores-Villar* both applied rational basis review to governmental action that discriminated against teenagers of a similar age to plaintiffs here. In both cases, that discrimination was found to be permissible if it had a rational basis.

Even if plaintiffs' suspect-class argument were not foreclosed by precedent, the Court would not be persuaded to break new ground in this area. *See Cunningham v. Beavers*, 858 F.2d 269, 273 (5th Cir. 1988) ("No cases have ever held, and we decline to hold, that children are a suspect class.").

Accordingly, defendants' motion to dismiss plaintiffs' equal protection claim based on plaintiffs' constituting a suspect class is granted.

74a

*Appendix D*

## VI. Third Claim for Relief: Unenumerated Rights Under the Ninth Amendment

Plaintiffs' third claim for relief, which is pleaded as a freestanding claim under the Ninth Amendment, alleges that the Nation's founders intended that the federal government would have both the authority and the responsibility to be a steward of our country's essential natural resources. SAC ¶ 303. This stewardship, plaintiffs assert, is clear from the delegation of powers to manage lands and the conveyed authority to address major challenges facing our nation. *Id.* Plaintiffs allege that among the "implicit liberties protected from government intrusion by the Ninth Amendment" is the right to be "sustained by our country's vital natural systems, including our climate system." *Id.*

Defendants assert that the Ninth Amendment has never been recognized as independently securing any constitutional right, and that this claim must be dismissed. Mot. at 21; *Strandberg v. City of Helena*, 791 F.2d 744, 748 (9th Cir. 1986).

Defendants are correct. Plaintiffs' Ninth Amendment claim is not viable. *Id.* Defendants' motion to dismiss plaintiffs' third claim for relief is granted.

## VII. Fourth Claim for Relief: Rights Under Public Trust Doctrine

Plaintiffs' public trust claim arises from the particular application of the public trust doctrine to essential natural

75a

*Appendix D*

resources. The complaint alleges that the overarching public trust resource is our country's life-sustaining climate system, which encompasses our atmosphere, waters, oceans, and biosphere. SAC ¶ 308. Plaintiffs assert that defendants must take affirmative steps to protect those trust resources. *Id.* As sovereign trustees, plaintiffs contend that defendants have a duty to refrain from "substantial impairment" of these essential natural resources. *Id.* ¶ 309. The affirmative aggregate acts of defendants, in plaintiffs' view, in fossil fuel production and consumption have "unconstitutionally caused, and continue to cause, substantial impairment to the essential public trust resources." *Id.*

Plaintiffs allege that defendants have failed in their duty of care to safeguard plaintiffs' interest as the present and future beneficiaries of the public trust, and that such an abdication of duty abrogates the ability of succeeding members of the Executive Branch and Congress to provide for the survival and welfare of our citizens and to promote the endurance of our nation. *Id.*

Defendants assert that plaintiffs' fourth claim for relief, asserting public trust claims, should be dismissed for two independent reasons. Mot. at 24. First, any public trust doctrine is a creature of state law that applies narrowly and exclusively to particular types of state-owned property not at issue here. *Id.*; U.S. Const. art. IV, § 3, cl. 2 ("The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States."). Defendants contend there is no

76a

*Appendix D*

basis for plaintiffs' public trust claim against the federal government under federal law. Second, the "climate system" or atmosphere is not within any conceivable federal public trust. *Id.*

The Court has expended innumerable hours in research and analysis of plaintiffs' public trust claim and, in prior orders, determined that plaintiffs have alleged violations of the public trust doctrine in connection with the territorial sea. *See Juliana v. United States*, 217 F. Supp. 3d 1224, 1255 (D. Or. 2016), *rev'd and remanded on other grounds*, 947 F.3d 1159 (9th Cir. 2020). Because the Ninth Circuit did not reach the merits of plaintiffs' claims, the Court incorporates its analysis and legal conclusions, as stated in *Juliana*, 217 F. Supp at 1255-61 (finding that plaintiffs' alleged injuries relate to the effects of ocean acidification and rising ocean temperatures, thus pleadings adequately alleged harm to public trust assets; the public trust doctrine applies to the federal government; the federal government, like the states, holds public assets, including the territorial seas, in trust for the people; environmental statutes have not displaced the venerable public trust doctrine; and plaintiffs' claims rest "directly on the Due Process Clause of the Fifth Amendment and are enforceable against the federal government.").

Accordingly, the Court finds that plaintiffs have stated a claim under a purported public trust doctrine. Defendants' motion to dismiss plaintiffs' fourth claim for relief is denied.

77a

*Appendix D*

## VIII.  Action Under Administrative Procedure Act

Defendants argue that plaintiffs needed to bring their claims under the Administrative Procedure Act ("APA") and failed to do so. Mot. at 32.

The Court finds that the APA does not govern plaintiffs' claims, and that, as a result, plaintiffs' failure to state a claim under the APA is not a ground for dismissing this action. The Ninth Circuit found that "[w]hatever the merits of the plaintiffs' claims, they may proceed independently of the review procedures mandated by the APA." *Juliana*, 947 F.3d at 1167-68. Defendants' motion to dismiss is denied as to this issue. Defendants reserve their right to disagree with the Ninth Circuit's determination on this point but concede that the Ninth Circuit's decision governs, and respectfully preserve their arguments on the applicability of the APA for potential further review.

## CONCLUSION

Other courts across the United States have noted that "[w]ith each year, the impacts of climate change amplify and the chances to mitigate dwindle." *Matter of Hawai'i Elec. Light Co., Inc.*, 152 Haw. 352, 359 (2023). The judicial branch of government can no longer "abdicat[e] responsibility to apply the rule of law." *Id.* at 365 (Wilson, J., concurring). For the reasons explained, Defendants' motion to dismiss the second amended complaint, ECF No. 547, is GRANTED in part and DENIED in part. The Court also DENIES defendants' request to certify for interlocutory review this opinion and order; DENIES

78a

*Appendix D*

defendants' motion for an order certifying its prior order, ECF No. 540, for interlocutory appeal, ECF No. 551; and DENIES defendants' motion to stay litigation, ECF No. 552. The Court GRANTS plaintiffs' motion to set a pretrial conference, ECF No. 543, and ORDERS the parties to confer and contact the Court to schedule a telephonic status conference to discuss next steps in this case.

It is so ORDERED on this day, December 29, 2023.

79a

**APPENDIX E**

2023 WL 3750334

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF OREGON, EUGENE DIVISION

_____

Civ. No. 6:15-cv-01517-AA

KELSEY CASCADIA ROSE JULIANA, *et al.*,

*Plaintiffs,*

v.

UNITED STATES OF AMERICA, *et al.*,

*Defendants.*

_____

Signed:   June 1, 2023

_____

**OPINION AND ORDER**

_____

AIKEN, District Judge:

In this civil rights action, plaintiffs—a group of young people between the ages of eight and nineteen when this lawsuit was filed and "future generations" through their guardian Dr. James Hansen—allege injury from the devastation of climate change and contend that the Constitution guarantees the right to a stable climate system capable of sustaining human life. Plaintiffs

80a

*Appendix E*

maintain that federal defendants have continued to permit, authorize, and subsidize fossil fuel extraction and consumption, despite knowledge that those actions cause catastrophic global warming. This case returns to this Court on remand from the Ninth Circuit Court of Appeals, where plaintiffs demonstrated their "injury in fact" was "fairly traceable" to federal defendants' actions—two of three requirements necessary to establish standing under Article III. However, the Ninth Circuit reversed with instructions to dismiss plaintiffs' case, holding that plaintiffs failed to demonstrate "redressability"—the third, final requirement to establish Article III standing. The Ninth Circuit determined that plaintiffs did not "surmount the remaining hurdle" to prove that the relief they seek is within the power of an Article III court to provide. *Juliana v. United States*, 947 F.3d 1159, 1171 (9th Cir. 2020). After that court's decision, plaintiffs moved to amend, notifying this Court of an intervening change in controlling law, *Uzuegbunam v. Preczewski*, — U.S. —, 141 S. Ct. 792, 209 L.Ed.2d 94 (2021), asserting abrogation of the Ninth Circuit's ruling on redressability. Now, plaintiffs contend that permitting amendment will allow plaintiffs to clear the hurdle the Ninth Circuit identified, so that the case may proceed to a decision on the merits. For the reasons explained, this Court grants plaintiffs' motion for leave to file a second amended complaint. (Doc. 462).

## BACKGROUND

In August 2015, plaintiffs brought this action asserting that the federal government has known for decades that

81a

*Appendix E*

carbon dioxide pollution was causing catastrophic climate change and that large-scale emission reduction was necessary to protect plaintiffs' constitutional right to a climate system capable of sustaining human life. (Doc. 7 at 51). As the Ninth Circuit recognized, plaintiffs provided compelling evidence, largely undisputed by federal defendants, that "leaves little basis for denying that climate change is occurring at an increasingly rapid pace." *Juliana*, 947 F.3d at 1166. The substantial evidentiary record supports that since the dawn of the Industrial Age, atmospheric carbon dioxide has "skyrocketed to levels not seen for almost three million years," with an astonishingly rapid increase in the last forty years. *Id.* at 1166. The Ninth Circuit summarized what plaintiffs' expert evidence establishes: that this unprecedented rise stems from fossil fuel combustion and will "wreak havoc on the Earth's climate if unchecked." *Id.* The problem is approaching "the point of no return," the court stated, finding that the record conclusively demonstrated that the federal government has long understood the risks of fossil fuel use. *See id.* (cataloguing, as early as 1965, urgent warnings and reports from government officials imploring swift nationwide action to reduce carbon emissions before it was too late).

In their first amended complaint, filed in the District Court for the District of Oregon, plaintiffs alleged violations of their substantive rights under the Due Process Clause of the Fifth Amendment; the Fifth Amendment right to equal protection of the law; the Ninth Amendment; and the public trust doctrine. (Doc. 7). Plaintiffs also sought several forms of declaratory

82a

*Appendix E*

relief and an injunction ordering federal defendants to implement a plan to "phase out fossil fuel emissions and draw down excess atmospheric [carbon dioxide]." *Id.* at 94-95.

Federal defendants moved to dismiss for lack of standing, failure to state a cognizable constitutional claim, and failure to state a claim on a public trust theory. (Doc. 27). Adopting the findings and recommendation of Federal Magistrate Judge Thomas Coffin, this Court denied federal defendants' motion, concluding that plaintiffs had standing to sue, raised justiciable questions, and had stated a claim for infringement of a Fifth Amendment due process right:

> In this opinion, this Court simply holds that where a complaint alleges governmental action is affirmatively and substantially damaging the climate system in a way that will cause human deaths, shorten human lifespans, result in widespread damage to property, threaten human food sources, and dramatically alter the planet's ecosystem, it states a claim for a due process violation[.] To hold otherwise would be to say that the Constitution affords no protection against a government's knowing decision to poison the air its citizens breathe or the water its citizens drink. Plaintiffs have adequately alleged infringement of a fundamental right.

*Juliana v. United States*, 217 F. Supp. 3d 1224, 1250 (D. Or. 2016), *rev'd and remanded*, 947 F.3d 1159 (9th Cir. 2020).

83a

*Appendix E*

At that stage of litigation, this Court also determined that plaintiffs had stated a viable due process claim arising from federal defendants' failure to regulate third-party emissions and had stated a public trust claim grounded in the Fifth and the Ninth Amendments. *Id.* at 1252, 1259.

Federal defendants moved to certify to the Ninth Circuit for interlocutory appeal[1] this Court's order denying federal defendants' motion to dismiss. Doc. 120. This Court denied the motion to certify. (Doc. 172). Federal defendants petitioned the Ninth Circuit for Writ of Mandamus, contending that this Court's opinion and order denying their motion to dismiss was based on clear error. (Doc. 177). The Ninth Circuit denied the petition, concluding mandamus relief was unwarranted at that stage of litigation, when plaintiffs' claims could be "narrowed" in further proceedings. *See In re United States*, 884 F.3d 830, 833 (9th Cir. 2018).

Federal defendants then filed several motions so aimed at narrowing plaintiffs' claims, including motions for judgment on the pleadings, doc. 195; a protective order barring discovery, doc. 196; and for summary judgment, doc. 207. This Court denied defendants' motion for a protective order. (Doc. 212). But this Court granted in

---

1. A request for permissive interlocutory appeal is governed by 28 U.S.C. § 1292(b), which permits a district court to certify an interlocutory order for immediate appeal if the court is of the opinion that such order: (1) involves a controlling question of law; (2) as to which there is substantial ground for difference of opinion; and (3) that an immediate appeal from the order may materially advance the ultimate termination of the litigation.

84a

*Appendix E*

part and denied in part federal defendants' motions for judgment on the pleadings and for summary judgment, dismissing plaintiffs' Ninth Amendment claim, dismissing the President as a defendant, and narrowing plaintiffs' equal protection claim to a fundamental rights theory. *Juliana v. United States*, 339 F. Supp. 3d 1062 1103 (D. Or. 2018), *rev'd and remanded*, 947 F.3d 1159 (9th Cir. 2020).

Federal defendants unsuccessfully petitioned for mandamus in the Ninth Circuit and twice sought, and were twice denied, a stay of proceedings by the United States Supreme Court. Ultimately, the Ninth Circuit, on November 8, 2018, issued an order inviting this Court to certify for interlocutory review its orders on federal defendants' dispositive motions. *United States v. U.S. Dist. Court for the Dist.* of Or., No. 18-73014. Shortly thereafter, the Ninth Circuit granted federal defendants' petition to appeal.

On interlocutory appeal of this Court's certified orders denying federal defendants' motions for dismissal, judgment on the pleadings, and summary judgment, the Ninth Circuit agreed with this Court's determination that plaintiffs had presented adequate evidence at the pre-trial stage to show particularized, concrete injuries to legally protected interests. That court recounted evidence that one plaintiff was "forced to leave her home because of water scarcity, separating her from relatives on the Navajo Reservation[,]" and another "had to evacuate his coastal home multiple times because of flooding." *Id.* at 1168. The Ninth Circuit also determined that this Court correctly found plaintiffs had presented sufficient

85a

*Appendix E*

evidence that their alleged injuries are fairly traceable to federal defendants' conduct, citing among its findings that plaintiffs' injuries "are caused by carbon emissions from fossil fuel production, extraction, and transportation" and that federal subsidies "have increased those emissions," with about 25% of fossil fuels extracted in the United States "coming from federal waters and lands," an activity requiring federal government authorization. *Id.* at 1169. The court held, however reluctantly, that plaintiffs failed to show their alleged injuries were substantially likely to be redressed by any order from an Article III court and that plaintiffs therefore lacked standing to bring suit. *Id.* at 1171.

In so holding, the court stated, "There is much to recommend the adoption of a comprehensive scheme to decrease fossil fuel emissions and combat climate change, both as a policy matter in general and a matter of national survival in particular," however, such was "beyond the power of an Article III court to order, design, supervise, or implement." *Id.* at 1171. Ultimately, based on its redressability holding alone, the Ninth Circuit reversed the certified orders of this Court and remanded the case with instructions to dismiss for lack of Article III standing. *Id.* at 1175.

After the Ninth Circuit issued its interlocutory opinion, plaintiffs notified this Court of what they identified as an intervening case in the United States Supreme Court which held that the award of nominal damages was "a form of declaratory relief in a legal system with no general declaratory judgment act" and

86a

*Appendix E*

that a "request for nominal damages alone satisfies the redressability element of standing where a plaintiff's claim is based on a completed violation of a legal right." *Uzuegbunam*, 141 S. Ct. at 798, 802. Writing for the majority, Justice Thomas explained that, even where a single dollar cannot provide full redress, the ability "to effectuate a *partial remedy*" satisfies the redressability requirement. *Id.* at 801 (quoting *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 13, 113 S.Ct. 447, 121 L.Ed.2d 313 (1992)) (emphasis added).

Plaintiffs contend that the Supreme Court's holding constitutes—as Chief Justice Roberts noted in his dissent—an "expansion of the judicial power" under Article III. *Uzuegbunam*, 141 S. Ct. at 806 (Roberts, C. J. dissenting). According to plaintiffs, the Ninth Circuit was skeptical, but did not decide whether declaratory relief alone would satisfy redressability, where such relief only partially redresses injury. Plaintiffs assert that they should be granted leave to amend to replead factual allegations demonstrating that relief under the under the Declaratory Judgment Act, 28 U.S.C. § 2201, is sufficient to allege redressability, even where a declaration effectuates a partial remedy, as stated in *Uzuegbunam*, which the Ninth Circuit did not have the chance to consider.

## LEGAL STANDARD

Federal Rule of Civil Procedure Rule 15 allows a party to amend its pleading "with the opposing party's written consent or the court's leave." The rule instructs that "[t]he court should freely give leave when justice

87a

*Appendix E*

so requires." Fed. R. Civ. P. 15(a)(2). Trial courts have discretion in deciding whether to grant leave to amend, but "[i]n exercising this discretion, a court must be guided by the underlying purpose of Rule 15 to facilitate decision on the merits, rather than on the pleadings or technicalities." *United States v. Webb*, 655 F.2d 977, 979 (9th Cir. 1981) (citing *Conley v. Gibson*, 355 U.S. 41, 47-48, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). The judicial policy of Rule 15 favoring amendments should be applied with "extreme liberality." *Id.* (citing *Rosenberg Brothers & Co. v. Arnold*, 283 F.2d 406 (9th Cir. 1960)) (per curiam). Leave to amend should be granted freely "even if a plaintiff's claims have previously been dismissed." *Hampton v. Steen*, No. 2:12-CV-00470-AA, 2017 WL 11573592, at *2 (D. Or. Nov. 13, 2017) (citing *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1039 (9th Cir. 2002)).

Courts consider four factors when determining whether leave to amend should be granted: 1) prejudice to the opposing party; 2) bad faith; 3) futility of amendment; and 4) undue delay. *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *see also Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003). Not all factors are equal and only when prejudice or bad faith is shown should leave to amend be denied. *Howey v. United States*, 481 F.2d 1187, 1190-91 (9th Cir. 1973). Leave to amend should not be denied based only on delay, *id.*, particularly when that delay is not caused by the party seeking amendment.

A court may deny leave to amend if the proposed amendment is futile or would be subject to dismissal.

88a

*Appendix E*

*Carrico v. City & Cnty. of San Francisco*, 656 F.3d 1002, 1008 (9th Cir. 2011). An amendment is "futile" if the complaint could not be saved by amendment. *United States v. Corinthian Colleges*, 655 F.3d 984, 995 (9th Cir. 2011). The court must determine whether the deficiencies in the pleadings "can be cured with additional allegations that are consistent with the challenged pleading and that do not contradict the allegations in the original complaint." *Id.* (quotation marks omitted). A party should be allowed to test his claim on the merits rather than on a motion to amend unless it appears beyond doubt that the proposed amended pleading would be subject to dismissal. *Roth v. Garcia Marquez*, 942 F.2d 617, 629 (9th Cir. 1991).

**DISCUSSION**

**I.  Ninth Circuit Mandate Permits Court to Consider Motion to Amend**

In its interlocutory opinion, the Ninth Circuit remanded the case to this Court with instructions to dismiss. Plaintiffs maintain that the Ninth Circuit did not state in its instructions whether dismissal was with or without leave to amend, and therefore, this Court should freely grant leave to do so. Federal defendants assert that this Court must dismiss according to the rule of mandate and because any amendment would be futile.[2]

---

2.  There is no material dispute between the parties whether plaintiffs' amendments are in bad faith, prejudicial to defendants, or unduly delayed. Having considered those factors, this Court finds that none bar plaintiffs' request to amend.

89a

*Appendix E*

Under the "rule of mandate," a lower court is unquestionably obligated to "execute the terms of a mandate." *United States v. Kellington*, 217 F.3d 1084, 1092 (9th Cir. 2000). Compliance with the rule of mandate "preserv[es] the hierarchical structure of the court system," *Thrasher*, 483 F.3d at 982, and thus constitutes a basic feature of the rule of law in an appellate scheme. But while "the mandate of an appellate court forecloses the lower court from reconsidering matters determined in the appellate court, it 'leaves to the district court any issue not expressly or impliedly disposed of on appeal.'" *Nguyen v. United States*, 792 F.2d 1500, 1502 (9th Cir. 1986) (quoting *Stevens v. F/V Bonnie Doon*, 731 F.2d 1433, 1435 (9th Cir. 1984)).

"Absent a mandate which explicitly directs to the contrary, a district court upon remand can permit the plaintiff to file additional pleadings. . . . " *San Francisco Herring Ass'n v. Dep't of the Interior*, 946 F.3d 564, 574 (9th Cir. 2019) (quoting *Nguyen*, 792 F.2d at 1502; *see also Sierra Club v. Penfold*, 857 F.2d 1307, 1312 (9th Cir. 1988)). When mandate in the prior appeal did not expressly address the possibility of amendment and did not indicate a clear intent to deny amendment seeking to raise new issues not decided by the prior appeal, that prior opinion did not purport "to shut the courthouse doors." *San Francisco Herring Ass'n*, 946 F.3d at 574 (citing *Nguyen*, 792 F.2d at 1503).

In *San Francisco Herring Ass'n*, the Ninth Circuit discussed its issuance of a mandate in a prior appeal, which vacated the district court's order entering summary

90a

*Appendix E*

judgment in the defendants' favor and directed the district court to dismiss the complaint. *See San Francisco Herring Ass'n v. U.S. Dep't of Interior*, 683 F. App'x 579, 581 (9th Cir. 2017) (vacating judgment and remanding case with instructions to dismiss for lack of subject matter jurisdiction). On remand, the district court allowed the plaintiff to seek leave to file a second amended complaint. The Ninth Circuit determined the district court correctly found that the mandate to dismiss did not prevent the plaintiff from seeking leave to re-plead. *San Francisco Herring Ass'n*, 946 F.3d 574. The court reasoned that in instructing to dismiss, it had been silent on whether the dismissal should be with or without leave to amend and did not preclude the plaintiff from filing new allegations. *Id.* at 572-574.

Here, this Court does not take lightly its responsibility under the rule of mandate. Rather, it considers plaintiffs' new factual allegations under the Declaratory Judgment Act, and amended request for relief in light of intervening recent precedent, to be a new issue that, while discussed, was not decided by the Ninth Circuit in the interlocutory appeal. Nor did the mandate expressly state that plaintiffs could not amend to replead their case—particularly where the opinion found a narrow deficiency with plaintiffs' pleadings on redressability. This Court therefore does not interpret the Ninth Circuit's instructions as mandating it "to shut the courthouse doors" on plaintiffs' case where they present newly amended allegations. *San Francisco Herring Ass'n*, 946 F.3d at 574.

91a

*Appendix E*

## II. Amendment is Not Futile

### A. The Interlocutory Opinion

The Ninth Circuit recited the established rule that, to demonstrate Article III redressability, plaintiffs must show that the relief they seek is both (1) substantially likely to redress their injuries; and (2) within the district court's power to award. *Juliana*, 947 F.3d at 1170. Redress need not be guaranteed, but it must be more than "merely speculative." *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).

Here, applying the above rule, the Ninth Circuit stated that a declaration alone is not relief "substantially likely to mitigate [plaintiffs'] asserted concrete injuries." *Juliana*, 947 F.3d at 1170. The court considered whether partial redress suffices to prove the first redressability prong, concluding that it likely does not, because even if plaintiffs obtained the sought relief and federal defendants ceased promoting fossil fuel, such would only ameliorate, rather than "solve global climate change." *Id. at* 1171.

Even so, the court did not decide that plaintiffs had failed to prove the first prong of redressability: the court stated, "[w]e are therefore skeptical that the first redressability prong is satisfied. But even *assuming that it is*, [plaintiffs] do not surmount the remaining hurdle—establishing that the specific relief they seek is within the power of an Article III court." *Juliana*, 947 F.3d at 1171. (emphasis added).

92a

*Appendix E*

In addressing whether plaintiffs had proved the second prong, the court identified the "specific relief" plaintiffs sought was an injunction requiring federal defendants not only to cease permitting, authorizing, and subsidizing fossil fuel, but also to prepare a plan, subject to judicial monitoring, to draw down harmful emissions. That specific relief, the court determined, was not within the power of an Article III court to award. *Id.* The court explained that for the district court to "order, design, supervise, or implement" plaintiffs' requested remedial plan, any effective plan would require a "host of complex policy decisions" entrusted under constitutional separation of powers to the executive and legislative branches. *Id.* In essence, the court found plaintiffs' injuries beyond redress because, in its view, plaintiffs' requested relief requires the district court to evaluate "competing policy considerations" and supervise implementation over many years. *Id.* at 1171-73

Summarizing what the court did—and did not—identify as the legal defects in plaintiffs' case, the court did not decide whether plaintiffs' requested declaratory relief failed or satisfied the redressability requirement for standing, and did not consider that issue under *Uzuegbunam* or the Declaratory Judgment Act. Rather, the court resolved that plaintiffs failed to demonstrate redressability on grounds that plaintiffs' requested remedial and injunctive relief was beyond the power of an Article III court to provide. The court was also silent on whether dismissal was to be with or without leave to amend.

93a

*Appendix E*

**B.  Plaintiffs' Proposed Amendments**

Plaintiffs assert that their proposed amendments cure the defects the Ninth Circuit identified and that they should be given opportunity to amend. Plaintiffs explain that the amended allegations demonstrate that relief under the Declaratory Judgment Act alone would be substantially likely to provide partial redress of asserted and ongoing concrete injuries, and that partial redress is sufficient, even if further relief is later found unavailable.

Plaintiffs also amended their factual allegations directly linking how a declaratory judgment alone will redress of plaintiffs' individual ongoing injuries. (*See* doc. 514-2 ¶¶ 19-A, 22-A, 30-A, 34-A, 39-A, 43-A, 46-A, 49-A, 52-A, 56-A, 59-A, 62-A, 64-A, 67-A, 70-A, 72-A, 76-A, 80-A, 85-A, 88-A, 90-A.). Plaintiffs assert that declaratory relief is within a court's Article III power to provide. Plaintiffs also omitted the "specific relief " the Ninth Circuit majority found to be outside Article III authority to award. Among other deletions, plaintiffs eliminated their requests for this Court to order federal defendants to prepare and implement a remedial plan and prepare a list of U.S. $CO_2$ emissions. Plaintiffs also omitted their request for this Court to monitor and enforce the remedial plan.

Plaintiffs' Second Amended Complaint thus requests this Court to: (1) declare that the United States' national energy system violates and continues to violate the Fifth Amendment of the U.S. Constitution and Plaintiffs' constitutional rights to substantive due process and equal protection of the law; (2) enter a judgment declaring the

94a

*Appendix E*

United States' national energy system has violated and continues to violate the public trust doctrine; and (3) enter a judgment declaring that § 201 of the Energy Policy Act has violated and continues to violate the Fifth Amendment of the U.S. Constitution and plaintiffs' constitutional rights to substantive due process and equal protection of the law.

While declaratory relief was part of plaintiffs' prayer in the operative complaint, plaintiffs did not cite *Uzuegbunam*—recent authority affirming that partial declaratory relief satisfies redressability for purposes of Article III standing. Plaintiffs contend that they should be granted leave to amend based on the Supreme Court's holding that a request for nominal damages alone (a form of declaratory relief ) satisfies the redressability element necessary for Article III standing, where the plaintiff's claim is based on a completed violation of a legal right, and the plaintiff establishes the first two elements of standing. *Uzuegbunam*, 141 S. Ct. at 801-02.

## C. Plaintiffs' Amended Pleadings Satisfy Redressability

This Court adamantly agrees with the Ninth Circuit that its ability to provide redress is animated by two inquiries, one of efficacy and one of power. *Juliana*, 947 F.3d at 1169. Plaintiffs' proposed amendments allege that a declaration under the Declaratory Judgment Act is substantially likely to remediate their ongoing injuries, and that such relief is within this Court's power to award.

95a

*Appendix E*

## 1. Declaratory Relief Alone is Substantially Likely to Redress Injury

The court can grant declaratory relief in the first instance and later consider further necessary or proper relief, if warranted, under the Declaratory Judgment Act. 28 U.S.C. §§ 2201, *et seq.* "In a case of actual controversy within its jurisdiction, [ ] any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." 28 U.S.C. § 2201. "Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment." 28 U.S.C. § 2202.

The Supreme Court has long recognized that declaratory judgment actions can provide redressability, even where relief obtained is a declaratory judgment alone. Well-known cases involve the census, *Franklin v. Massachusetts*, 505 U.S. 788, 803, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992), and *Utah v. Evans*, 536 U.S. 452, 122 S.Ct. 2191, 153 L.Ed.2d 453 (2002).

In each of the census cases, a state objected to the way the Census Bureau counted people and sued government officials. In *Franklin v. Massachusetts*, the Supreme Court stated, "For purposes of establishing standing," it did not need to decide whether injunctive relief against

96a

*Appendix E*

was appropriate where "the injury alleged is likely to be redressed by declaratory relief " and the court could "assume it is substantially likely that the President and other executive and congressional officials would abide by an authoritative interpretation of the census statute and constitutional provision by the District Court." 505 U.S. at 803, 112 S.Ct. 2767.

In *Utah v. Evans*, the Supreme Court referenced *Franklin*, explaining that, in terms of its "standing" precedent, declaratory relief affects a change in legal status, and the practical consequence of that change would "amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered." 536 U.S. 452, 122 S.Ct. 2191, 153 L.Ed.2d 453 (2002).

Similarly, the Supreme Court has determined that a plaintiff had standing to sue the Nuclear Regulatory Commission for a declaration that the Price-Anderson Act, which limited the liability of nuclear power companies, was unconstitutional. *Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*, 438 U.S. 59, 81, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978).

Other cases recognized the role of declaratory relief in resolving constitutional cases. *See, e.g., Evers v. Dwyer*, 358 U.S. 202, 202-04, 79 S.Ct. 178, 3 L.Ed.2d 222 (1958) (ongoing governmental enforcement of segregation laws created actual controversy for declaratory judgment); *Powell v. McCormack*, 395 U.S. 486, 499, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969) ("A court may grant declaratory

97a

*Appendix E*

relief even though it chooses not to issue an injunction or mandamus.").

Finally, the Supreme Court held that, for the purpose of Article III standing, nominal damages—a form of declaratory relief—provide the necessary redress for a completed violation of a legal right, even where the underlying unlawful conduct had ceased. *Uzuegbunam*, — U.S. —, 141 S. Ct. 792, 802, 209 L.Ed.2d 94. *Uzuegbunam* illustrates that when a plaintiff shows a completed violation of a legal right, as plaintiffs have shown here, standing survives, even when relief is nominal or trivial.

Here, this Court notes that, in its determination of standing, the Ninth Circuit was "skeptical" that declaratory relief alone would remediate plaintiffs' injuries, *Juliana*, 947 F.3d at 1171. The court noted that even if all plaintiffs' requests for relief were granted against federal defendants, such would not solve the problem of climate change entirely. But for redressability under Article III standing, plaintiffs need not allege that a declaration alone would solve their every ill. To plead a justiciable case, a court need only evaluate "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127, 127 S.Ct. 764, 166 L.Ed.2d 604 (2007) (quoting *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941)). There is nothing in § 2201 preventing a court from granting declaratory relief even if it is the only relief awarded.

98a

*Appendix E*

In light of that determination, by pleading a claim under § 2201, plaintiffs establish that the text of the statute itself resolves the uncertainty posed by the Ninth Circuit, given that plaintiffs have established an active case and controversy showing injury and causation. Section 2201 also provides that declaratory relief may be granted "whether or not further relief is or could be sought." *Id.* Under the statute, the relief plaintiffs seek fits like a glove, where plaintiffs request consideration of declaratory relief independently of other forms of relief, such as an injunction. *See Steffel v. Thompson*, 415 U.S. 452, 475, 94 S.Ct. 1209, 39 L.Ed.2d 505, (1974) (stating in a different context that "regardless of whether injunctive relief may be appropriate, federal declaratory relief is not precluded."). This Court finds that plaintiffs' proposed amendments are not futile: a declaration that federal defendants' energy policies violate plaintiffs' constitutional rights would itself be significant relief.

## 2. Redress is Within Power of Article III Courts

It is a foundational doctrine that when government conduct catastrophically harms American citizens, the judiciary is constitutionally required to perform its independent role and determine whether the challenged conduct, not exclusively committed to any branch by the Constitution, is unconstitutional. *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 176-78, 2 L.Ed. 60 (1803). The judicial role in cases like this is to apply constitutional law, declare rights, and declare the government's responsibilities. No other branch of government can perform this function

99a

*Appendix E*

because the "judicial Power" is exclusively in the hands of Article III courts. U.S. Const. Art. III, § 1. The issue before this Court now is not to determine what relief, specifically, is in its power to provide. This Court need only decide whether plaintiffs' amendments—alleging that declaratory relief is within an Article III court's power to award—"would be subject to dismissal." *Carrico*, 656 F.3d 1002.

The Declaratory Judgment Act authorizes this Court's determination in its embrace of both constitutional and prudential concerns where the text is "deliberately cast in terms of permissive, rather than mandatory, authority." *Pub. Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 250, 73 S.Ct. 236, 97 L.Ed. 291 (1952) (J. Reed, concurring). The Act gives "federal courts competence to make a declaration of rights." *Pub. Affairs Associates v. Rickover*, 369 U.S. 111, 112, 82 S.Ct. 580, 7 L.Ed.2d 604 (1962). The Supreme Court has found it "consistent with the statute . . . to vest district courts with discretion in the first instance, because facts bearing on the usefulness of the declaratory judgment remedy, and the fitness of the case for resolution, are peculiarly within their grasp." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 136, 127 S.Ct. 764, 166 L.Ed.2d 604 (2007).

Here, plaintiffs seek declaratory relief that "the United States' national energy system that creates the harmful conditions described herein has violated and continues to violate the Fifth Amendment of the U.S. Constitution and Plaintiffs' constitutional rights to substantive due process and equal protection of the law." (Doc. 514-1 ¶ 1). This relief

100a

*Appendix E*

is squarely within the constitutional and statutory power of Article III courts to grant. Such relief would at least partially, and perhaps wholly, redress plaintiffs' ongoing injuries caused by federal defendants' ongoing policies and practices. Last, but not least, the declaration that plaintiffs seek would by itself guide the independent actions of the other branches of our government and cures the standing deficiencies identified by the Ninth Circuit. This Court finds that the complaint can be saved by amendment. *See Corinthian Colleges*, 655 F.3d at 995.

## CONCLUSION

For the reasons stated above, plaintiffs' Motion to File a Second Amended Complaint, doc. 462, is GRANTED.

101a

**APPENDIX F**

947 F.3d 1159

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

————

No. 18-36082

KELSEY CASCADIA ROSE JULIANA; XIUHTEZCATL TONATIUH
M., through his Guardian Tamara Roske-Martinez;
ALEXANDER LOZNAK; JACOB LEBEL; ZEALAND B., through
his Guardian Kimberly Pash-Bell; AVERY M., through
her Guardian Holly McRae; SAHARA V., through her
Guardian Toa Aguilar; KIRAN ISAAC OOMMEN; TIA MARIE
HATTON; ISAAC V., through his Guardian Pamela Vergun;
MIKO V., through her Guardian Pamel Vergun; HAZEL
V., through her Guardian Margo Van Ummerson; SOPHIE
K., through her Guardian Dr. James Hansen; JAIME B.,
through her Guardian Jamescita Peshlakai; JOURNEY
Z., through his Guardian Erika Schneider; VICTORIA B.,
through her Guardian Daisy Calderon; NATHANIEL B.,
through his Guardian Sharon Baring; AJI P., through
his Guardian Helaina Piper; LEVI D., through his
Guardian Leigh-Ann Draheim; JAYDEN F., through her
Guardian Cherri Foytlin; NICHOLAS V., through his
Guardian Marie Venner; EARTH GUARDIANS, a nonprofit
organization; FUTURE GENERATIONS, through their
Guardian Dr. James Hansen,

*Plaintiffs-Appellees,*

v.

102a

*Appendix F*

UNITED STATES OF AMERICA; MARY B. NEUMAYR, in her capacity as Chairman of Council on Environmental Quality; MICK MULVANEY, in his official capacity as Director of the Office of Management and the Budget; KELVIN K. DROEGEMEIR, in his official capacity as Director of the Office of Science and Technology Policy; DAN BROUILLETTE, in his official capacity as Secretary of Energy; U.S. DEPARTMENT OF THE INTERIOR; DAVID L. BERNHARDT, in his official capacity as Secretary of Interior; U.S. DEPARTMENT OF TRANSPORTATION; ELAINE L. CHAO, in her official capacity as Secretary of Transportation; UNITED STATES DEPARTMENT OF AGRICULTURE; SONNY PERDUE, in his official capacity as Secretary of Agriculture; UNITED STATES DEPARTMENT OF COMMERCE; WILBUR ROSS, in his official capacity as Secretary of Commerce; UNITED STATES DEPARTMENT OF DEFENSE; MARK T. ESPER, in his official capacity as Secretary of Defense; UNITED STATES DEPARTMENT OF STATE; MICHAEL R. POMPEO, in his official capacity as Secretary of State; ANDREW WHEELER, in his official capacity as Administrator of the EPA; OFFICE OF THE PRESIDENT OF THE UNITED STATES; U.S. ENVIRONMENTAL PROTECTION AGENCY; U.S. DEPARTMENT OF ENERGY; DONALD J. TRUMP, in his official capacity as President of the United States,

*Defendants-Appellants.*

————

Filed:   January 17, 2020

————

103a

*Appendix F*

**OPINION**

————

Appeal from the United States District Court for the District of Oregon, Ann L. Aiken, District Judge, Presiding, D.C. No. 6:15-cv-01517-AA.

————

Before: Mary H. Murguia and Andrew D. Hurwitz, Circuit Judges, and Josephine L. Staton,* District Judge.

Dissent by Judge Staton

HURWITZ, Circuit Judge:

In the mid-1960s, a popular song warned that we were "on the eve of destruction."[1] The plaintiffs in this case have presented compelling evidence that climate change has brought that eve nearer. A substantial evidentiary record documents that the federal government has long promoted fossil fuel use despite knowing that it can cause catastrophic climate change, and that failure to change existing policy may hasten an environmental apocalypse.

The plaintiffs claim that the government has violated their constitutional rights, including a claimed right under

————

* The Honorable Josephine L. Staton, United States District Judge for the Central District of California, sitting by designation.

1. Barry McGuire, *Eve of Destruction, on* Eve of Destruction (Dunhill Records, 1965).

104a

*Appendix F*

the Due Process Clause of the Fifth Amendment to a "climate system capable of sustaining human life." The central issue before us is whether, even assuming such a broad constitutional right exists, an Article III court can provide the plaintiffs the redress they seek—an order requiring the government to develop a plan to "phase out fossil fuel emissions and draw down excess atmospheric $CO_2$." Reluctantly, we conclude that such relief is beyond our constitutional power. Rather, the plaintiffs' impressive case for redress must be presented to the political branches of government.

**I.**

The plaintiffs are twenty-one young citizens, an environmental organization, and a "representative of future generations." Their original complaint named as defendants the President, the United States, and federal agencies (collectively, "the government"). The operative complaint accuses the government of continuing to "permit, authorize, and subsidize" fossil fuel use despite long being aware of its risks, thereby causing various climate-change related injuries to the plaintiffs. Some plaintiffs claim psychological harm, others impairment to recreational interests, others exacerbated medical conditions, and others damage to property. The complaint asserts violations of: (1) the plaintiffs' substantive rights under the Due Process Clause of the Fifth Amendment; (2) the plaintiffs' rights under the Fifth Amendment to equal protection of the law; (3) the plaintiffs' rights under the Ninth Amendment; and (4) the public trust doctrine. The plaintiffs seek declaratory relief and an injunction

105a

*Appendix F*

ordering the government to implement a plan to "phase out fossil fuel emissions and draw down excess atmospheric [carbon dioxide]."[2]

The district court denied the government's motion to dismiss, concluding that the plaintiffs had standing to sue, raised justiciable questions, and stated a claim for infringement of a Fifth Amendment due process right to a "climate system capable of sustaining human life." The court defined that right as one to be free from catastrophic climate change that "will cause human deaths, shorten human lifespans, result in widespread damage to property, threaten human food sources, and dramatically alter the planet's ecosystem." The court also concluded that the plaintiffs had stated a viable "danger-creation due process claim" arising from the government's failure to regulate third-party emissions. Finally, the court held that the plaintiffs had stated a public trust claim grounded in the Fifth and the Ninth Amendments.

The government unsuccessfully sought a writ of mandamus. *In re United States*, 884 F.3d 830, 837-38 (9th Cir. 2018). Shortly thereafter, the Supreme Court denied the government's motion for a stay of proceedings.

---

2. The plaintiffs also assert that section 201 of the Energy Policy Act of 1992, Pub. L. No. 102-486, § 201, 106 Stat. 2776, 2866 (codified at 15 U.S.C. § 717b(c)), which requires expedited authorization for certain natural gas imports and exports "without modification or delay," is unconstitutional on its face and as applied. The plaintiffs also challenge DOE/FE Order No. 3041, which authorizes exports of liquefied natural gas from the proposed Jordan Cove terminal in Coos Bay, Oregon.

106a

*Appendix F*

*United States v. U.S. Dist. Court for Dist. of Or.*, 139 S. Ct. 1, 201 L. Ed. 2d 1112 (2018). Although finding the stay request "premature," the Court noted that the "breadth of respondents' claims is striking . . . and the justiciability of those claims presents substantial grounds for difference of opinion." *Id.*

The government then moved for summary judgment and judgment on the pleadings. The district court granted summary judgment on the Ninth Amendment claim, dismissed the President as a defendant, and dismissed the equal protection claim in part.[3] But the court otherwise denied the government's motions, again holding that the plaintiffs had standing to sue and finding that they had presented sufficient evidence to survive summary judgment. The court also rejected the government's argument that the plaintiffs' exclusive remedy was under the Administrative Procedure Act ("APA"), 5 U.S.C. § 702 *et seq.*

The district court initially declined the government's request to certify those orders for interlocutory appeal. But, while considering a second mandamus petition from the government, we invited the district court to revisit certification, noting the Supreme Court's justiciability concerns. *United States v. U.S. Court for the Dist. of Or.*, No. 18-73014, Dkt. 3; *see In re United States*, 139 S. Ct. 452, 453, 202 L. Ed. 2d 344 (2018) (reiterating justiciability concerns in denying a subsequent stay application from the

---

3. The court found that age is not a suspect class, but allowed the equal protection claim to proceed on a fundamental rights theory.

107a

*Appendix F*

government). The district court then reluctantly certified the orders denying the motions for interlocutory appeal under 28 U.S.C. § 1292(b) and stayed the proceedings, while "stand[ing] by its prior rulings . . . as well as its belief that this case would be better served by further factual development at trial." *Juliana v. United States*, No. 6:15-cv-01517-AA, 2018 U.S. Dist. LEXIS 207366, 2018 WL 6303774, at *3 (D. Or. Nov. 21, 2018). We granted the government's petition for permission to appeal.

**II.**

The plaintiffs have compiled an extensive record, which at this stage in the litigation we take in the light most favorable to their claims. *See Plumhoff v. Rickard*, 572 U.S. 765, 768, 134 S. Ct. 2012, 188 L. Ed. 2d 1056 (2014). The record leaves little basis for denying that climate change is occurring at an increasingly rapid pace. It documents that since the dawn of the Industrial Age, atmospheric carbon dioxide has skyrocketed to levels not seen for almost three million years. For hundreds of thousands of years, average carbon concentration fluctuated between 180 and 280 parts per million. Today, it is over 410 parts per million and climbing. Although carbon levels rose gradually after the last Ice Age, the most recent surge has occurred more than 100 times faster; half of that increase has come in the last forty years.

Copious expert evidence establishes that this unprecedented rise stems from fossil fuel combustion and will wreak havoc on the Earth's climate if unchecked. Temperatures have already risen 0.9 degrees Celsius

108a

*Appendix F*

above pre-industrial levels and may rise more than 6 degrees Celsius by the end of the century. The hottest years on record all fall within this decade, and each year since 1997 has been hotter than the previous average. This extreme heat is melting polar ice caps and may cause sea levels to rise 15 to 30 feet by 2100. The problem is approaching "the point of no return." Absent some action, the destabilizing climate will bury cities, spawn life-threatening natural disasters, and jeopardize critical food and water supplies.

The record also conclusively establishes that the federal government has long understood the risks of fossil fuel use and increasing carbon dioxide emissions. As early as 1965, the Johnson Administration cautioned that fossil fuel emissions threatened significant changes to climate, global temperatures, sea levels, and other stratospheric properties. In 1983, an Environmental Protection Agency ("EPA") report projected an increase of 2 degrees Celsius by 2040, warning that a "wait and see" carbon emissions policy was extremely risky. And, in the 1990s, the EPA implored the government to act before it was too late. Nonetheless, by 2014, U.S. fossil fuel emissions had climbed to 5.4 billion metric tons, up substantially from 1965. This growth shows no signs of abating. From 2008 to 2017, domestic petroleum and natural gas production increased by nearly 60%, and the country is now expanding oil and gas extraction four times faster than any other nation.

The record also establishes that the government's contribution to climate change is not simply a result of inaction. The government affirmatively promotes

109a

*Appendix F*

fossil fuel use in a host of ways, including beneficial tax provisions, permits for imports and exports, subsidies for domestic and overseas projects, and leases for fuel extraction on federal land.[4]

## A.

The government by and large has not disputed the factual premises of the plaintiffs' claims. But it first argues that those claims must proceed, if at all, under the APA. We reject that argument. The plaintiffs do not claim that any individual agency action exceeds statutory authorization or, taken alone, is arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A), (C). Rather, they contend that the totality of various government actions contributes to the deprivation of constitutionally protected rights. Because the APA only allows challenges to discrete agency decisions, *see Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890-91, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990), the plaintiffs cannot effectively pursue their constitutional claims—whatever their merits—under that statute.

---

4. The programs and policies identified by the plaintiffs include: (1) the Bureau of Land Management's authorization of leases for 107 coal tracts and 95,000 oil and gas wells; (2) the Export-Import Bank's provision of $14.8 billion for overseas petroleum projects; (3) the Department of Energy's approval of over 2 million barrels of crude oil imports; (4) the Department of Agriculture's approval of timber cutting on federal land; (5) the undervaluing of royalty rates for federal leasing; (6) tax subsidies for purchasing fuel-inefficient sport-utility vehicles; (7) the "intangible drilling costs" and "percentage depletion allowance" tax code provisions, 26 U.S.C. §§ 263(c), 613; and (8) the government's use of fossil fuels to power its own buildings and vehicles.

110a

*Appendix F*

The defendants argue that the APA's "comprehensive remedial scheme" for challenging the constitutionality of agency actions implicitly bars the plaintiffs' freestanding constitutional claims. But, even if some constitutional challenges to agency action must proceed through the APA, forcing all constitutional claims to follow its strictures would bar plaintiffs from challenging violations of constitutional rights in the absence of a discrete agency action that caused the violation. *See Sierra Club v. Trump*, 929 F.3d 670, 694, 696 (9th Cir. 2019) (stating that plaintiffs could "bring their challenge through an equitable action to enjoin unconstitutional official conduct, or under the judicial review provisions of the [APA]"); *Navajo Nation v. Dep't of the Interior*, 876 F.3d 1144, 1172 (9th Cir. 2017) (holding "that the second sentence of § 702 waives sovereign immunity broadly for all causes of action that meet its terms, while § 704's 'final agency action' limitation applies only to APA claims"). Because denying "any judicial forum for a colorable constitutional claim" presents a "serious constitutional question," Congress's intent through a statute to do so must be clear. *See Webster v. Doe*, 486 U.S. 592, 603, 108 S. Ct. 2047, 100 L. Ed. 2d 632 (1988) (quoting *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 681 n.12, 106 S. Ct. 2133, 90 L. Ed. 2d 623 (1986)); *see also Allen v. Milas*, 896 F.3d 1094, 1108 (9th Cir. 2018) ("After *Webster*, we have assumed that the courts will be open to review of constitutional claims, even if they are closed to other claims."). Nothing in the APA evinces such an intent.[5] Whatever the merits of the

---

5. The government relies upon *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 328-29, 135 S. Ct. 1378, 191 L. Ed. 2d 471 (2015), and *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 74-

111a

*Appendix F*

plaintiffs' claims, they may proceed independently of the review procedures mandated by the APA. *See Sierra Club*, 929 F.3d at 698-99 ("Any constitutional challenge that Plaintiffs may advance under the APA would exist regardless of whether they could also assert an APA claim . . . . [C]laims challenging agency actions—particularly constitutional claims—may exist wholly apart from the APA."); *Navajo Nation*, 876 F.3d at 1170 (explaining that certain constitutional challenges to agency action are "not grounded in the APA").

**B.**

The government also argues that the plaintiffs lack Article III standing to pursue their constitutional claims. To have standing under Article III, a plaintiff must have (1) a concrete and particularized injury that (2) is caused by the challenged conduct and (3) is likely redressable by a favorable judicial decision. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81, 120 S. Ct. 693, 145 L. Ed. 2d 610 (2000); *Jewel v. NSA*, 673 F.3d 902, 908 (9th Cir. 2011). A plaintiff need only establish a genuine dispute as to these requirements to survive summary judgment. *See Cent. Delta Water Agency v. United States*, 306 F.3d 938, 947 (9th Cir. 2002).

---

76, 116 S. Ct. 1114, 134 L. Ed. 2d 252 (1996), both of which held that statutory remedial schemes implicitly barred freestanding equitable claims. Neither case, however, involved claims by the plaintiffs that the federal government was violating their constitutional rights. *See Armstrong*, 575 U.S. at 323-24 (claiming that state officials had violated a federal statute); *Seminole Tribe*, 517 U.S. at 51-52 (same).

112a

*Appendix F*

**1.**

The district court correctly found the injury requirement met. At least some plaintiffs claim concrete and particularized injuries. Jaime B., for example, claims that she was forced to leave her home because of water scarcity, separating her from relatives on the Navajo Reservation. *See Trump v. Hawaii*, 138 S. Ct. 2392, 2416, 201 L. Ed. 2d 775 (2018) (finding separation from relatives to be a concrete injury). Levi D. had to evacuate his coastal home multiple times because of flooding. *See Maya v. Centex Corp.*, 658 F.3d 1060, 1070-71 (9th Cir. 2011) (finding diminution in home property value to be a concrete injury). These injuries are not simply "'conjectural' or 'hypothetical;'" at least some of the plaintiffs have presented evidence that climate change is affecting them now in concrete ways and will continue to do so unless checked. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155, 110 S. Ct. 1717, 109 L. Ed. 2d 135 (1990)); *cf. Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 478, 385 U.S. App. D.C. 257 (D.C. Cir. 2009) (finding no standing because plaintiffs could "only aver that any significant adverse effects of climate change 'may' occur at some point in the future").

The government argues that the plaintiffs' alleged injuries are not particularized because climate change affects everyone. But, "it does not matter how many persons have been injured" if the plaintiffs' injuries are "concrete and personal." *Massachusetts v. EPA*, 549 U.S.

113a

*Appendix F*

497, 517, 127 S. Ct. 1438, 167 L. Ed. 2d 248 (2007) (quoting *Lujan*, 504 U.S. at 581 (Kennedy, J., concurring)); *see also Novak v. United States*, 795 F.3d 1012, 1018 (9th Cir. 2015) ("[T]he fact that a harm is widely shared does not necessarily render it a generalized grievance.") (alteration in original) (quoting *Jewel*, 673 F.3d at 909). And, the Article III injury requirement is met if only one plaintiff has suffered concrete harm. *See Hawaii*, 138 S. Ct. at 2416; *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1651, 198 L. Ed. 2d 64 (2017) ("At least one plaintiff must have standing to seek each form of relief requested in the complaint. . . . For all relief sought, there must be a litigant with standing.").

**2.**

The district court also correctly found the Article III causation requirement satisfied for purposes of summary judgment. Causation can be established "even if there are multiple links in the chain," *Mendia v. Garcia*, 768 F.3d 1009, 1012 (9th Cir. 2014), as long as the chain is not "hypothetical or tenuous," *Maya*, 658 F.3d at 1070 (quoting *Nat'l Audubon Soc'y, Inc. v. Davis*, 307 F.3d 835, 849 (9th Cir. 2002), *amended on denial of reh'g*, 312 F.3d 416 (9th Cir. 2002)). The causal chain here is sufficiently established. The plaintiffs' alleged injuries are caused by carbon emissions from fossil fuel production, extraction, and transportation. A significant portion of those emissions occur in this country; the United States accounted for over 25% of worldwide emissions from 1850 to 2012, and currently accounts for about 15%. *See Massachusetts*, 549 U.S. at 524-25 (finding that emissions

114a

*Appendix F*

amounting to about 6% of the worldwide total showed cause of alleged injury "by any standard"). And, the plaintiffs' evidence shows that federal subsidies and leases have increased those emissions. About 25% of fossil fuels extracted in the United States come from federal waters and lands, an activity that requires authorization from the federal government. *See* 30 U.S.C. §§ 181-196 (establishing legal framework governing the disposition of fossil fuels on federal land), § 201 (authorizing the Secretary of the Interior to lease land for coal mining).

Relying on *Washington Environmental Council v. Bellon*, 732 F.3d 1131, 1141-46 (9th Cir. 2013), the government argues that the causal chain is too attenuated because it depends in part on the independent actions of third parties. *Bellon* held that the causal chain between local agencies' failure to regulate five oil refineries and the plaintiffs' climate-change related injuries was "too tenuous to support standing" because the refineries had a "scientifically indiscernible" impact on climate change. *Id.* at 1143-44. But the plaintiffs here do not contend that their injuries were caused by a few isolated agency decisions. Rather, they blame a host of federal policies, from subsidies to drilling permits, spanning "over 50 years," and direct actions by the government. There is at least a genuine factual dispute as to whether those policies were a "substantial factor" in causing the plaintiffs' injuries. *Mendia*, 768 F.3d at 1013 (quoting *Tozzi v. U.S. Dep't of Health & Human Servs.*, 271 F.3d 301, 308, 350 U.S. App. D.C. 40 (D.C. Cir. 2001)).

115a

*Appendix F*

**3.**

The more difficult question is whether the plaintiffs' claimed injuries are redressable by an Article III court. In analyzing that question, we start by stressing what the plaintiffs do and do not assert. They do not claim that the government has violated a statute or a regulation. They do not assert the denial of a procedural right. Nor do they seek damages under the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.* Rather, their sole claim is that the government has deprived them of a substantive constitutional right to a "climate system capable of sustaining human life," and they seek remedial declaratory and injunctive relief.

Reasonable jurists can disagree about whether the asserted constitutional right exists. *Compare Clean Air Council v. United States*, 362 F. Supp. 3d 237, 250-53 (E.D. Pa. 2019) (finding no constitutional right), *with Juliana*, 217 F. Supp. 3d at 1248-50; *see also In re United States*, 139 S. Ct. at 453 (reiterating "that the 'striking' breadth of plaintiffs' below claims 'presents substantial grounds for difference of opinion'"). In analyzing redressability, however, we assume its existence. *See M.S. v. Brown*, 902 F.3d 1076, 1083 (9th Cir. 2018). But that merely begins our analysis, because "not all meritorious legal claims are redressable in federal court." *Id.* To establish Article III redressability, the plaintiffs must show that the relief they seek is both (1) substantially likely to redress their injuries; and (2) within the district court's power to award. *Id.* Redress need not be guaranteed, but it must be more than "merely speculative." *Id.* (quoting *Lujan*, 504 U.S. at 561).

116a

*Appendix F*

The plaintiffs first seek a declaration that the government is violating the Constitution. But that relief alone is not substantially likely to mitigate the plaintiffs' asserted concrete injuries. A declaration, although undoubtedly likely to benefit the plaintiffs psychologically, is unlikely by itself to remediate their alleged injuries absent further court action. *See Clean Air Council*, 362 F. Supp. 3d at 246, 249; *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107, 118 S. Ct. 1003, 140 L. Ed. 2d 210 (1998) ("By the mere bringing of his suit, *every* plaintiff demonstrates his belief that a favorable judgment will make him happier. But although a suitor may derive great comfort and joy from the fact that the United States Treasury is not cheated, that a wrongdoer gets his just deserts, or that the Nation's laws are faithfully enforced, that psychic satisfaction is not an acceptable Article III remedy because it does not redress a cognizable Article III injury."); *see also Friends of the Earth*, 528 U.S. at 185 ("[A] plaintiff must demonstrate standing separately for each form of relief sought.").

The crux of the plaintiffs' requested remedy is an injunction requiring the government not only to cease permitting, authorizing, and subsidizing fossil fuel use, but also to prepare a plan subject to judicial approval to draw down harmful emissions. The plaintiffs thus seek not only to enjoin the Executive from exercising discretionary authority expressly granted by Congress, *see, e.g.*, 30 U.S.C. § 201 (authorizing the Secretary of the Interior to lease land for coal mining), but also to enjoin Congress from exercising power expressly granted by the Constitution over public lands, *see* U.S. Const. art. IV, § 3, cl. 2 ("The Congress shall have Power to dispose of

117a

*Appendix F*

and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States.").

As an initial matter, we note that although the plaintiffs contended at oral argument that they challenge only affirmative activities by the government, an order simply enjoining those activities will not, according to their own experts' opinions, suffice to stop catastrophic climate change or even ameliorate their injuries.[6] The plaintiffs' experts opine that the federal government's leases and subsidies have contributed to global carbon emissions. But they do not show that even the total elimination of the challenged programs would halt the growth of carbon dioxide levels in the atmosphere, let alone decrease that growth. Nor does any expert contend that elimination of the challenged pro-carbon fuels programs would by itself prevent further injury to the plaintiffs. Rather, the record shows that many of the emissions causing climate change happened decades ago or come from foreign and non-governmental sources.

Indeed, the plaintiffs' experts make plain that reducing the global consequences of climate change demands much more than cessation of the government's promotion of fossil fuels. Rather, these experts opine that such a result calls for no less than a fundamental transformation of this country's energy system, if not that of the industrialized world. One expert opines that atmospheric carbon reductions must come "largely via

---

6. The operative complaint, however, also seems to challenge the government's inaction.

118a

*Appendix F*

reforestation," and include rapid and immediate decreases in emissions from many sources. "[L]eisurely reductions of one of two percent per year," he explains, "will not suffice." Another expert has opined that although the required emissions reductions are "technically feasible," they can be achieved only through a comprehensive plan for "nearly complete decarbonization" that includes both an "unprecedently rapid build out" of renewable energy and a "sustained commitment to infrastructure transformation over decades." And, that commitment, another expert emphasizes, must include everything from energy efficient lighting to improved public transportation to hydrogen-powered aircraft.

The plaintiffs concede that their requested relief will not alone solve global climate change, but they assert that their "injuries would be to some extent ameliorated." Relying on *Massachusetts v. EPA*, the district court apparently found the redressability requirement satisfied because the requested relief would likely slow or reduce emissions. *See* 549 U.S. at 525-26. That case, however, involved a procedural right that the State of Massachusetts was allowed to assert "without meeting all the normal standards for redressability;" in that context, the Court found redressability because "there [was] some possibility that the requested relief [would] prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Id.* at 517-18, 525-26 (quoting *Lujan*, 504 U.S. at 572 n.7). The plaintiffs here do not assert a procedural right, but rather a substantive due process claim.[7]

_____

7. The dissent reads *Massachusetts* to hold that "a perceptible reduction in the advance of climate change is sufficient to redress

119a

*Appendix F*

We are therefore skeptical that the first redressability prong is satisfied. But even assuming that it is, the plaintiffs do not surmount the remaining hurdle—establishing that the specific relief they seek is within the power of an Article III court. There is much to recommend the adoption of a comprehensive scheme to decrease fossil fuel emissions and combat climate change, both as a policy matter in general and a matter of national survival in particular. But it is beyond the power of an Article III court to order, design, supervise, or implement the plaintiffs' requested remedial plan. As the opinions of their experts make plain, any effective plan would necessarily require a host of complex policy decisions entrusted, for better or worse, to the wisdom and discretion of the executive and legislative branches. *See Brown*, 902 F.3d at 1086 (finding the plaintiff's requested declaration requiring the government to issue driver cards "incompatible with democratic principles embedded in the structure of the Constitution"). These decisions range, for

---

a plaintiff's climate change-induced harms." Diss. at 47. But *Massachusetts* "permitted a State to challenge EPA's refusal to regulate greenhouse gas emissions," *Am. Elec. Power Co., Inc. v. Connecticut*, 564 U.S. 410, 420, 131 S. Ct. 2527, 180 L. Ed. 2d 435 (2011), finding that as a sovereign it was "entitled to special solicitude in [the] standing analysis," *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2664 n.10, 192 L. Ed. 2d 704 (2015) (quoting *Massachusetts*, 549 U.S. at 520). Here, in contrast, the plaintiffs are not sovereigns, and a substantive right, not a procedural one, is at issue. *See Massachusetts*, 549 U.S. at 517-21, 525-26; *see also Lujan*, 504 U.S. at 572 n.7 ("There is this much truth to the assertion that 'procedural rights' are special: The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy.").

120a

*Appendix F*

example, from determining how much to invest in public transit to how quickly to transition to renewable energy, and plainly require consideration of "competing social, political, and economic forces," which must be made by the People's "elected representatives, rather than by federal judges interpreting the basic charter of Government for the entire country." *Collins v. City of Harker Heights*, 503 U.S. 115, 128-29, 112 S. Ct. 1061, 117 L. Ed. 2d 261 (1992); *see Lujan*, 504 U.S. at 559-60 ("[S]eparation of powers depends largely upon common understanding of what activities are appropriate to legislatures, to executives, and to courts.").

The plaintiffs argue that the district court need not itself make policy decisions, because if their general request for a remedial plan is granted, the political branches can decide what policies will best "phase out fossil fuel emissions and draw down excess atmospheric CO2." To be sure, in some circumstances, courts may order broad injunctive relief while leaving the "details of implementation" to the government's discretion. *Brown v. Plata*, 563 U.S. 493, 537-38, 131 S. Ct. 1910, 179 L. Ed. 2d 969 (2011). But, even under such a scenario, the plaintiffs' request for a remedial plan would subsequently require the judiciary to pass judgment on the sufficiency of the government's response to the order, which necessarily would entail a broad range of policymaking. And inevitably, this kind of plan will demand action not only by the Executive, but also by Congress. Absent court intervention, the political branches might conclude—however inappropriately in the plaintiffs' view—that economic or defense considerations called for continuation of the very programs challenged in this suit, or a less

121a

*Appendix F*

robust approach to addressing climate change than the plaintiffs believe is necessary. "But we cannot substitute our own assessment for the Executive's [or Legislature's] predictive judgments on such matters, all of which 'are delicate, complex, and involve large elements of prophecy.'" *Hawaii*, 138 S. Ct. at 2421 (quoting *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 111, 68 S. Ct. 431, 92 L. Ed. 568 (1948)). And, given the complexity and long-lasting nature of global climate change, the court would be required to supervise the government's compliance with any suggested plan for many decades. *See Nat. Res. Def. Council, Inc. v. EPA*, 966 F.2d 1292, 1300 (9th Cir. 1992) ("Injunctive relief could involve extraordinary supervision by this court. . . . [and] may be inappropriate where it requires constant supervision.").[8]

---

8. However belatedly, the political branches are currently debating such action. Many resolutions and plans have been introduced in Congress, ranging from discrete measures to encourage clean energy innovation to the "Green New Deal" and comprehensive proposals for taxing carbon and transitioning all sectors of the economy away from fossil fuels. *See, e.g.*, H.R. Res. 109, 116th Cong. (2019); S.J. Res. 8, 116th Cong. (2019); Enhancing Fossil Fuel Energy Carbon Technology Act, S. 1201, 116th Cong. (2019); Climate Action Now Act, H.R. 9, 116th Cong. (2019); Methane Waste Prevention Act, H.R. 2711, 116th Cong. (2019); Clean Energy Standard Act, S. 1359, 116th Cong. (2019); National Climate Bank Act, S. 2057, 116th Cong. (2019); Carbon Pollution Transparency Act, S. 1745, 116th Cong. (2019); Leading Infrastructure for Tomorrow's America Act, H.R. 2741, 116th Cong. (2019); Buy Clean Transparency Act, S. 1864, 116th Cong. (2019); Carbon Capture Modernization Act, H.R. 1796, 116th Cong. (2019); Challenges & Prizes for Climate Act, H.R. 3100, 116th Cong. (2019); Energy Innovation and Carbon Dividend Act, H.R. 763, 116th Cong. (2019); Climate Risk Disclosure Act, S. 2075, 116th Cong. (2019); Clean Energy for America Act, S. 1288, 116th Cong. (2019). The proposed legislation, consistent

122a

*Appendix F*

As the Supreme Court recently explained, "a constitutional directive or legal standards" must guide the courts' exercise of equitable power. *Rucho v. Common Cause*, 139 S. Ct. 2484, 2508, 204 L. Ed. 2d 931 (2019). *Rucho* found partisan gerrymandering claims presented political questions beyond the reach of Article III courts. *Id.* at 2506-07. The Court did not deny extreme partisan gerrymandering can violate the Constitution. *See id.* at 2506; *id.* at 2514-15 (Kagan, J., dissenting). But, it concluded that there was no "limited and precise" standard discernible in the Constitution for redressing the asserted violation. *Id.* at 2500. The Court rejected the plaintiffs' proposed standard because unlike the one-person, one-vote rule in vote dilution cases, it was not "relatively easy to administer as a matter of math." *Id.* at 2501.

*Rucho* reaffirmed that redressability questions implicate the separation of powers, noting that federal courts "have no commission to allocate political power and influence" without standards to guide in the exercise of such authority. *See id.* at 2506-07, 2508. Absent those standards, federal judicial power could be "unlimited in scope and duration," and would inject "the unelected and politically unaccountable branch of the Federal Government [into] assuming such an extraordinary and unprecedented role." *Id.* at 2507; *see also Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125, 134 S. Ct. 1377, 188 L. Ed. 2d 392 (2014) (noting the

_____

with the opinions of the plaintiffs' experts, envisions that tackling this global problem involves the exercise of discretion, trade-offs, international cooperation, private-sector partnerships, and other value judgments ill-suited for an Article III court.

123a

*Appendix F*

"separation-of-powers principles underlying" standing doctrine); *Brown*, 902 F.3d at 1087 (stating that "in the context of Article III standing, . . . federal courts must respect their 'proper—and properly limited—role . . . in a democratic society'" (quoting *Gill v. Whitford*, 138 S. Ct. 1916, 1929, 201 L. Ed. 2d 313 (2018)). Because "it is axiomatic that 'the Constitution contemplates that democracy is the appropriate process for change,'" *Brown*, 902 F.3d at 1087 (quoting *Obergefell v. Hodges*, 135 S. Ct. 2584, 2605, 192 L. Ed. 2d 609 (2015)), some questions—even those existential in nature—are the province of the political branches. The Court found in *Rucho* that a proposed standard involving a mathematical comparison to a baseline election map is too difficult for the judiciary to manage. *See* 139 S. Ct. at 2500-02. It is impossible to reach a different conclusion here.

The plaintiffs' experts opine that atmospheric carbon levels of 350 parts per million are necessary to stabilize the global climate. But, even accepting those opinions as valid, they do not suggest how an order from this Court can achieve that level, other than by ordering the government to develop a plan. Although the plaintiffs' invitation to get the ball rolling by simply ordering the promulgation of a plan is beguiling, it ignores that an Article III court will thereafter be required to determine whether the plan is sufficient to remediate the claimed constitutional violation of the plaintiffs' right to a "climate system capable of sustaining human life." We doubt that any such plan can be supervised or enforced by an Article III court. And, in the end, any plan is only as good as the court's power to enforce it.

124a

*Appendix F*

**C.**

Our dissenting colleague quite correctly notes the gravity of the plaintiffs' evidence; we differ only as to whether an Article III court can provide their requested redress. In suggesting that we can, the dissent reframes the plaintiffs' claimed constitutional right variously as an entitlement to "the country's perpetuity," Diss. at 35-37, 39, or as one to freedom from "the amount of fossil-fuel emissions that will irreparably devastate our Nation," *id.* at 57. But if such broad constitutional rights exist, we doubt that the plaintiffs would have Article III standing to enforce them. Their alleged individual injuries do not flow from a violation of these claimed rights. Indeed, any injury from the dissolution of the Republic would be felt by all citizens equally, and thus would not constitute the kind of discrete and particularized injury necessary for Article III standing. *See Friends of the Earth*, 528 U.S. at 180-81. A suit for a violation of these reframed rights, like one for a violation of the Guarantee Clause, would also plainly be nonjusticiable. *See, e.g., Rucho*, 139 S. Ct. at 2506 ("This Court has several times concluded, however, that the Guarantee Clause does not provide the basis for a justiciable claim.") (citing *Pac. States Tel. & Tel. Co. v. Oregon*, 223 U.S. 118, 149, 32 S. Ct. 224, 56 L. Ed. 377 (1912)); *Luther v. Borden*, 48 U.S. 1, 36-37, 39, 12 L. Ed. 581 (1849).

More importantly, the dissent offers no metrics for judicial determination of the level of climate change that would cause "the willful dissolution of the Republic," Diss. at 40, nor for measuring a constitutionally acceptable

125a

*Appendix F*

"perceptible reduction in the advance of climate change," *id.* at 47. Contrary to the dissent, we cannot find Article III redressability requirements satisfied simply because a court order might "postpone[] the day when remedial measures become insufficiently effective." *Id.* at 46; *see Brown*, 902 F.3d at 1083 ("If, however, a favorable judicial decision would not require the defendant to redress the plaintiff's claimed injury, the plaintiff cannot demonstrate redressability[.]"). Indeed, as the dissent recognizes, a guarantee against government conduct that might threaten the Union—whether from political gerrymandering, nuclear proliferation, Executive misconduct, or climate change—has traditionally been viewed by Article III courts as "not separately enforceable." *Id.* at 39. Nor has the Supreme Court recognized "the perpetuity principle" as a basis for interjecting the judicial branch into the policy-making purview of the political branches. *See id.* at 42.

Contrary to the dissent, we do not "throw up [our] hands" by concluding that the plaintiffs' claims are nonjusticiable. *Id.* at 33. Rather, we recognize that "Article III protects liberty not only through its role in implementing the separation of powers, but also by specifying the defining characteristics of Article III judges." *Stern v. Marshall*, 564 U.S. 462, 483, 131 S. Ct. 2594, 180 L. Ed. 2d 475 (2011). Not every problem posing a threat—even a clear and present danger—to the American Experiment can be solved by federal judges. As Judge Cardozo once aptly warned, a judicial commission does not confer the power of "a knight-errant, roaming at will in pursuit of his own ideal of beauty or of goodness;"

126a

*Appendix F*

rather, we are bound "to exercise a discretion informed by tradition, methodized by analogy, disciplined by system.'" Benjamin N. Cardozo, *The Nature of the Judicial Process* 141 (1921).[9]

The dissent correctly notes that the political branches of government have to date been largely deaf to the pleas of the plaintiffs and other similarly situated individuals. But, although inaction by the Executive and Congress may affect the form of judicial relief ordered when there is Article III standing, it cannot bring otherwise nonjusticiable claims within the province of federal courts. *See Rucho*, 139 S. Ct. at 2507-08; *Gill*, 138 S. Ct. at 1929 ("'Failure of political will does not justify unconstitutional remedies.' . . . Our power as judges . . . rests not on the default of politically accountable officers, but is instead grounded in and limited by the necessity of resolving, according to legal principles, a plaintiff's particular claim of legal right." (quoting *Clinton v. City of New York*, 524 U.S. 417, 449, 118 S. Ct. 2091, 141 L. Ed. 2d 393 (1998) (Kennedy, J., concurring))); *Brown*, 902 F.3d at 1087 ("The *absence* of a law, however, has never been held to constitute a 'substantive result' subject to judicial review[.]").

---

9. Contrary to the dissent, we do not find this to be a political question, although that doctrine's factors often overlap with redressability concerns. Diss. at 51-61; *Republic of Marshall Islands v. United States*, 865 F.3d 1187, 1192 (9th Cir. 2017) ("Whether examined under the . . . the redressability prong of standing, or the political question doctrine, the analysis stems from the same separation-of-powers principle—enforcement of this treaty provision is not committed to the judicial branch. Although these are distinct doctrines . . . there is significant overlap.").

127a

*Appendix F*

The plaintiffs have made a compelling case that action is needed; it will be increasingly difficult in light of that record for the political branches to deny that climate change is occurring, that the government has had a role in causing it, and that our elected officials have a moral responsibility to seek solutions. We do not dispute that the broad judicial relief the plaintiffs seek could well goad the political branches into action. Diss. at 45-46, 49-50, 57-61. We reluctantly conclude, however, that the plaintiffs' case must be made to the political branches or to the electorate at large, the latter of which can change the composition of the political branches through the ballot box. That the other branches may have abdicated their responsibility to remediate the problem does not confer on Article III courts, no matter how well-intentioned, the ability to step into their shoes.

**III.**

For the reasons above, we reverse the certified orders of the district court and remand this case to the district court with instructions to dismiss for lack of Article III standing.[10]

**REVERSED**.

---

10. The plaintiffs' motion for an injunction pending appeal, Dkt. 21, is **DENIED**. Their motions for judicial notice, Dkts. 134, 149, are **GRANTED**.

128a

*Appendix F*

STATON, District Judge, dissenting:

In these proceedings, the government accepts as fact that the United States has reached a tipping point crying out for a concerted response—yet presses ahead toward calamity. It is as if an asteroid were barreling toward Earth and the government decided to shut down our only defenses. Seeking to quash this suit, the government bluntly insists that it has the absolute and unreviewable power to destroy the Nation.

My colleagues throw up their hands, concluding that this case presents nothing fit for the Judiciary. On a fundamental point, we agree: No case can singlehandedly prevent the catastrophic effects of climate change predicted by the government and scientists. But a federal court need not manage all of the delicate foreign relations and regulatory minutiae implicated by climate change to offer real relief, and the mere fact that this suit cannot alone halt climate change does not mean that it presents no claim suitable for judicial resolution.

Plaintiffs bring suit to enforce the most basic structural principle embedded in our system of ordered liberty: that the Constitution does not condone the Nation's willful destruction. So viewed, plaintiffs' claims adhere to a judicially administrable standard. And considering

129a

*Appendix F*

plaintiffs seek no less than to forestall the Nation's demise, even a partial and temporary reprieve would constitute meaningful redress. Such relief, much like the desegregation orders and statewide prison injunctions the Supreme Court has sanctioned, would vindicate plaintiffs' constitutional rights without exceeding the Judiciary's province. For these reasons, I respectfully dissent.[1]

## I.

As the majority recognizes, and the government does not contest, carbon dioxide ("CO$_2$") and other greenhouse gas ("GHG") emissions created by burning fossil fuels are devastating the planet. Maj. Op. at 14-15. According to one of plaintiffs' experts, the inevitable result, absent immediate action, is "an inhospitable future . . . marked by rising seas, coastal city functionality loss, mass migrations, resource wars, food shortages, heat waves, mega-storms, soil depletion and desiccation, freshwater shortage, public health system collapse, and the extinction of increasing numbers of species."

---

1. I agree with the majority that plaintiffs need not bring their claims under the APA. *See Franklin v. Massachusetts*, 505 U.S. 788, 801, 112 S. Ct. 2767, 120 L. Ed. 2d 636 (1992); *Webster v. Doe*, 486 U.S. 592, 603-04, 108 S. Ct. 2047, 100 L. Ed. 2d 632 (1988).

130a

*Appendix F*

Even government scientists[2] project that, given current warming trends, sea levels will rise two feet by 2050, nearly four feet by 2070, over eight feet by 2100, 18 feet by 2150, and over 31 feet by 2200. To put that in perspective, a three-foot sea level rise will make two million American homes uninhabitable; a rise of approximately 20 feet will result in the total loss of Miami, New Orleans, and other coastal cities. So, as described by plaintiffs' experts, the injuries experienced by plaintiffs are the first small wave in an oncoming tsunami—now visible on the horizon of the not-so-distant future—that will destroy the United States as we currently know it.

What sets this harm apart from all others is not just its magnitude, but its irreversibility. The devastation might look and feel somewhat different if future generations could simply pick up the pieces and restore the Nation. But plaintiffs' experts speak of a certain level of global warming as "locking in" this catastrophic damage. Put more starkly by plaintiffs' expert, Dr. Harold R. Wanless, "[a]tmospheric warming will continue for some 30 years after we stop putting more greenhouse gasses into the atmosphere. But that warmed atmosphere will continue warming the ocean for centuries, and the accumulating heat in the oceans *will persist for millennia*" (emphasis added). Indeed, another of plaintiffs' experts echoes, "[t]he fact that GHGs dissipate very slowly from the atmosphere . . . and that the costs of taking $CO_2$ out of the atmosphere through non-biological carbon capture and storage are

---

2. NOAA, Technical Rep. NOS CO-OPS 083, Global and Regional Sea Level Rise Scenarios for the United States 23 (Jan. 2017).

131a

*Appendix F*

very high means that *the consequences of GHG emissions should be viewed as effectively irreversible*" (emphasis added). In other words, "[g]iven the self-reinforcing nature of climate change," the tipping point may well have arrived, and we may be rapidly approaching the point of no return.

Despite countless studies over the last half century warning of the catastrophic consequences of anthropogenic greenhouse gas emissions, many of which the government conducted, the government not only failed to act but also "affirmatively promote[d] fossil fuel use in a host of ways." Maj. Op. at 15. According to plaintiffs' evidence, our nation is crumbling—at our government's own hand—into a wasteland. In short, the government has directly facilitated an existential crisis to the country's perpetuity.[3]

## II.

In tossing this suit for want of standing, the majority concedes that the children and young adults who brought suit have presented enough to proceed to trial on the first two aspects of the inquiry (injury in fact and traceability). But the majority provides two-and-a-half reasons for concluding that plaintiffs' injuries are not redressable. After detailing its "skeptic[ism]" that the relief sought could "suffice to stop catastrophic climate change or even ameliorate [plaintiffs'] injuries[,]" Maj. Op. at 23-25, the majority concludes that, at any rate, a court would lack any

---

3. My asteroid analogy would therefore be more accurate if I posited a scenario in which the government itself accelerated the asteroid towards the earth before shutting down our defenses.

132a

*Appendix F*

power to award it. In the majority's view, the relief sought is too great and unsusceptible to a judicially administrable standard.

To explain why I disagree, I first step back to define the interest at issue. While standing operates as a threshold issue distinct from the merits of the claim, "it often turns on the nature and source of the claim asserted." *Warth v. Seldin*, 422 U.S. 490, 500, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975). And, unlike the majority, I believe the government has more than just a nebulous "moral responsibility" to preserve the Nation. Maj. Op. at 31-32.

**A.**

The Constitution protects the right to "life, liberty, and property, to free speech, a free press, [and] freedom of worship and assembly." *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 638, 63 S. Ct. 1178, 87 L. Ed. 1628 (1943). Through "reasoned judgment," the Supreme Court has recognized that the Due Process Clause, enshrined in the Fifth and Fourteenth Amendments, also safeguards certain "interests of the person so fundamental that the [government] must accord them its respect." *Obergefell v. Hodges*, 135 S. Ct. 2584, 2598, 192 L. Ed. 2d 609 (2015). These include the right to marry, *Loving v. Virginia*, 388 U.S. 1, 12, 87 S. Ct. 1817, 18 L. Ed. 2d 1010 (1967), to maintain a family and rear children, *M.L.B. v. S.L.J.*, 519 U.S. 102, 116, 117 S. Ct. 555, 136 L. Ed. 2d 473 (1996), and to pursue an occupation of one's choosing, *Schware v. Bd. of Bar Exam.*, 353 U.S. 232, 238-39, 77 S. Ct. 752, 1 L. Ed. 2d 796 (1957). As fundamental rights, these "may not be submitted to vote; they depend on the outcome of no

133a

*Appendix F*

elections." *Lucas v. Forty-Fourth Gen. Assembly*, 377 U.S. 713, 736, 84 S. Ct. 1459, 12 L. Ed. 2d 632 (1964) (quoting *Barnette*, 319 U.S. at 638).

Some rights serve as the necessary predicate for others; their fundamentality therefore derives, at least in part, from the necessity to preserve other fundamental constitutional protections. *Cf., e.g., Timbs v. Indiana*, 139 S. Ct. 682, 689, 203 L. Ed. 2d 11 (2019) (deeming a right fundamental because its deprivation would "undermine other constitutional liberties"). For example, the right to vote "is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds v. Sims*, 377 U.S. 533, 555, 84 S. Ct. 1362, 12 L. Ed. 2d 506 (1964). Because it is "preservative of all rights," the Supreme Court has long regarded suffrage "as a fundamental political right." *Yick Wo v. Hopkins*, 118 U.S. 356, 370, 6 S. Ct. 1064, 30 L. Ed. 220 (1886). This holds true even though the right to vote receives imperfect express protection in the Constitution itself: While several amendments proscribe the denial or abridgement of suffrage based on certain characteristics, the Constitution does not guarantee the right to vote *ab initio. See* U.S. Const. amends. XV, XIX, XXIV, XXVI; *cf.* U.S. Const. art. I, § 4, cl. 1.

Much like the right to vote, the perpetuity of the Republic occupies a central role in our constitutional structure as a "guardian of all other rights," *Plyler v. Doe*, 457 U.S. 202, 217 n.15, 102 S. Ct. 2382, 72 L. Ed. 2d 786 (1982). "Civil liberties, as guaranteed by the Constitution, imply the existence of an organized society . . . ." *Cox v. New Hampshire*, 312 U.S. 569, 574, 61 S. Ct. 762, 85 L.

134a

*Appendix F*

Ed. 1049 (1941); *see also Ex parte Yarbrough (The Ku Klux Cases), 110 U.S. 651, 657-58, 4 S. Ct. 152, 28 L. Ed. 274 (1884)*. And, of course, in our system, that organized society consists of the Union. Without it, all the liberties protected by the Constitution to live the good life are meaningless.

This observation is hardly novel. After securing independence, George Washington recognized that "the destiny of unborn millions" rested on the fate of the new Nation, cautioning that "whatever measures have a tendency to dissolve the Union, or contribute to violate or lessen the Sovereign Authority, ought to be considered as hostile to the Liberty and Independency of America[.]" President George Washington, Circular Letter of Farewell to the Army (June 8, 1783). Without the Republic's preservation, Washington warned, "there is a natural and necessary progression, from the extreme of anarchy to the extreme of Tyranny; and that arbitrary power is most easily established on the ruins of Liberty abused to licentiousness." *Id.*

When the Articles of the Confederation proved ill-fitting to the task of safeguarding the Union, the framers formed the Constitutional Convention with "the great object" of "preserv[ing] and perpetuat[ing]" the Union, for they believed that "the prosperity of America depended on its Union." The Federalist No. 2, at 19 (John Jay) (E. H. Scott ed., 1898); *see also* Letter from James Madison to Thomas Jefferson (Oct. 24, 1787)[4] ("It appeared to be the

---

4. Available at https://founders.archives.gov/documents/Jefferson/01-12-02-0274.

135a

*Appendix F*

sincere and unanimous wish of the Convention to cherish and preserve the Union of the States."). In pressing New York to ratify the Constitution, Alexander Hamilton spoke of the gravity of the occasion: "The subject speaks its own importance; comprehending in its consequences nothing less than the existence of the Union, the safety and welfare of the parts of which it is composed—the fate of an empire, in many respects the most interesting in the world." The Federalist No. 1, at 11 (Alexander Hamilton) (E. H. Scott ed., 1898). In light of this animating principle, it is fitting that the Preamble declares that the Constitution is intended to secure "the Blessings of Liberty" not just for one generation, but for all future generations—our "Posterity."

The Constitution's structure reflects this perpetuity principle. *See Alden v. Maine*, 527 U.S. 706, 713, 119 S. Ct. 2240, 144 L. Ed. 2d 636 (1999) (examining how "[v]arious textual provisions of the Constitution assume" a structural principle). In taking the Presidential Oath, the Executive must vow to "preserve, protect and defend the Constitution of the United States," U.S. Const. art. II, § 1, cl. 8, and the Take Care Clause obliges the President to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3. Likewise, though generally not separately enforceable, Article IV, Section 4 provides that the "United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion; and . . . against domestic Violence." U.S. Const. art. IV, § 4; *see also New York v. United States*, 505 U.S. 144, 184-85, 112 S. Ct. 2408, 120 L. Ed. 2d 120 (1992).

136a

*Appendix F*

Less than a century after the country's founding, the perpetuity principle undergirding the Constitution met its greatest challenge. Faced with the South's secession, President Lincoln reaffirmed that the Constitution did not countenance its own destruction. "[T]he Union of these States is perpetual[,]" he reasoned in his First Inaugural Address, because "[p]erpetuity is implied, if not expressed, in the fundamental law of all national governments. It is safe to assert that no government proper ever had a provision in its organic law for its own termination." President Abraham Lincoln, First Inaugural Address (Mar. 4, 1861). In justifying this constitutional principle, Lincoln drew from history, observing that "[t]he Union is much older than the Constitution." *Id.* He reminded his fellow citizens, "one of the declared objects for ordaining and establishing the Constitution was 'to form a *more perfect* Union.'" *Id.* (emphasis added) (quoting U.S. Const. pmbl.). While secession manifested the existential threat most apparently contemplated by the Founders—political dissolution of the Union—the underlying principle applies equally to its physical destruction.

This perpetuity principle does not amount to "a right to live in a contaminant-free, healthy environment." *Guertin v. Michigan*, 912 F.3d 907, 922 (6th Cir. 2019). To be sure, the stakes can be quite high in environmental disputes, as pollution causes tens of thousands of premature deaths each year, not to mention disability and diminished quality of life.[5] Many abhor living in a polluted environment, and

_____

5. *See, e.g.*, Andrew L. Goodkind et al., *Fine-Scale Damage Estimates of Particulate Matter Air Pollution Reveal Opportunities for Location-Specific Mitigation of Emissions, in* 116 Proceedings of

137a

*Appendix F*

some pay with their lives. But mine-run environmental concerns "involve a host of policy choices that must be made by . . . elected representatives, rather than by federal judges interpreting the basic charter of government[.]" *Collins v. City of Harker Heights*, 503 U.S. 115, 129, 112 S. Ct. 1061, 117 L. Ed. 2d 261 (1992). The perpetuity principle is not an environmental right at all, and it does not task the courts with determining the optimal level of environmental regulation; rather, it prohibits only the willful dissolution of the Republic.[6]

That the principle is structural and implicit in our constitutional system does not render it any less enforceable. To the contrary, our Supreme Court has recognized that "[t]here are many [] constitutional doctrines that are not spelled out in the Constitution" but are nonetheless enforceable as "historically rooted principle[s] embedded in the text and structure of the Constitution." *Franchise Tax Bd. of California v. Hyatt*,

---

the National Academy of Sciences 8775, 8779 (2019) (estimating that fine particulate matter caused 107,000 premature deaths in 2011).

6. Unwilling to acknowledge that the very nature of the climate crisis places this case in a category of one, the government argues that "the Constitution does not provide judicial remedies for every social and economic ill." For support, the government cites *Lindsey v. Normet*, 405 U.S. 56, 74, 92 S. Ct. 862, 31 L. Ed. 2d 36 (1972), which held Oregon's wrongful detainer statute governing landlord/tenant disputes constitutional. The perpetuity principle, however, cabins the right and avoids any slippery slope. While the principle's goal is to preserve the most fundamental individual rights to life, liberty, and property, it is not triggered absent an existential threat to the country arising from a "point of no return" that is, at least in part, of the government's own making.

138a

*Appendix F*

139 S. Ct. 1485, 1498-99, 203 L. Ed. 2d 768 (2019). For instance, the Constitution does not in express terms provide for judicial review, *Marbury v. Madison*, 5 U.S. 137, 176-77, 2 L. Ed. 60 (1803); sovereign immunity (outside of the Eleventh Amendment's explicit restriction), *Alden*, 527 U.S. at 735-36; the anticommandeering doctrine, *Murphy v. NCAA*, 138 S. Ct. 1461, 1477, 200 L. Ed. 2d 854 (2018); or the regimented tiers of scrutiny applicable to many constitutional rights, *see, e.g., Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641-42, 114 S. Ct. 2445, 129 L. Ed. 2d 497 (1994). Yet these doctrines, as well as many other implicit principles, have become firmly entrenched in our constitutional landscape. And, in an otherwise justiciable case, a private litigant may seek to vindicate such structural principles, for they "protect the individual as well" as the Nation. *See Bond v. United States*, 564 U.S. 211, 222, 225-26, 131 S. Ct. 2355, 180 L. Ed. 2d 269 (2011); *INS. v. Chadha*, 462 U.S. 919, 935-36, 103 S. Ct. 2764, 77 L. Ed. 2d 317 (1983).

In *Hyatt*, for instance, the Supreme Court held that a state could not be sued in another state's courts without its consent. Although nothing in the text of the Constitution expressly forbids such suits, the Court concluded that they contravened "the 'implicit ordering of relationships within the federal system necessary to make the Constitution a workable governing charter and to give each provision within that document the full effect intended by the Framers.'" *Hyatt*, 139 S. Ct. at 1492 (quoting *Nevada v. Hall*, 440 U.S. 410, 433, 99 S. Ct. 1182, 59 L. Ed. 2d 416 (1979) (Rehnquist, J., dissenting)). So too here.

139a

*Appendix F*

Nor can the perpetuity principle be rejected simply because the Court has not yet had occasion to enforce it as a limitation on government conduct. Only over time, as the Nation confronts new challenges, are constitutional principles tested. For instance, courts did not recognize the anticommandeering doctrine until the 1970s because "[f]ederal commandeering of state governments [was] such a novel phenomenon." *Printz v. United States*, 521 U.S. 898, 925, 117 S. Ct. 2365, 138 L. Ed. 2d 914 (1997). And the Court did not recognize that cell-site data fell within the Fourth Amendment until 2018. In so holding, the Court rejected "a 'mechanical interpretation' of the Fourth Amendment" because "technology has enhanced the Government's capacity to encroach upon areas normally guarded from inquisitive eyes[.]" *Carpenter v. United States*, 138 S. Ct. 2206, 2214, 201 L. Ed. 2d 507 (2018). Thus, it should come as no surprise that the Constitution's commitment to perpetuity only now faces judicial scrutiny, for never before has the United States confronted an existential threat that has not only gone unremedied but is actively backed by the government.

The mere fact that we have alternative means to enforce a principle, such as voting, does not diminish its constitutional stature. Americans can vindicate federalism, separation of powers, equal protection, and voting rights through the ballot box as well, but that does not mean these constitutional guarantees are not independently enforceable. By its very nature, the Constitution "withdraw[s] certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them

140a

*Appendix F*

as legal principles to be applied by the courts." *Barnette*, 319 U.S. at 638. When fundamental rights are at stake, individuals "need not await legislative action." *Obergefell*, 135 S. Ct. at 2605.

Indeed, in this *sui generis* circumstance, waiting is not an option. Those alive today are at perhaps the singular point in history where society (1) is scientifically aware of the impending climate crisis, and (2) can avoid the point of no return. And while democracy affords citizens the right "to debate so they can learn and decide and then, through the political process, act in concert to try to shape the course of their own times[,]" *id.* (quoting *Schuette v. Coalition to Defend Affirmative Action*, 572 U.S. 291, 312, 134 S. Ct. 1623, 188 L. Ed. 2d 613 (2014)), that process cannot override the laws of nature. Or, more colloquially, we can't shut the stable door after the horse has bolted.

As the last fifty years have made clear, telling plaintiffs that they must vindicate their right to a habitable United States through the political branches will rightfully be perceived as telling them they have no recourse. The political branches must often realize constitutional principles, but in a justiciable case or controversy, courts serve as the ultimate backstop. To this issue, I turn next.

**B.**

Of course, "it is not the role of courts, but that of the political branches, to shape the institutions of government in such fashion as to comply with the laws and the Constitution." *Lewis v. Casey*, 518 U.S. 343, 349, 116 S. Ct. 2174, 135 L. Ed. 2d 606 (1996). So federal courts are not

141a

*Appendix F*

free to address *every* grievance. "Whether a party has a sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy is what has traditionally been referred to as the question of standing to sue." *Sierra Club v. Morton*, 405 U.S. 727, 731-32, 92 S. Ct. 1361, 31 L. Ed. 2d 636 (1972). Standing is "a doctrine rooted in the traditional understanding of a case or controversy," developed to "ensure that federal courts do not exceed their authority as it has been traditionally understood." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547, 194 L. Ed. 2d 635 (2016).

A case is fit for judicial determination only if the plaintiff has: "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992); then citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC)*, 528 U.S. 167, 180-81, 120 S. Ct. 693, 145 L. Ed. 2d 610 (2000)). As to the first two elements, my colleagues and I agree: Plaintiffs present adequate evidence at this pre-trial stage to show particularized, concrete injuries to legally-protected interests, and they present further evidence to raise genuine disputes as to whether those injuries—at least in substantial part—are fairly traceable to the government's conduct at issue. *See* Maj. Op. at 18-21. Because I find that plaintiffs have also established the third prong for standing, redressability, I conclude that plaintiffs' legal stake in this action suffices to invoke the adjudicative powers of the federal bench.

142a

*Appendix F*

**1.**

"Redressability" concerns whether a federal court is capable of vindicating a plaintiff's legal rights. I agree with the majority that our ability to provide redress is animated by two inquiries, one of efficacy and one of power. Maj. Op. at 21 (citing *M.S. v. Brown*, 902 F.3d 1076, 1083 (9th Cir. 2018)). First, as a causal matter, is a court order likely to actually remediate the plaintiffs' injury? If so, does the judiciary have the constitutional authority to levy such an order? *Id.*

Addressing the first question, my colleagues are skeptical that curtailing the government's facilitation of fossil-fuel extraction and combustion will ameliorate the plaintiffs' harms. *See* Maj. Op. at 22-25. I am not, as the nature of the injury at stake informs the effectiveness of the remedy. *See Warth*, 422 U.S. at 500.

As described above, the right at issue is not to be entirely free from any climate change. Rather, plaintiffs have a constitutional right to be free from *irreversible and catastrophic climate change*. Plaintiffs have begun to feel certain concrete manifestations of this violation, ripening their case for litigation, but such prefatory harms are just the first barbs of an *ongoing* injury flowing from an *ongoing* violation of plaintiffs' rights. The bulk of the injury is yet to come. Therefore, practical redressability is not measured by our ability to stop climate change in its tracks and immediately undo the injuries that plaintiffs suffer today—an admittedly tall order; it is instead measured by our ability to curb by some meaningful degree what the record shows to be

143a

*Appendix F*

an otherwise inevitable march to the point of no return. Hence, the injury at issue is not climate change writ large; it is climate change beyond the threshold point of no return. As we approach that threshold, the significance of every emissions reduction is magnified.

The majority portrays any relief we can offer as just a drop in the bucket. *See* Maj. Op. at 22-25. In a previous generation, perhaps that characterization would carry the day and we would hold ourselves impotent to address plaintiffs' injuries. But we are perilously close to an overflowing bucket. These final drops matter. *A lot.* Properly framed, a court order—even one that merely postpones the day when remedial measures become insufficiently effective—would likely have a real impact on preventing the impending cataclysm. Accordingly, I conclude that the court could do something to help the plaintiffs before us.

And "something" is all that standing requires. In *Massachusetts v. EPA*, 549 U.S. 497, 127 S. Ct. 1438, 167 L. Ed. 2d 248 (2007), the Supreme Court explicitly held that a non-negligible reduction in emissions—there, by regulating vehicles emissions—satisfied the redressability requirement of Article III standing:

> While it may be true that regulating motor-vehicle emissions will not by itself *reverse* global warming, it by no means follows that we lack jurisdiction to decide whether EPA has a duty to take steps to *slow* or *reduce* it. Because of the enormity of the potential consequences associated with manmade climate change, the

144a

*Appendix F*

fact that the effectiveness of a remedy might be delayed during the (relatively short) time it takes for a new motor-vehicle fleet to replace an older one is essentially irrelevant. Nor is it dispositive that developing countries such as China and India are poised to increase greenhouse gas emissions substantially over the next century: A reduction in domestic emissions would slow the pace of global emissions increases, no matter what happens elsewhere.

. . . .

. . . The risk of catastrophic harm, though remote, is nevertheless real.

*Id.* at 525-26 (internal citation omitted).

In other words, under Article III, a perceptible reduction in the advance of climate change is sufficient to redress a plaintiff's climate change-induced harms. Full stop. The majority dismisses this precedent because *Massachusetts v. EPA* involved a procedural harm, whereas plaintiffs here assert a purely substantive right. Maj. Op. at 24. But this difference in posture does not affect the outcome.

While the redressability requirement is relaxed in the procedural context, that does not mean (1) we must engage in a similarly relaxed analysis whenever we invoke *Massachusetts v. EPA* or (2) we cannot rely on *Massachusetts v. EPA's* substantive examination of the

145a

*Appendix F*

relationship between government action and the course of climate change. Accordingly, here, we do not consider the likelihood that plaintiffs will prevail in any newly-awarded agency procedure, nor whether granting access to that procedure will redress plaintiffs' injury. *Cf. Massachusetts v. EPA*, 549 U.S. at 517-18; *Lujan*, 504 U.S. at 572 n.7. Rather, we assume plaintiffs *will* prevail—removing the procedural link from the causal chain—and we resume our traditional analysis to determine whether the desired outcome would in fact redress plaintiffs' harms.[7] In *Massachusetts v. EPA*, the remaining substantive inquiry was whether reducing emissions from fossil-fuel combustion would likely ameliorate climate change-induced injuries despite the global nature of climate change (regardless of whether renewed procedures were themselves likely to mandate such lessening). The Supreme Court unambiguously answered that question in the affirmative. That holding squarely applies to the instant facts,[8]

---

7. The presence of a procedural right is more critical when determining whether the first and second elements of standing are present. This is especially true where Congress has "define[d] injuries and articulate[d] chains of causation that will give rise to a case or controversy where none existed before" by conferring procedural rights that give certain persons a "stake" in an injury that is otherwise not their own. *Spokeo*, 136 S. Ct. at 1549 (quoting *Lujan*, 504 U.S. at 580 (Kennedy, J., concurring)). But who seeks to vindicate an injury is irrelevant to the question of whether a court has the tools to relieve that injury.

8. Indeed, the majority has already acknowledged as much in finding plaintiffs' injuries traceable to the government's misconduct because the traceability and redressability inquiries are largely coextensive. *See* Maj. Op. at 19-21; *see also Wash. Envtl. Council v. Bellon*, 732 F.3d 1131, 1146 (2013) ("The Supreme Court has

146a

*Appendix F*

rendering the absence of a procedural right here irrelevant. [9]

_____

clarified that the 'fairly traceable' and 'redressability' components for standing overlap and are 'two facets of a single causation requirement.' The two are distinct insofar as causality examines the connection between the alleged misconduct and injury, whereas redressability analyzes the connection between the alleged injury and requested judicial relief.") (internal citation omitted). Here, where the requested relief is simply to stop the ongoing misconduct, the inquiries are nearly identical. *Cf. Allen v. Wright*, 468 U.S. 737, 753 n.19, 104 S. Ct. 3315, 82 L. Ed. 2d 556 (1984) ("[I]t is important to keep the inquiries separate" where "the relief requested goes well beyond the violation of law alleged."), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 S. Ct. 1377, 188 L. Ed. 2d 392 (2014); *see also infra* Part II.B.3.

9. Nor am I persuaded that *Massachusetts v. EPA* is distinguishable because of the relaxed standing requirements and "special solicitude" in cases brought by a state against the United States. *Massachusetts v. EPA*, 549 U.S. at 517-20. When *Massachusetts v. EPA* was decided, more than a decade ago, there was uncertainty and skepticism as to whether an individual could state a sufficiently definite climate change-induced harm based on gradually warming air temperatures and rising seas. But the Supreme Court sidestepped such questions of the *concreteness* of the plaintiffs' injuries by finding that "[Massachusetts's] stake in the outcome of this case is sufficiently concrete to warrant the exercise of federal judicial power." *Id.* at 519. Here and now, the plaintiffs submit *undisputed scientific evidence* that their distinct and discrete injuries are caused by climate change brought about by emissions from fossil-fuel combustion. They need not rely on the "special solicitude," *id.* at 520, of a state to be heard. Regardless, any distinction would go to the concreteness or particularity of plaintiffs' injuries and not to the issue of redressability.

147a

*Appendix F*

**2.**

The majority laments that it cannot step into the shoes of the political branches, *see* Maj. Op. at 32, but appears ready to yield even if those branches walk the Nation over a cliff. This deference-to-a-fault promotes separation of powers to the detriment of our countervailing constitutional mandate to intervene where the political branches run afoul of our foundational principles. Our tripartite system of government is often and aptly described as one of "checks and balances." The doctrine of standing preserves *balance* among the branches by keeping separate questions of general governance and those of specific legal entitlement. But the doctrine of judicial review compels federal courts to fashion and effectuate relief to right legal wrongs, even when—as frequently happens—it requires that we instruct the other branches as to the constitutional limitations on their power. Indeed, sometimes "the [judicial and governance] roles briefly and partially coincide when a court, in granting relief against actual harm that has been suffered, . . . orders the alteration of an institutional organization or procedure that causes the harm." *Lewis*, 518 U.S. at 350; *cf. Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 474, 102 S. Ct. 752, 70 L. Ed. 2d 700 (1982) ("Proper regard for the complex nature of our constitutional structure requires neither that the Judicial Branch shrink from a confrontation with the other two coequal branches of the Federal Government, nor that it hospitably accept for adjudication claims of constitutional violation by other branches of government where the claimant has not

148a

*Appendix F*

suffered cognizable injury."). In my view, this Court must confront and reconcile this tension before deciding that thorny questions of standing preclude review in this case. And faithful application of our history and precedents reveals that a failure to do so leads to the wrong result.

Taking the long (but essential) way around, I begin first by acknowledging explicitly what the majority does not mention: our history plainly establishes an ambient presumption of judicial review to which separation-of-powers concerns provide a rebuttal under limited circumstances. Few would contest that "[i]t is emphatically the province and duty of the judicial department" to curb acts of the political branches that contravene those fundamental tenets of American life so dear as to be constitutionalized and thus removed from political whims. *See Marbury*, 5 U.S. at 177-78. This presumptive authority entails commensurate power to grant appropriate redress, as recognized in *Marbury*, "which effectively place[s] upon those who would deny the existence of an effective legal remedy the burden of showing why their case was special." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1874, 198 L. Ed. 2d 290 (2017) (Breyer, J., dissenting). That is, "there must be something 'peculiar' (*i.e.*, special) about a case that warrants 'excluding the injured party from legal redress and placing it within that class of cases which come under the description of *damnum absque injuria*—a loss without an injury.'" *Id.* (cleaned up) (quoting *Marbury*, 5 U.S. at 163-64). In sum, although it is the plaintiffs' burden to establish injury in fact, causation, and redressability, it is the government's burden to establish why this otherwise-justiciable controversy implicates grander separation-of-powers concerns not already captured by

149a

*Appendix F*

those requirements. We do not otherwise abdicate our duty to enforce constitutional rights.

Without explicitly laying this groundwork, the majority nonetheless suggests that this case is "special"—and beyond our redress—because plaintiffs' requested relief requires (1) the messy business of evaluating competing policy considerations to steer the government away from fossil fuels and (2) the intimidating task of supervising implementation over many years, if not decades. *See* Maj. Op. at 25-27. I admit these are daunting tasks, but we are constitutionally empowered to undertake them. There is no justiciability exception for cases of great complexity and magnitude.

**3.**

I readily concede that courts must on occasion refrain from answering those questions that are truly reserved for the political branches, even where core constitutional precepts are implicated. This deference is known as the "political question doctrine," and its applicability is governed by a well-worn multifactor test that counsels judicial deference where there is:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution

150a

*Appendix F*

without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker v. Carr*, 369 U.S. 186, 217, 82 S. Ct. 691, 7 L. Ed. 2d 663 (1962); *see also Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 195-201, 132 S. Ct. 1421, 182 L. Ed. 2d 423 (2012) (discussing and applying *Baker* factors); *Vieth v. Jubelirer*, 541 U.S. 267, 277-90, 124 S. Ct. 1769, 158 L. Ed. 2d 546 (2004) (same); *Nixon v. United States*, 506 U.S. 224, 228-38, 113 S. Ct. 732, 122 L. Ed. 2d 1 (1993) (same); *Chadha*, 462 U.S. at 940-43 (same).[10] In some sense, these factors are frontloaded in significance. "We have characterized the first three factors as 'constitutional limitations of a court's jurisdiction' and the other three factors as 'prudential considerations.'" *Republic of Marshall Islands v. United States*, 865 F.3d 1187, 1200 (9th

---

10. The political question doctrine was first conceived in *Marbury. See Marbury*, 5 U.S. at 165-66 ("By the constitution of the United States, the President is invested with certain important political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character, and to his own conscience."). The modern incarnation of the doctrine has existed relatively unaltered since its exposition in *Baker* in 1962. Although the majority disclaims the applicability of the political question doctrine, *see* Maj. Op. at 31, n.9, the opinion's references to the lack of discernable standards and its reliance on *Rucho v. Common Cause*, 139 S. Ct. 2484, 204 L. Ed. 2d 931 (2019), as a basis for finding this case nonjusticiable blur any meaningful distinction between the doctrines of standing and political question.

151a

*Appendix F*

Cir. 2017) (quoting *Corrie v. Caterpillar, Inc.*, 503 F.3d 974, 981 (9th Cir. 2007)).[11] Moreover, "we have recognized that the first two are likely the most important." *Marshall Islands*, 865 F.3d at 1200 (citing *Alperin v. Vatican Bank*, 410 F.3d 532, 545 (9th Cir. 2005)). Yet, we have also recognized that the inquiry is highly case-specific, the factors "often collaps[e] into one another[,]" and any one factor of sufficient weight is enough to render a case unfit for judicial determination. *See Marshall Islands*, 865 F.3d at 1200 (first alteration in original) (quoting *Alperin*, 410 F.3d at 544). Regardless of any intra-factor flexibility and flow, however, there is a clear mandate to apply the political question doctrine both shrewdly and sparingly.

> Unless one of these formulations is inextricable from the case at bar, there should be no dismissal for non-justiciability on the ground of a political question's presence. The doctrine of which we treat is one of 'political questions,' not one of 'political cases.' The courts cannot reject as 'no law suit' a bona fide controversy as to whether some action denominated 'political' exceeds constitutional authority.

---

11. The six *Baker* factors have been characterized as "reflect[ing] three distinct justifications for withholding judgment on the merits of a dispute." *Zivotofsky v. Clinton*, 566 U.S. at 203 (Sotomayor, J., concurring). Under the first *Baker* factor, "abstention is warranted because the court lacks authority to resolve" "issue[s] whose resolution is textually committed to a coordinate political department[.]" *Id.* Under the second and third factors, abstention is warranted in "circumstances in which a dispute calls for decisionmaking beyond courts' competence[.]" *Id.* Under the final three factors, abstention is warranted where "prudence . . . counsel[s] against a court's resolution of an issue presented." *Id.* at 204.

152a

*Appendix F*

*Baker*, 369 U.S. at 217; *see also Corrie*, 503 F.3d at 982
("We will not find a political question 'merely because
[a] decision may have significant political overtones.'")
(quoting *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478
U.S. 221, 230, 106 S. Ct. 2860, 92 L. Ed. 2d 166 (1986)).
Rather, when detecting the presence of a "political
question," courts must make a "discriminating inquiry
into the precise facts and posture of the particular case"
and refrain from "resolution by any semantic cataloguing."
*Baker*, 369 U.S. at 217.

Here, confronted by difficult questions on the
constitutionality of *policy*, the majority creates a minefield
of *politics* en route to concluding that we cannot adjudicate
this suit. And the majority's map for navigating that
minefield is *Rucho v. Common Cause*, 139 S. Ct. 2484,
204 L. Ed. 2d 931 (2019), an inapposite case about
gerrymandering. My colleagues conclude that climate
change is too political for the judiciary to touch by likening
it to the process of political representatives drawing
political maps to elect other political representatives. I
vehemently disagree.

The government does not address on appeal the
district judge's reasoning that the first, third, fourth, fifth
and sixth *Baker* factors do not apply here. Neither does
the majority rely on any of these factors in its analysis. In
relevant part, I find the opinion below both thorough and
well-reasoned, and I adopt its conclusions. I note, however,
that the absence of the first *Baker* factor—whether the
Constitution textually delegates the relevant subject
matter to another branch—is especially conspicuous. As

153a

*Appendix F*

the district judge described, courts invoke this factor only where the Constitution makes an unambiguous commitment of responsibility to one branch of government. Very few cases turn on this factor, and almost all that do pertain to two areas of constitutional authority: foreign policy and legislative proceedings. *See, e.g., Marshall Islands*, 865 F.3d at 1200-01 (treaty enforcement); *Corrie*, 503 F.3d at 983 (military aid); *Nixon*, 506 U.S. at 234 (impeachment proceedings); *see also Davis v. Passman*, 442 U.S. 228, 235 n.11, 99 S. Ct. 2264, 60 L. Ed. 2d 846 (1979) ("[J]udicial review of congressional employment decisions is constitutionally limited only by the reach of the Speech or Debate Clause[,] . . . [which is] a paradigm example of a textually demonstrable constitutional commitment of [an] issue to a coordinate political department.") (internal quotation marks omitted); *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 135 S. Ct. 2076, 2086, 192 L. Ed. 2d 83 (2015) ("The text and structure of the Constitution grant the President the power to recognize foreign nations and governments.").

Since this matter has been under submission, the Supreme Court cordoned off an additional area from judicial review based in part on a textual commitment to another branch: partisan gerrymandering. *See Rucho*, 139 S. Ct. at 2494-96.[12] Obviously, the Constitution

---

12. *Rucho* does not turn exclusively on the first *Baker* factor and acknowledges that there are some areas of districting that courts may police, notwithstanding the Elections Clause's "assign[ment] to state legislatures the power to prescribe the 'Times, Places and Manner of holding Elections' for Members of Congress, while giving Congress the power to 'make or alter' any such regulations." *Rucho*,

154a

*Appendix F*

does not explicitly address climate change. But neither does climate change *implicitly* fall within a recognized political-question area. As the district judge described, the questions of energy policy at stake here may have rippling effects on foreign policy considerations, but that is not enough to wholly exempt the subject matter from our review. *See Juliana v. United States*, 217 F. Supp. 3d 1224, 1238 (D. Or. 2016) ("[U]nlike the decisions to go to war, take action to keep a particular foreign leader in power, or give aid to another country, climate change policy is not *inherently*, or even primarily, a foreign policy decision."); *see also Baker*, 369 U.S. at 211 ("[I]t is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance.").

Without endorsement from the constitutional text, the majority's theory is grounded exclusively in the second *Baker* factor: a (supposed) lack of clear judicial standards for shaping relief. Relying heavily on *Rucho*, the majority contends that we cannot formulate standards (1) to determine what relief "is sufficient to remediate the claimed constitutional violation" or (2) to "supervise[] or enforce[]" such relief. Maj. Op. at 29.

The first point is a red herring. Plaintiffs submit ample evidence that there is a discernable "tipping point" at which the government's conduct turns from facilitating mere pollution to inducing an unstoppable cataclysm in violation of plaintiffs' rights. Indeed, the majority

---

139 S. Ct. at 2495. Instead, *Rucho* holds that a combination of the text (as illuminated by historical practice) and absence of clear judicial standards precludes judicial review of excessively partisan gerrymanders. *See infra* Part II.B.4.

155a

*Appendix F*

itself cites plaintiffs' evidence that "atmospheric carbon levels of 350 parts per million are necessary to stabilize the climate." *Id.* at 24. This clear line stands in stark contrast to *Rucho*, which held that—even assuming an excessively partisan gerrymander was unconstitutional—no standards exist by which to determine *when a rights violation has even occurred*. There, "[t]he central problem [wa]s not determining whether a jurisdiction has engaged in partisan gerrymandering. It [wa]s determining when political gerrymandering has gone too far." *Rucho*, 139 S. Ct. at 2497 (internal quotation marks omitted); *see also id.* at 2498 ("[T]he question is one of degree: How to provide a standard for deciding how much partisan dominance is too much.") (internal quotation marks omitted); *id.* at 2499 ("If federal courts are to . . . adjudicat[e] partisan gerrymandering claims, they must be armed with a standard that can reliably differentiate unconstitutional from constitutional political gerrymandering.") (internal quotation marks and citation omitted).

Here, the right at issue is fundamentally one of a discernable standard: the amount of fossil-fuel emissions that will irreparably devastate our Nation. That amount can be established by scientific evidence like that proffered by the plaintiffs. Moreover, we need not *definitively* determine that standard today. Rather, we need conclude only that plaintiffs have submitted sufficient evidence to create a genuine dispute as to whether such an amount can possibly be determined as a matter of scientific fact. Plaintiffs easily clear this bar. Of course, plaintiffs will have to carry their burden of proof to establish this fact in order to prevail at trial, but that issue is not before us. We must not get ahead of ourselves.

156a

*Appendix F*

The procedural posture of this case also informs the question of oversight and enforcement. It appears the majority's real concerns lie not in the judiciary's ability to draw a line between lawful and unlawful conduct, but in our ability to equitably walk the government back from that line without wholly subverting the authority of our coequal branches. My colleagues take great issue with plaintiffs' request for a "plan" to reduce fossil-fuel emissions. I am not so concerned. At this stage, we need not promise plaintiffs the moon (or, more apropos, the earth in a habitable state). For purposes of standing, we need hold only that the trial court could fashion some sort of meaningful relief should plaintiffs prevail on the merits.[13]

Nor would any such remedial "plan" necessarily require the courts to muck around in policymaking to an impermissible degree; the *scope* and *number* of policies a court would have to reform to provide relief is irrelevant to the second *Baker* factor, which asks only if there are judicially discernable standards to guide that reformation. Indeed, our history is no stranger to widespread, programmatic changes in government functions ushered in by the judiciary's commitment to requiring adherence to the Constitution. Upholding the Constitution's prohibition on cruel and unusual punishment, for example,

---

13. It is possible, of course, that the district court ultimately concludes that it is unable to provide meaningful redress based on the facts proved at trial, but trial has not yet occurred. Our present occasion is to decide only whether plaintiffs have raised a genuine dispute as to the judiciary's ability to provide meaningful redress under *any* subset of the facts at issue today. *See* Maj. Op. at 18 (citing *Cent. Delta Water Agency v. United States*, 306 F.3d 938, 947 (9th Cir. 2002)).

157a

*Appendix F*

the Court ordered the overhaul of prisons in the Nation's most populous state. *See Brown v. Plata*, 563 U.S. 493, 511, 131 S. Ct. 1910, 179 L. Ed. 2d 969 (2011) ("Courts may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration.") And in its finest hour, the Court mandated the racial integration of every public school—state and federal—in the Nation, vindicating the Constitution's guarantee of equal protection under the law.[14] *See Brown v. Bd. of Educ.* (*Brown I*), 347 U.S. 483, 74 S. Ct. 686, 98 L. Ed. 873 (1954); *Bolling v. Sharpe*, 347 U.S. 497, 74 S. Ct. 693, 98 L. Ed. 884 (1954). In the school desegregation cases, the Supreme Court was explicitly unconcerned with the fact that crafting relief would require individualized review of thousands of state and local policies that facilitated segregation. Rather, a unanimous Court held that the judiciary could work to dissemble segregation over time while remaining cognizant of the many public interests at stake:

> To effectuate [the plaintiffs'] interest[s] may call for elimination of a variety of obstacles in making the transition to school systems

---

14. In contrast, we are haunted by the days we declined to curtail the government's approval of invidious discrimination in public life, *see Plessy v. Ferguson*, 163 U.S. 537, 559, 16 S. Ct. 1138, 41 L. Ed. 256 (1896) (Harlan, J., dissenting) ("[T]he judgment this day rendered will, in time, prove to be quite as pernicious as the decision made by this tribunal in the Dred Scott Case."), and neglected to free thousands of innocents prejudicially interned by their own government without cause, *see Trump v. Hawaii*, 138 S. Ct. 2392, 2423, 201 L. Ed. 2d 775 (2018) ("*Korematsu* was gravely wrong the day it was decided[.]").

158a

*Appendix F*

operated in accordance with the constitutional principles set forth in [*Brown I*]. Courts of equity may properly take into account the public interest in the elimination of such obstacles in a systematic and effective manner. But it should go without saying that the vitality of these constitutional principles cannot be allowed to yield simply because of disagreement with them.

. . . [T]he courts may find that additional time is necessary to carry out the ruling in an effective manner. The burden rests upon the defendants to establish that such time is necessary in the public interest and is consistent with good faith compliance at the earliest practicable date. To that end, the courts may consider problems related to administration, arising from the physical condition of the school plant, the school transportation system, personnel, revision of school districts and attendance areas into compact units to achieve a system of determining admission to the public schools on a nonracial basis, and revision of local laws and regulations which may be necessary in solving the foregoing problems.

*Brown v. Bd. of Educ.* (*Brown II*), 349 U.S. 294, 300-01, 75 S. Ct. 753, 99 L. Ed. 1083, 71 Ohio Law Abs. 584 (1955).

As we are all too aware, it took decades to even partially realize *Brown*'s promise, but the slow churn of

159a

*Appendix F*

constitutional vindication did not dissuade the *Brown* Court, and it should not dissuade us here. Plaintiffs' request for a "plan" is neither novel nor judicially incognizable. Rather, consistent with our historical practices, their request is a recognition that remedying decades of institutionalized violations may take some time. Here, too, decelerating from our path toward cataclysm will undoubtedly require "elimination of a variety of obstacles." Those obstacles may be great in number, novelty, and magnitude, but there is no indication that they are devoid of discernable standards. Busing mandates, facilities allocation, and district-drawing were all "complex policy decisions" faced by post-*Brown* trial courts, *see* Maj. Op. at 25, and I have no doubt that disentangling the government from promotion of fossil fuels will take an equally deft judicial hand. Mere complexity, however, does not put the issue out of the courts' reach. Neither the government nor the majority has articulated why the courts could not weigh scientific and prudential considerations—as we often do—to put the government on a path to constitutional compliance.

The majority also expresses concern that any remedial plan would require us to compel "the adoption of a comprehensive scheme to decrease fossil fuel emissions and combat climate change[.]" *Id.* at 25. Even if the operative complaint is fairly read as requesting an affirmative scheme to address *all* drivers of climate change, however caused, *see id.* at 23 n.6., such an overbroad request does not doom our ability to redress those drivers implicated by the conduct at issue here. Courts routinely grant plaintiffs less than the full gamut of requested relief,

160a

*Appendix F*

and our inability to compel legislation that addresses emissions beyond the scope of this case—such as those purely in the private sphere or within the control of foreign governments—speaks nothing to our ability to enjoin the government from exercising its discretion in violation of plaintiffs' constitutional rights.

**4.**

In sum, resolution of this action requires answers only to scientific questions, not political ones. And plaintiffs have put forth sufficient evidence demonstrating their entitlement to have those questions addressed at trial in a court of law.

As discussed above, the majority reaches the opposite conclusion not by marching purposefully through the *Baker* factors, which carve out a narrow set of nonjusticiable *political* cases, but instead by broadly invoking *Rucho* in a manner that would cull from our dockets any case that presents administrative issues "too difficult for the judiciary to manage." Maj. Op. at 28. That simply is not the test. Difficult questions are not necessarily political questions and, beyond reaching the wrong conclusion in this case, the majority's application of *Rucho* threatens to eviscerate judicial review in a swath of complicated but plainly apolitical contexts.

*Rucho*'s limitations should be apparent on the face of that opinion. *Rucho* addresses the political process itself, namely whether the metastasis of partisan politics

161a

*Appendix F*

has unconstitutionally invaded the drawing of political districts within states. Indeed, the *Rucho* opinion characterizes the issue before it as a request for the Court to reallocate political power between the major parties. *Rucho*, 139 S. Ct. at 2502, 2507, 2508. *Baker* factors aside, *Rucho* surely confronts fundamentally "political" questions in the common sense of the term. Nothing about climate change, however, is inherently political. The majority is correct that redressing climate change will require consideration of scientific, economic, energy, and other policy factors. But that endeavor does not implicate the way we elect representatives, assign governmental powers, or otherwise structure our polity.

Regardless, we do not limit our jurisdiction based on common parlance. Instead, legal and constitutional principles define the ambit of our authority. In the present case, the *Baker* factors provide the relevant guide and further distinguish *Rucho*. As noted above, *Rucho*'s holding that policing partisan gerrymandering is beyond the courts' competence rests heavily on the first *Baker* factor, *i.e.*, the textual and historical delegation of electoral-district drawing to state legislatures. The *Rucho* Court decided it could not discern mathematical standards to navigate a way out of that particular political thicket. It did not, however, hold that mathematical (or scientific) difficulties in creating appropriate standards divest jurisdiction in *any* context. Such an expansive reading of *Rucho* would permit the "political question" exception to swallow the rule.

162a

*Appendix F*

Global warming is certainly an imposing conundrum, but so are diversity in higher education, the intersection between prenatal life and maternal health, the role of religion in civic society, and many other social concerns. *Cf. Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265, 360, 98 S. Ct. 2733, 57 L. Ed. 2d 750 (1978) ("[T]he line between honest and thoughtful appraisal of the effects of past discrimination and paternalistic stereotyping is not so clear[.]"); *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 871, 112 S. Ct. 2791, 120 L. Ed. 2d 674 (1992) (stating that *Roe v. Wade*, 410 U.S. 113, 93 S. Ct. 705, 35 L. Ed. 2d 147 (1973), involved the "difficult question" of determining the "weight to be given [the] state interest" in light of the "strength of the woman's [privacy] interest"); *Am. Legion v. Am. Humanist Ass'n*, 139 S. Ct. 2067, 2094, 204 L. Ed. 2d 452 (2019) (Kavanaugh, J., concurring) (noting that determining the constitutionality of a large cross's presence on public land was "difficult because it represents a clash of genuine and important interests"). These issues may not have been considered within the purview of the judicial branch had the Court imported wholesale *Rucho*'s "manageable standards" analysis even in the absence of *Rucho*'s inherently political underpinnings. Beyond the outcome of the instant case, I fear that the majority's holding strikes a powerful blow to our ability to hear important cases of widespread concern.

## III.

To be sure, unless there is a constitutional violation, courts should allow the democratic and political processes

163a

*Appendix F*

to perform their functions. And while all would now readily agree that the 91 years between the Emancipation Proclamation and the decision in *Brown v. Board* was too long, determining when a court must step in to protect fundamental rights is not an exact science. In this case, my colleagues say that time is "never"; I say it is now.

Were we addressing a matter of social injustice, one might sincerely lament any delay, but take solace that "the arc of the moral universe is long, but it bends towards justice."[15] The denial of an individual, constitutional right—though grievous and harmful—can be corrected in the future, even if it takes 91 years. And that possibility provides hope for future generations.

Where is the hope in today's decision? Plaintiffs' claims are based on science, specifically, an impending point of no return. If plaintiffs' fears, backed by the government's *own studies*, prove true, history will not judge us kindly. When the seas envelop our coastal cities, fires and droughts haunt our interiors, and storms ravage everything between, those remaining will ask: Why did so many do so little?

I would hold that plaintiffs have standing to challenge the government's conduct, have articulated claims under

---

15. Dr. Martin Luther King, Jr., Remaining Awake Through a Great Revolution, Address at the National Cathedral, Washington, D.C. (Mar. 31, 1968). In coining this language, Dr. King was inspired by an 1853 sermon by abolitionist Theodore Parker. *See* Theodore Parker, *Of Justice and the Conscience, in* Ten Sermons of Religion 84-85 (Boston, Crosby, Nichols & Co. 1853).

164a

*Appendix F*

the Constitution, and have presented sufficient evidence to press those claims at trial. I would therefore affirm the district court.

With respect, I dissent.

165a

**APPENDIX G**

139 S. Ct. 452

SUPREME COURT OF THE UNITED STATES

_____

No. 18A410

IN RE UNITED STATES, *et al.*,

*Applicants.*

_____

Filed:   November 2, 2018

_____

**OPINION**

_____

The Government seeks a stay of proceedings in the District Court pending disposition of a petition for a writ of mandamus, No. 18–505, ordering dismissal of the suit. In such circumstances, a stay is warranted if there is (1) "a fair prospect that a majority of the Court will vote to grant mandamus," and (2) "a likelihood that irreparable harm will result from the denial of a stay." *Hollingsworth v. Perry*, 558 U.S. 183, 190, 130 S.Ct. 705, 175 L.Ed.2d 657 (2010) *(per curiam)*. Mandamus may issue when "(1) 'no other adequate means [exist] to attain the relief [the party] desires,' (2) the party's 'right to issuance of the writ is clear and indisputable,' and (3) 'the writ is appropriate under the circumstances.'" *Ibid.* (quoting *Cheney v. United*

166a

*Appendix G*

*States Dist. Court for D.C.,* 542 U.S. 367, 380–381, 124 S.Ct. 2576, 159 L.Ed.2d 459 (2004)). "The traditional use of the writ in aid of appellate jurisdiction . . . has been to confine [the court against which mandamus is sought] to a lawful exercise of its prescribed jurisdiction." *Id.* at 380, 124 S.Ct. 2576 (quoting *Roche v. Evaporated Milk Assn.,* 319 U.S. 21, 26, 63 S.Ct. 938, 87 L.Ed. 1185 (1943)).

The Government contends that these standards are satisfied here because the litigation is beyond the limits of Article III. The Government notes that the suit is based on an assortment of unprecedented legal theories, such as a substantive due process right to certain climate conditions, and an equal protection right to live in the same climate as enjoyed by prior generations. The Government further points out that plaintiffs ask the District Court to create a "national remedial plan" to stabilize the climate and "restore the Earth's energy balance."

The District Court denied the Government's dispositive motions, stating that "[t]his action is of a different order than the typical environmental case. It alleges that defendants' actions and inactions-whether or not they violate any specific statutory duty-have so profoundly damaged our home planet that they threaten plaintiffs' fundamental constitutional rights to life and liberty." *Juliana v. United States,* 217 F.Supp.3d 1224, 1261 (D.Ore.2016). The District Court declined to certify its orders for interlocutory review under 28 U.S.C. § 1292(b) (permitting such review when the district court certifies that its order "involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal . . . may materially

167a

*Appendix G*

advance the ultimate termination of the litigation"). See this Court's order of July 30, 2018, No. 18A65 (noting that the "striking" breadth of plaintiffs' below claims "presents substantial grounds for difference of opinion").

At this time, however, the Government's petition for a writ of mandamus does not have a "fair prospect" of success in this Court because adequate relief may be available in the United States Court of Appeals for the Ninth Circuit. When mandamus relief is available in the court of appeals, pursuit of that option is ordinarily required. See S.Ct. Rule 20.1 (petitioners seeking extraordinary writ must show "that adequate relief cannot be obtained in any other form *or from any other court*" (emphasis added)); S.Ct. Rule 20.3 (mandamus petition must "set out with particularity why the relief sought is not available in any other court"); see also *Ex parte Peru*, 318 U.S. 578, 585, 63 S.Ct. 793, 87 L.Ed. 1014 (1943) (mandamus petition "ordinarily must be made to the intermediate appellate court").

Although the Ninth Circuit has twice denied the Government's request for mandamus relief, it did so without prejudice. And the court's basis for denying relief rested, in large part, on the early stage of the litigation, the likelihood that plaintiffs' claims would narrow as the case progressed, and the possibility of attaining relief through ordinary dispositive motions. Those reasons are, to a large extent, no longer pertinent. The 50–day trial was scheduled to begin on October 29, 2018, and is being held in abeyance only because of the current administrative stay.

168a

*Appendix G*

In light of the foregoing, the application for stay, presented to THE CHIEF JUSTICE and by him referred to the Court, is denied without prejudice. The order heretofore entered by THE CHIEF JUSTICE is vacated.

Justice THOMAS and Justice GORSUCH would grant the application.

169a

## APPENDIX H

139 S. Ct. 1

SUPREME COURT OF THE UNITED STATES

————

No. 18A65

UNITED STATES, *et al.*,

*Applicants*

v.

U.S. DISTRICT COURT FOR
DISTRICT OF OREGON

————

Filed:   July 30, 2018

————

## OPINION

————

The application for stay presented to Justice Kennedy and by him referred to the Court is denied.

The Government's request for relief is premature and is denied without prejudice. The breadth of respondents' claims is striking, however, and the justiciability of those claims presents substantial grounds for difference of opinion. The District Court should take these concerns into account in assessing the burdens of discovery and trial, as well as the desirability of a prompt ruling on the Government's pending dispositive motions.

170a

**APPENDIX I**

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

No. 24-684
D.C. No. 6:15-cv-1517, Portland

IN RE: UNITED STATES OF AMERICA

UNITED STATES OF AMERICA, *et al.*;

*Petitioners,*

v.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON, EUGENE,

*Respondent,*

STATE OF ALABAMA,

*Defendant,*

XIUHTEZCATL TONATIUH M., through his
Guardian Tamara Roske-Martinez, *et al.*;

*Real Parties in Interest,*

THE NATIONAL ASSOCIATION
OF MANUFACTURERS, *et al.*;

*Intervenors,*

_____

171a

*Appendix I*

ENVIRONMENTAL JUSTICE CLINIC –
UNIVERSITY OF MIAMI SCHOOL OF LAW, *et al.*;

*Amici Curiae.*

————

Filed:   July 12, 2024

————

Before: BENNETT, R. NELSON, and MILLER, Circuit
Judges.

Judge Bennett, Judge R. Nelson, and Judge Miller all
voted to deny the motion for rehearing or reconsideration
en banc.  Dkt. No. 27.1.  The motion was distributed to the
full court on June 20, 2024, and no judge requested a vote on
whether to rehear the matter en banc.  Fed. R. App. P. 35.

The motion for rehearing or reconsideration en banc
is DENIED.  The motion to vacate the May 1, 2024 order
and recall the mandate, Dkt. No. 26.1, is also DENIED.

**AFFIDAVIT OF SERVICE**

SUPREME COURT OF THE UNITED STATES

No. 24-___

---------------------------------------------------------------------------------------------------X

IN RE KELSEY CASCADIA ROSE JULIANA, et al.,

*Petitioners*

---------------------------------------------------------------------------------------------------X

STATE OF NEW YORK            )

COUNTY OF NEW YORK            )

I, Mathew Planalp, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

I am retained by Counsel of Record for Petitioners.

That on the 12th day of September, 2024, I served the within *Petition for a Writ of Mandamus* in the above-captioned matter upon:

Elizabeth Prelogar
Solicitor General of the United States
U.S. Department of Justice
Room 5616
950 Pennsylvania Avenue, N.W.
Washington, DC  20530-0001
(202) 514-2217
supremectbriefs@usdoj.gov

by sending three copies of the *Petition for a Writ of Mandamus*, addressed to each individual respectively, through FedEx Overnight Mail. An electronic version was also served by email to each individual.

That on the same date as above, I sent to this Court forty copies of the within *Petition for a Writ of Mandamus* and three hundred dollar filing fee check through the Overnight Next Day Federal Express, postage prepaid. In addition, the documents have been submitted through the Court's electronic filing system.

All parties required to be served have been served.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 12th day of September, 2024.

_Mathew Planalp_

_____

Mathew Planalp

Sworn to and subscribed before me
this 12th day of September, 2024.

**MARIANA BRAYLOVSKIY**
Notary Public State of New York
No. 01BR6004935
Qualified in Richmond County
Commission Expires March 30, 2026

COUNSEL PRESS
(800) 274-3321 • (800) 359-6859
www.counselpress.com

SUPREME COURT OF THE UNITED STATES

No. 24-___

-----------------------------------------------------------------------------------------------------------------X

IN RE KELSEY CASCADIA ROSE JULIANA, et al.,

*Petitioners*

-----------------------------------------------------------------------------------------------------------------X

## CERTIFICATE OF COMPLIANCE

As required by Supreme Court Rule 33.1(h), I certify that the document contains 8,999 words, excluding the parts of the document that are exempted by Supreme Court Rule 33.1(d).

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 12th day of September, 2024.

*Mathew Planalp*

_____
Mathew Planalp


Sworn to and subscribed before me
on this 12th day of September, 2024.

*Mariana Braylovsky*

**MARIANA BRAYLOVSKIY**
Notary Public State of New York
No. 01BR6004935
Qualified in Richmond County
Commission Expires March 30, 2026